Justin T. Quinn
ROBINSON MILLER LLC
110 Edison Place, Suite 302
Newark, NJ 07102
Telephone: (973) 690-5400
Facsimile: (973) 466-2760
jquinn@rwmlegal.com

Steven E. Fineman
(*pro hac vice* application forthcoming)
Michael J. Miarmi
(*pro hac vice* application forthcoming)
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9500
Facsimile: (212) 355-9592
sfineman@lchb.com
mmiarmi@lchb.com

*Attorneys for Plaintiffs*

[Additional counsel listed on signature page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BLACKROCK GLOBAL ALLOCATION FUND, INC.; ACTIVE STOCK FUND E; ALPHA ADVANTAGE 3000 FUND – AGGREGATE; ALPHA ADVANTAGE 500 FUND B – AGGREGATE; ALPHA ADVANTAGE GLOBAL FUND – AGGREGATE; ALPHA TILTS FUND B; BLACKROCK GLOBAL ALLOCATION COLLECTIVE FUND; BLACKROCK MSCI U.S. EQUITY INDEX FUND; BLACKROCK MSCI U.S. EQUITY INDEX NON-LENDABLE FUND; DEVELOPED EX-FOSSIL FUEL INDEX FUND B; EQUITY GROWTH NON-LENDABLE FUND; EQUITY INDEX FUND; EQUITY INDEX FUND B; EQUITY INDEX NON-LENDABLE FUND; EQUITY INDEX NON-LENDABLE FUND B; EQUITY INDEX PLUS FUND A; EQUITY VALUE NON-LENDABLE FUND; FTSE EDHEC-RISK EFFICIENT USA INDEX FUND; FTSE RAFI U.S. 1000 INDEX FUND; GLOBAL ALPHA TILTS FUND A; GLOBAL ALPHA TILTS FUND B; GLOBAL MARKET NEUTRAL FUND B; LARGE CAPITALIZATION CORE TILTS ESG SCREENED FUND B; MSCI U.S. | Civil Action No. _____<br><br><br><br>**JURY TRIAL DEMANDED**<br><br>ECF Case |

EQUITY INDEX FUND B; MSCI U.S. EQUITY INDEX NON-LENDABLE FUND B; MSCI U.S. IMI INDEX FUND B2; MSCI WORLD EQUITY ESG SCREENED INDEX FUND B; RUSSELL 1000 ALPHA TILTS FUND B; RUSSELL 1000 ALPHA TILTS FUND E; RUSSELL 1000 GROWTH FUND; RUSSELL 1000 GROWTH FUND B; RUSSELL 1000 GROWTH NON-LENDABLE FUND; RUSSELL 1000 INDEX FUND; RUSSELL 1000 INDEX NON-LENDABLE FUND; RUSSELL 1000 INDEX NON-LENDABLE FUND B; RUSSELL 1000 INDEX PLUS FUND – JACKET; RUSSELL 1000 VALUE FUND; RUSSELL 1000 VALUE FUND B; RUSSELL 1000 VALUE NON-LENDABLE FUND; RUSSELL 3000 INDEX FUND; RUSSELL 3000 INDEX NON-LENDABLE FUND; RUSSELL MIDCAP INDEX NON-LENDABLE FUND; S&P 500 EQUAL WEIGHT EQUITY INDEX FUND; U.S. EQUITY INDEX ESG SCREENED FUND B; U.S. EQUITY MARKET FUND; U.S. EQUITY MARKET FUND B; U.S. FUNDAMENTAL LARGE CAP GROWTH FUND; U.S. LARGE CAP CARBON EFFICIENT ESG EQUITY INDEX NON-LENDABLE FUND B; WORLD ALPHA TILTS FUND; iSHARES CORE DIVIDEND GROWTH ETF; iSHARES CORE S&P 500 ETF; iSHARES CORE S&P TOTAL U.S. STOCK MARKET ETF; iSHARES CORE S&P U.S. GROWTH ETF; iSHARES CORE S&P U.S. VALUE ETF; iSHARES DOW JONES U.S. ETF; iSHARES EDGE MSCI USA MOMENTUM FACTOR ETF; iSHARES EDGE MSCI USA SIZE FACTOR ETF; iSHARES EDGE MSCI USA VALUE FACTOR ETF; iSHARES GLOBAL HEALTHCARE ETF; iSHARES MORNINGSTAR LARGE-CAP GROWTH ETF; iSHARES MORNINGSTAR MID-CAP ETF; iSHARES MORNINGSTAR MID-CAP VALUE ETF; iSHARES MSCI ACWI ETF; iSHARES MSCI ACWI LOW CARBON TARGET ETF; iSHARES MSCI KOKUSAI ETF; iSHARES MSCI USA EQUAL

WEIGHTED ETF; iSHARES MSCI WORLD
ETF; iSHARES RUSSELL 1000 ETF;
iSHARES RUSSELL 1000 GROWTH ETF;
iSHARES RUSSELL 1000 VALUE ETF;
iSHARES RUSSELL 3000 ETF; iSHARES
RUSSELL MID-CAP ETF; iSHARES
RUSSELL MID-CAP GROWTH ETF;
iSHARES RUSSELL MID-CAP VALUE ETF;
iSHARES S&P 500 GROWTH ETF; iSHARES
S&P 500 VALUE ETF; iSHARES U.S.
HEALTHCARE ETF; iSHARES U.S.
PHARMACEUTICALS ETF; MASTER FOCUS
GROWTH LLC; ACTIVE STOCK MASTER
PORTFOLIO – AGGREGATE; BLACKROCK
CAPITAL APPRECIATION FUND, INC.;
BLACKROCK CAPITAL APPRECIATION
PORTFOLIO OF BLACKROCK SERIES
FUND, INC.; BLACKROCK CAPITAL
APPRECIATION V.I. FUND OF
BLACKROCK VARIABLE SERIES FUND;
BLACKROCK GLOBAL ALLOCATION
PORTFOLIO (INS - SERIES); BLACKROCK
GLOBAL ALLOCATION VARIABLE SERIES
(V.I.) FUND (INS - VAR SER); BLACKROCK
GLOBAL LONG/SHORT EQUITY FUND;
BLACKROCK HEALTH SCIENCES
OPPORTUNITIES PORTFOLIO;
BLACKROCK HEALTH SCIENCES TRUST
(BME); BLACKROCK HIGH EQUITY
INCOME FUND; BLACKROCK MID-CAP
GROWTH EQUITY PORTFOLIO;
BLACKROCK S&P 500 V.I. FUND OF
BLACKROCK VARIABLE SERIES FUNDS,
INC.; iSHARES EDGE MSCI USA SIZE
FACTOR INDEX FUND; iSHARES EDGE
MSCI USA VALUE FACTOR INDEX FUND;
iSHARES MSCI DEVELOPED WORLD
INDEX FUND; iSHARES RUSSELL MID-CAP
INDEX FUND; iSHARES TOTAL U.S. STOCK
MARKET INDEX FUND; LARGE CAP
INDEX MASTER PORTFOLIO; S&P 500
INDEX MASTER PORTFOLIO; AUS
GLOBAL DEVELOPED MARKETS IMI
EQUITY SUB-ACCOUNT; BIF GEM SUB
ACCOUNT; FISSION GEM SUB ACCOUNT;
iSHARES WHOLESALE INTERNATIONAL

EQUITY INDEX FUND; BLACKROCK
GLOBAL ALLOCATION FUND (AUST);
iSHARES US FUNDAMENTAL INDEX ETF;
BLACKROCK CDN RUSSELL 3000 INDEX
NON-TAXABLE FUND; BLACKROCK CDN
US ALPHA TILTS NON-TAXABLE FUND;
BLACKROCK CDN US EQUITY INDEX
FUND; BLACKROCK CDN US EQUITY
INDEX NON-TAXABLE FUND;
BLACKROCK CDN WORLD INDEX FUND;
CDN ACWI ALPHA TILTS FUND; THE 32
CAPITAL MASTER FUND SPC LTD.;
GLOBAL ALPHA OPPORTUNITIES
MASTER FUND LTD. – AGGREGATE;
GLOBAL THEMATIC ALPHA MASTER
FUND LTD. – AGGREGATE; KOKUSAI
EQUITY INDEX FUND; MUGC/B MULTI
ASSET FUND; MULTI-STRATEGY MASTER
FUND LIMITED – AGGREGATE; iSHARES
CORE MSCI WORLD UCITS COMMON
POOL; iSHARES CORE S&P 500 UCITS ETF
– CP; iSHARES CORE S&P 500 UCITS ETF
USD (DIST); iSHARES EDGE MSCI USA
VALUE FACTOR UCITS COMMON POOL;
iSHARES EDGE MSCI WORLD
MOMENTUM FACTOR UCITS ETF
COMMON POOL; iSHARES EDGE MSCI
WORLD VALUE FACTOR UCITS COMMON
POOL; iSHARES MSCI ACWI UCITS ETF
USD (ACC); iSHARES MSCI NORTH
AMERICA UCITS ETF USD (DIST); iSHARES
MSCI USA ISLAMIC UCITS ETF USD (DIST);
iSHARES MSCI USA UCITS ETF USD (ACC);
iSHARES MSCI WORLD CHF HEDGED
UCITS ETF (ACC); iSHARES MSCI WORLD
EUR HEDGED UCITS ETF (ACC); iSHARES
MSCI WORLD GBP HEDGED UCITS ETF
(ACC); iSHARES MSCI WORLD ISLAMIC
UCITS ETF USD (DIST); iSHARES MSCI
WORLD UCITS ETF USD (DIST); iSHARES
S&P 500 CHF HEDGED UCITS ETF (ACC);
iSHARES S&P 500 EUR HEDGED UCITS ETF
(ACC); iSHARES S&P 500 GBP HEDGED
UCITS ETF (ACC); iSHARES S&P 500
HEALTH CARE SECTOR UCITS ETF USD
(ACC); BLACKROCK DIVERSIFIED

DISTRIBUTION FUND – AGGREGATE;
BLACKROCK US EQUITY MILLENNIUM
SUB-FUND; iSHARES DEVELOPED WORLD
EX TOBACCO INDEX FUND (IE); iSHARES
DEVELOPED WORLD INDEX FUND (IE)
COMMON POOL; iSHARES NORTH
AMERICA INDEX FUND (IE); BIPF
BLACKROCK GLOBAL ENHANCED INDEX
FUND; JTSB #65429-0016 GLOBAL EQUITY;
BLK #900002 GLOBAL EQUITY; BGF ESG
MULTI-ASSET FUND – AGGREGATE; BGF
GLOBAL ALLOCATION FUND –
AGGREGATE; BGF GLOBAL DYNAMIC
EQUITY FUND – AGGREGATE; BGF US
GROWTH FUND – AGGREGATE; BGF US
SMALL & MIDCAP OPPORTUNITIES FUND
– AGGREGATE; BGF WORLD
HEALTHSCIENCE FUND – AGGREGATE;
BSF - BLACKROCK GLOBAL LONG/SHORT
EQUITY FUND – AGGREGATE; BSF
BLACKROCK AMERICAS DIVERSIFIED
EQUITY ABSOLUTE RETURN FUND –
AGGREGATE; BSF BLACKROCK
SYSTEMATIC GLOBAL EQUITY FUND –
AGGREGATE; iSHARES NORTH AMERICA
EQUITY INDEX FUND (LU); iSHARES
WORLD EQUITY INDEX FUND (LU);
AQUILA LIFE GLOBAL 3000
FUNDAMENTAL WEIGHTED INDEX FUND;
AQUILA LIFE GLOBAL DEVELOPED
FUNDAMENTAL WEIGHTED INDEX FUND;
AQUILA LIFE MSCI WORLD FUND;
AQUILA LIFE US EQUITY INDEX FUND;
ASCENT LIFE ENHANCED GLOBAL
EQUITY; ASCENT LIFE OVERSEAS EQUITY
FUND; ASCENT LIFE US EQUITY FUND;
ACS US EQUITY TRACKER FUND;
BLACKROCK GLOBAL LONG / SHORT
EQUITY FUND – AGGREGATE;
BLACKROCK US OPPORTUNITIES FUND;
iSHARES NORTH AMERICAN EQUITY
INDEX FUND (UK); and iSHARES US
EQUITY INDEX FUND (UK),

Plaintiffs,

v.

PERRIGO COMPANY PLC; JOSEPH C.
PAPA; and JUDY L. BROWN,

Defendants.

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

**Page**

I.     SUMMARY OF THE ACTION ............................................................. 2

II.    JURISDICTION AND VENUE ........................................................... 9

III.   PARTIES ........................................................................................... 9

     A.     Plaintiffs ................................................................................. 9

     B.     Defendants ........................................................................... 17

     1.     Perrigo ................................................................................. 17

     2.     Individual Defendants .......................................................... 20

IV.   DEFENDANTS REPEATEDLY THWARTED MYLANS'S ATTEMPTS
       TO ACQUIRE PERRIGO ............................................................... 20

V.     DEFENDANTS DEFRAUDED INVESTORS REGARDING
       PERRIGO'S INTEGRATION OF OMEGA AND OMEGA'S
       FINANCIAL BENEFITS TO PERRIGO ........................................ 24

     A.     Defendants Repeatedly Touted the Purportedly Successful
            Integration of Omega as Well as Omega's Impact on Perrigo's
            Financial Results and Prospects. ......................................... 24

     B.     Through Their Numerous Representations to Investors Concerning
            Omega, Defendants Concealed Serious and Far-Reaching
            Integration Problems, Which Defendants Knew About or
            Recklessly Disregarded. ....................................................... 40

VI.   DEFENDANTS DEFRAUDED INVESTORS REGARDING
       PERRIGO'S PARTICIPATION IN ANTICOMPETITIVE DRUG
       PRICING AND THE COMPANY'S EXPOSURE TO PRICING
       PRESSURES. .................................................................................. 47

     A.     Defendants Made Numerous Statements to Investors Regarding the
            Pricing of Perrigo's Drugs and the Generic Pharmaceuticals
            Market. ................................................................................. 48

     B.     Defendants Concealed from Investors that Perrigo Was Colluding
            with Other Pharmaceutical Companies to Artificially Inflate the
            Price of Numerous Drugs. ..................................................... 59

     1.     Desonide ............................................................................... 64

     2.     Econazole .............................................................................. 66

     3.     Permethrin ............................................................................ 67

     4.     Tretinoin ............................................................................... 67

# TABLE OF CONTENTS
## (continued)

Page

5.    Clobetasol ............................................................. 68

6.    Halobetasol propionate .......................................... 69

C.    Defendants Also Concealed from Investors that Perrigo Was Not Insulated from Pricing Pressures Due to Competition in the Generic Pharmaceutical Industry. ............................................ 69

1.    The FDA's accelerated approvals for new generic drugs reached record levels in 2015. ............................................. 70

2.    Defendants knew or recklessly disregarded that the pricing levels for Perrigo's U.S. generic drugs were unsustainable. .............. 74

VII.    DEFENDANTS ISSUED FALSE OR MISLEADING FINANCIAL GUIDANCE ............................................................. 76

VIII.    DEFENDANTS DEFRAUDED INVESTORS REGARDING PERRIGO'S ORGANIC GROWTH ................................. 78

A.    Defendants Made Numerous Representations to Investors Regarding Perrigo's Organic Growth. ................................ 78

B.    Through Their Numerous Misrepresentations Regarding Organic Growth, Defendants Concealed the Truth Regarding Perrigo's Financial Situation and Prospects. ................................. 92

IX.    DEFENDANTS DEFEAUDED INVESTORS REGARDING THE VALUE OF PERRIGO'S LARGESST ASSET, THE TYSABRI ROYALTY STREAM .................................................. 94

A.    Defendants Repeatedly Touted the Tysabri Royalty Stream as an Important Component of Perrigo's Financial Strength and Prospects. .......................................................... 94

B.    The Value of the Tysabri Royalty Stream Was Far Less Than What Defendants Represented to Investors. ............................. 97

1.    Applicable GAAP Requirements ............................. 97

2.    Defendants' accounting for the Tysabri royalty stream admittedly violated GAAP. .................................................. 100

3.    Defendants used GAAP violations to hide billions of dollars of deterioration in the Tysabri royalty stream's fair value. ........ 102

X.    THE PREVIOUSLY CONCEALED FACTS WERE ULTIMATELY REVEALED TO THE MARKET .................................. 105

XI.    ADDITIONAL ALLEGATIONS OF SCIENTER .............. 113

# TABLE OF CONTENTS
## (continued)

Page

XII.    PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF RELIANCE ...... 121

XIII.   CLAIMS FOR RELIEF ................................................................. 123

COUNT I ................................................................................................. 123

FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT  AND SEC RULE 10b-5 (AGAINST ALL DEFENDANTS) ....................... 123

COUNT II ................................................................................................ 125

FOR VIOLATIONS OF SECTION 14(e) OF THE EXCHANGE ACT  (AGAINST ALL DEFENDANTS) ....................................................... 125

COUNT III ............................................................................................... 126

FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT  (AGAINST DEFENDANTS PAPA AND BROWN) ......................... 126

PRAYER FOR RELIEF .......................................................................... 127

JURY DEMAND ..................................................................................... 127

Plaintiffs BlackRock Funds and Accounts (defined below) bring this action under the federal securities laws to recover damages caused by false and misleading statements made by Defendants Perrigo Company plc ("Perrigo" or the "Company"), its former Chief Executive Officer Joseph C. Papa, and its former Chief Financial Officer Judy L. Brown (collectively, "Defendants") between April 21, 2015 and May 3, 2017, inclusive (the "Relevant Period"). Specifically, Plaintiffs assert (1) claims against all Defendants under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated by the United States Securities and Exchange Commission ("SEC"), arising from Defendants' false or misleading statements in connection with Plaintiffs' purchases of Perrigo stock during the Relevant Period; (2) claims against all Defendants under Section 14(e) of the Exchange Act by Plaintiffs who held Perrigo stock as of November 13, 2015, arising from Defendants' false or misleading statements in connection with the tender offer ("Tender Offer") by Mylan, N.V. ("Mylan") to acquire Perrigo; and (3) claims against Papa and Brown under Section 20(a) of the Exchange Act based on their status as "controlling persons" of Perrigo during the Relevant Period.[1]

Plaintiffs' allegations are informed by, among other things, (1) SEC filings by Perrigo; (2) Perrigo press releases; (3) transcripts of Perrigo public conference calls; (4) publicly available media articles concerning Perrigo; (5) securities analysts' reports concerning Perrigo; and (6) Plaintiffs' counsel's review of filings in *Roofers' Pension Fund v. Papa*, No. 2:16-cv-02805-MCA-LDW (D.N.J.) (the "Securities Class Action"), and related direct actions pending in this

---

[1] In accordance with Local Rule 10.1, Plaintiffs state they are investment vehicles managed by affiliates of BlackRock, Inc., which maintains its headquarters at 55 East 52nd Street, New York, NY 10055.  Additionally, on information and belief, (i) Defendant Perrigo Company plc maintains its headquarters at The Sharp Building, Hogan Place, Dublin 2, Ireland D02 TY74; (ii) Defendant Joseph C. Papa resides at 1 Deer Hill Road, Chester, NJ 07930; and (iii) Defendant Judy L. Brown resides at 3833 Hayvenhurst Drive, Encino, CA 91436.

District.[2]  Plaintiffs believe substantial additional evidentiary support will exist for the

allegations set forth in this Complaint after a reasonable opportunity for discovery.

## I.    SUMMARY OF THE ACTION

1.    Both throughout the Relevant Period and specifically in connection with the

Tender Offer, Defendants made a series of false or misleading statements to investors concerning

four critical aspects of Perrigo's business: (i) the integration and overvaluation of Perrigo's

largest acquisition, Omega Pharma NV ("Omega"); (ii) collusive pricing with respect to

numerous generic drugs, which is now the focus of investigations by Congress, the Antitrust

Division of the United States Department of Justice ("DOJ"), and 45 state attorneys general

("AGs"), as well as Perrigo's ability to sustain generic-drug revenues notwithstanding serious

pricing pressures due to competition in the industry; (iii) Perrigo's organic growth; and (iv) the

deteriorating value of Perrigo's largest financial asset, a royalty stream for the drug Tysabri.[3]

2.    *First*, Defendants repeatedly touted the integration and prospects of Omega,

falsely or misleadingly representing to investors the status of the integration and the key role

Omega would play in Perrigo's growth.  Indeed, following the expiration of Mylan's Tender

Offer, Perrigo effectively conceded that Defendants had misrepresented Omega's integration and

---

[2] *See, e.g.*, *Sculptor Master Fund, Ltd. (f/k/a OZ Master Fund, Ltd.), et al. v. Perrigo Co. plc, et al.*, 2:19-cv-04900-MCA-LDW (D.N.J.); *Burlington Loan Mgmt. DAC (f/k/a Burlington Loan Mgmt. Ltd.) v. Perrigo Co., plc, et al.*, No. 2:20-cv-01484-MCA-LDW (D.N.J.); *Kuwait Inv. Auth., et al. v. Perrigo Co. plc*, No. 2:20-cv-03431-MCA-LDW (D.N.J.).  Plaintiffs refer below to the Amended Complaint for Violation of the Federal Securities Laws filed in the Securities Class Action (Dkt. 89) ("Class Complaint"), as well as the complaints in *Sculptor Master Fund* (Dkt. 1) ("Sculptor Master Fund Complaint") and *Kuwait Investment Authority* (Dkt. 1) ("Kuwait Complaint").

[3] In its July 27, 2018 decision granting in part and denying in part defendants' motion to dismiss in the Securities Class Action, the Court dismissed, without prejudice, claims to the extent they were based on alleged misrepresentations regarding Perrigo's organic growth or the value of the Tysabri royalty stream.  Plaintiffs include those claims here to preserve them.

prospects.  The concealed problems with Omega were so profound that Perrigo ultimately took impairment charges totaling approximately $2.3 billion, or about half the total purchase price for Omega.

3.      Further, and as demonstrated through the accounts of numerous former employees of Perrigo and Omega (among other sources), Defendants emphasized synergies with Omega as central to Perrigo's growth claims, even though Papa and Brown knew or recklessly disregarded that there were deep problems with the Omega integration and the underlying assets, including (a) a decentralized structure, disparate information technologies ("IT") and management resistance at Omega that impeded integration; (b) regulatory hurdles to achieving claimed synergies; and (c) weak Omega sales.

4.      *Second*, instead of engaging in price competition that usually drives generic drug prices downward toward the cost of production, Perrigo and other generics manufacturers—beginning in 2013 and continuing through the Relevant Period—colluded to raise prices for many generic products by ***300% to 500%*** or more.  In particular, Perrigo colluded with its competitors to fix the prices of clobetasol, desonide, econazole, halobetasol, permethrin and tretinoin, among other generic drugs.  Those price hikes allowed Perrigo to reap hundreds of millions of dollars in collusive revenues.

5.      The facts regarding Perrigo's participation in collusive efforts to fix the prices of generic drugs are compelling.  The drugs' prices moved in near-perfect unison and increased suddenly and simultaneously at each drug company.  And those increases were exponential. Further, Perrigo and its competitors attended numerous industry conferences, which were followed by abrupt and unprecedented spikes in Perrigo's prices closely timed with spikes in Perrigo's competitors' prices.  In April and May 2013, for example, shortly after an industry

conference attended by executives from Perrigo and its competitor Taro Pharmaceuticals ("Taro"), both companies suddenly increased their prices for generic desonide from just over $0.50 per gram to almost $4.50 per gram.

6.    There is no non-collusive explanation for Perrigo's and its co-conspirators' sudden, synchronized price increases.  There was no supply shortage, production problem, or sudden increase in demand for those drugs during the pertinent period.  Nor were the price increases precipitated by competitors leaving the market.  The markets for those drugs are, moreover, highly susceptible to collusion because they are dominated by only a few companies, rendering collusion easy.  Additionally, (i) demand for the drugs was inelastic, with increases or miniscule reductions in the quantities sold even after massive and sudden price hikes; (ii) as generics with price constituting the only distinguishing factor for purchasers, the drugs were commodity-like products; (iii) the drugs had no viable substitutes; (iv) the drugs' markets had high barriers to entry; and (v) information sharing and price discovery were common.  Further, the drug prices did not decrease following the initial price increases, as would be expected if the sudden price increases reflected temporary supply shortages, cost increases, or other benign market conditions.

7.    Perrigo's extraordinary and historic price increases for those generic drugs would have been against the Company's economic self-interest absent a price-fixing scheme.  Because generic drugs are commodity products, absent price collusion, if one manufacturer raises the price of a given drug, its competitors will seek to increase their own market share by selling the drug at lower prices.  Indeed, under the "maximum allowable cost" pricing regime that governs much of the U.S. generic pharmaceutical market, drug-cost reimbursements from insurance companies are capped at a certain price, and if a drug manufacturer raises its price above that cap

while its competitors do not, the reimbursements for the higher-priced drug will cease.  It would therefore not be in any drug manufacturer's interest to increase the prices of its generic drugs unless the other manufacturers had collusively agreed to do the same.

8.     The ongoing governmental investigations into generic drug pricing have begun to reveal a widespread, well-coordinated, and long-running series of schemes to fix prices for a number of generic drugs.  They have also revealed that collusion on generic drug prices was centered around meetings of trade associations, such as the Generic Pharmaceutical Association, and other industry gatherings attended by senior Perrigo executives.

9.     Throughout the Relevant Period, Defendants fraudulently concealed their illegal conduct; misrepresented the generic drug market's competitiveness; misled investors about the true cause of Perrigo's growth, revenues, profits, and improved product pricing; and falsely claimed competitive advantages based on expertise and execution, when in reality they were derived from illegal price-fixing.  As a result, Perrigo's public statements were materially false or misleading throughout the Relevant Period.

10.     Further, while engaging in price-fixing with respect to numerous drugs, Defendants falsely or misleadingly assured investors that Perrigo could withstand pricing pressures due to competition in the generic-drug industry.  Indeed, those pricing pressures gave Defendants a clear motive to engage in the anticompetitive collusion that allowed them to record artificially inflated revenues for the price-fixed drugs.

11.     As Perrigo was failing to get Omega off the ground, increased competition and regulatory scrutiny in the U.S. generic drug industry were major causes of concern for investors and the subject of numerous questions posed to Defendants during the Relevant Period.  In each instance, Defendants denied Perrigo was feeling the impact of any "pricing pressures,"

repeatedly assuring the market that the Company could withstand any such pressures by keeping pricing "flat to up slightly."  Brown even told the market on October 22, 2015—just three weeks before the deadline for Perrigo shareholders to accept Mylan's Tender Offer—that "nearly all of [Perrigo's] revenues are *insulated from the current pricing drama* you see playing out in the pharmaceutical industry today."[4]

12.     In fact, beginning before the Relevant Period, the United States Food and Drug Administration ("FDA"), faced with a significant backlog of generic drug applications and political pressure to lower the price of generic drugs, accelerated its approvals of new generics to historic levels.  That led to an influx of new competitors and approved products in the generic drug markets, including products in direct competition with those owned by Perrigo, resulting in significant downward pricing and unprecedented levels of newly approved generic drugs competing with existing brands (and previously approved generics).

13.     The influx was no surprise to Perrigo.  According to several former Perrigo employees who worked in the Company's Generic Rx (sometimes referred to simply as "Rx") segment and are referenced in complaints filed in individual actions pending in this District, Perrigo specifically kept track of what their rivals were doing in the new product development area.  As a result, Perrigo knew which drugs the other generic pharmaceutical companies were bringing to the market to compete with existing Perrigo products, and closely tracked the FDA's submission, review, and approval process.

14.     Defendants accordingly knew or recklessly disregarded that far from being "insulated from" pricing pressures, the elevated pricing levels for Perrigo's generic drugs were

---

[4] Unless otherwise indicated, all emphasis in this Complaint has been added.

unsustainable as new drug approvals accelerated at an unabated pace throughout 2015. Yet, in an attempt to defeat the Mylan Tender Offer, Defendants concealed that fact from investors.

15.     *Third*, recognizing that organic growth—i.e., Perrigo's ability to grow other than by acquisition—was important to investors, Defendants falsely or misleadingly claimed 7-8% average historical organic growth during Papa's tenure as CEO, while in fact organic growth (which the Company did not regularly report) had slowed significantly during the six quarters immediately preceding the Relevant Period, and was even negative during part of that time. And in the second calendar year quarter of 2015, organic growth turned negative, for both the quarter and the trailing twelve months.[5]

16.     Additionally, to persuade Perrigo shareholders to reject the Tender Offer, Defendants issued an artificially inflated profit forecast leading investors to expect 2016 earnings of $9.30-$9.85, which Perrigo later conceded was not "realistic." Further, Defendants misled investors regarding Perrigo's organic growth rate and prospects, the Company's purported success in achieving synergies with Omega—despite knowing of or recklessly disregarding significant problems with the integration—and Perrigo's revenues and ability to maintain revenue levels, which were driven by massive price increases made possible by the Company's collusion with other pharmaceutical companies.

17.     *Fourth*, throughout the Relevant Period Defendants falsely presented an inflated value for Perrigo's largest financial asset—its Tysabri royalty stream—and misclassified it as an "intangible asset" in violation of Generally Accepted Accounting Principles ("GAAP"), which

---

[5] Perrigo calculated "organic growth" as the year-over-year change in net sales after deducting sales attributable to acquisitions made in the 12 months preceding the given period. *See, e.g.*, Perrigo October 22, 2015 Earnings Release, Table III.   Organic growth generally refers to growth by increased output, expanded customer base, or increased demand and sales, rather than by acquisition.

mandated that the Company treat the royalty stream as a "financial asset" and thus mark its fair value to market at least each quarter. Perrigo has since admitted that its repeated assertions that the Tysabri royalty stream was worth $5.8 billion, and that the Company accounted for the royalty stream in accordance with GAAP, were false.

18.     Through its GAAP violations, which Perrigo's then-CFO Judy Brown oversaw, the Company concealed billions of dollars in value deterioration from investors. Perrigo ultimately was required to restate earnings and conceded that its Relevant Period balance sheets should have recorded billions of dollars of deteriorating fair values.

19.     In addition to artificially inflating the price of Perrigo stock throughout the Relevant Period, Defendants' misstatements and omissions succeeded in defeating the Tender Offer. As a result, Plaintiffs and other Perrigo shareholders were forced to hold Perrigo stock valued at $140.54 per share on November 13, 2015 (as of when the market opened), when they could have received a value of $174.36 per each Perrigo share (based on the Mylan share price at the close on November 12, 2015), plus cash from Mylan, had the Tender Offer succeeded.

20.     The truth ultimately came to light through a series of disclosures from February 18, 2016 to May 2, 2017, causing the value of Perrigo stock to decline, which caused damages to Plaintiffs and other investors. In total, Defendants' false and misleading statements caused Perrigo's stock to fall more than 62% and deprived investors of the opportunity to fairly evaluate and participate in the Tender Offer. While investors suffered, Papa and Brown were awarded millions of dollars in special bonuses for their roles in defeating the Tender Offer.

21.     Plaintiffs now seek to recover the significant damages they incurred due to Defendants' fraud.

## II.      JURISDICTION AND VENUE

22.      Plaintiffs' claims arise under Sections 10(b), 14(e), and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78n(e), and 78t(a), respectively), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5).  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, as well as Section 27 of the Exchange Act (15 U.S.C. § 78aa).

23.      Venue is proper in this District under Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Many of the acts and conduct constituting the violations of law asserted in this Complaint occurred in this District.  Defendant Papa resides in this District and maintained a residence here throughout the Relevant Period.  Additionally, Perrigo maintains offices and operations in Piscataway, New Jersey, and Parsippany, New Jersey, which are situated within this District.  In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.      PARTIES

### A.      Plaintiffs

24.      BlackRock, Inc. ("BlackRock") is a multinational investment management corporation based in New York, New York.  BlackRock provides investment management and advisory services for institutional and retail clients, including governments, companies, foundations, and millions of individuals.  The following investment funds and accounts that are managed and/or advised by BlackRock (collectively, "BlackRock Funds and Accounts") are plaintiffs in this action:

1)  BlackRock Global Allocation Fund, Inc.

2)  Active Stock Fund E

3)  Alpha Advantage 3000 Fund - Aggregate

4) Alpha Advantage 500 Fund B - Aggregate

5) Alpha Advantage Global Fund - Aggregate

6) Alpha Tilts Fund B

7) BlackRock Global Allocation Collective Fund

8) BlackRock MSCI U.S. Equity Index Fund

9) BlackRock MSCI U.S. Equity Index Non-Lendable Fund

10) Developed ex-Fossil Fuel Index Fund B

11) Equity Growth Non-Lendable Fund

12) Equity Index Fund

13) Equity Index Fund B

14) Equity Index Non-Lendable Fund

15) Equity Index Non-Lendable Fund B

16) Equity Index Plus Fund A

17) Equity Value Non-Lendable Fund

18) FTSE EDHEC-Risk Efficient USA Index Fund

19) FTSE RAFI U.S. 1000 Index Fund

20) Global Alpha Tilts Fund A

21) Global Alpha Tilts Fund B

22) Global Market Neutral Fund B

23) Large Capitalization Core Tilts ESG Screened Fund B

24) MSCI U.S. Equity Index Fund B

25) MSCI U.S. Equity Index Non-Lendable Fund B

26) MSCI U.S. IMI Index Fund B2

27) MSCI World Equity ESG Screened Index Fund B

28) Russell 1000 Alpha Tilts Fund B

29) Russell 1000 Alpha Tilts Fund E

30) Russell 1000 Growth Fund

31) Russell 1000 Growth Fund B

32) Russell 1000 Growth Non-Lendable Fund

33) Russell 1000 Index Fund

34) Russell 1000 Index Non-Lendable Fund

35) Russell 1000 Index Non-Lendable Fund B

36) Russell 1000 Index Plus Fund - Jacket

37) Russell 1000 Value Fund

38) Russell 1000 Value Fund B

39) Russell 1000 Value Non-Lendable Fund

40) Russell 3000 Index Fund

41) Russell 3000 Index Non-Lendable Fund

42) Russell MidCap Index Non-Lendable Fund

43) S&P 500 Equal Weight Equity Index Fund

44) U.S. Equity Index ESG Screened Fund B

45) U.S. Equity Market Fund

46) U.S. Equity Market Fund B

47) U.S. Fundamental Large Cap Growth Fund

48) U.S. Large Cap Carbon Efficient ESG Equity Index Non-Lendable Fund B

49) World Alpha Tilts Fund

50) iShares Core Dividend Growth ETF

51) iShares Core S&P 500 ETF

52) iShares Core S&P Total U.S. Stock Market ETF

53) iShares Core S&P U.S. Growth ETF

54) iShares Core S&P U.S. Value ETF

55) iShares Dow Jones U.S. ETF

56) iShares Edge MSCI USA Momentum Factor ETF

57) iShares Edge MSCI USA Size Factor ETF

58) iShares Edge MSCI USA Value Factor ETF

59) iShares Global Healthcare ETF

60) iShares Morningstar Large-Cap Growth ETF

61) iShares Morningstar Mid-Cap ETF

62) iShares Morningstar Mid-Cap Value ETF

63) iShares MSCI ACWI ETF

64) iShares MSCI ACWI Low Carbon Target ETF

65) iShares MSCI Kokusai ETF

66) iShares MSCI USA Equal Weighted ETF

67) iShares MSCI World ETF

68) iShares Russell 1000 ETF

69) iShares Russell 1000 Growth ETF

70) iShares Russell 1000 Value ETF

71) iShares Russell 3000 ETF

72) iShares Russell Mid-Cap ETF

73) iShares Russell Mid-Cap Growth ETF

74) iShares Russell Mid-Cap Value ETF

75) iShares S&P 500 Growth ETF

76) iShares S&P 500 Value ETF

77) iShares U.S. Healthcare ETF

78) iShares U.S. Pharmaceuticals ETF

79) Master Focus Growth LLC

80) Active Stock Master Portfolio - Aggregate

81) BlackRock Capital Appreciation Fund, Inc.

82) BlackRock Capital Appreciation Portfolio of BlackRock Series Fund, Inc.

83) BlackRock Capital Appreciation V.I. Fund of BlackRock Variable Series Fund

84) BlackRock Global Allocation Portfolio (Ins - Series)

85) BlackRock Global Allocation Variable Series (V.I.) Fund (Ins - Var Ser)

86) BlackRock Global Long/Short Equity Fund

87) BlackRock Health Sciences Opportunities Portfolio

88) BlackRock Health Sciences Trust (BME)

89) BlackRock High Equity Income Fund

90) BlackRock Mid-Cap Growth Equity Portfolio

91) BlackRock S&P 500 V.I. Fund of BlackRock Variable Series Funds, Inc.

92) iShares Edge MSCI USA Size Factor Index Fund

93) iShares Edge MSCI USA Value Factor Index Fund

94) iShares MSCI Developed World Index Fund

95) iShares Russell Mid-Cap Index Fund

96) iShares Total U.S. Stock Market Index Fund

97) Large Cap Index Master Portfolio

98) S&P 500 Index Master Portfolio

99) AUS Global Developed Markets IMI Equity Sub-account

100)     BIF GEM Sub Account

101)     Fission GEM Sub Account

102)     iShares Wholesale International Equity Index Fund

103)     BlackRock Global Allocation Fund (Aust)

104)     iShares US Fundamental Index ETF

105)     BlackRock CDN Russell 3000 Index Non-Taxable Fund

106)     BlackRock CDN US Alpha Tilts Non-Taxable Fund

107)     BlackRock CDN US Equity Index Fund

108)     BlackRock CDN US Equity Index Non-Taxable Fund

109)     BlackRock CDN World Index Fund

110)     CDN ACWI Alpha Tilts Fund

111)     The 32 Capital Master Fund SPC Ltd.

112)     Global Alpha Opportunities Master Fund Ltd. - Aggregate

113)     Global Thematic Alpha Master Fund Ltd. - Aggregate

114)     Kokusai Equity Index Fund

115)     MUGC/B Multi Asset Fund

116)     Multi-Strategy Master Fund Limited - Aggregate

117)     iShares Core MSCI World UCITS Common Pool

118)     iShares Core S&P 500 UCITS ETF – CP

119)    iShares Core S&P 500 UCITS ETF USD (Dist)

120)    iShares Edge MSCI USA Value Factor UCITS Common Pool

121)    iShares Edge MSCI World Momentum Factor UCITS ETF Common Pool

122)    iShares Edge MSCI World Value Factor UCITS Common Pool

123)    iShares MSCI ACWI UCITS ETF USD (Acc)

124)    iShares MSCI North America UCITS ETF USD (Dist)

125)    iShares MSCI USA Islamic UCITS ETF USD (Dist)

126)    iShares MSCI USA UCITS ETF USD (Acc)

127)    iShares MSCI World CHF Hedged UCITS ETF (Acc)

128)    iShares MSCI World EUR Hedged UCITS ETF (Acc)

129)    iShares MSCI World GBP Hedged UCITS ETF (Acc)

130)    iShares MSCI World Islamic UCITS ETF USD (Dist)

131)    iShares MSCI World UCITS ETF USD (Dist)

132)    iShares S&P 500 CHF Hedged UCITS ETF (Acc)

133)    iShares S&P 500 EUR Hedged UCITS ETF (Acc)

134)    iShares S&P 500 GBP Hedged UCITS ETF (Acc)

135)    iShares S&P 500 Health Care Sector UCITS ETF USD (Acc)

136)    BlackRock Diversified Distribution Fund - Aggregate

137)    BlackRock US Equity Millennium Sub-Fund

138)    iShares Developed World ex Tobacco Index Fund (IE)

139)    iShares Developed World Index Fund (IE) Common Pool

140)    iShares North America Index Fund (IE)

141)    BIPF BlackRock Global Enhanced Index Fund

142)    JTSB #65429-0016 Global Equity

143)    BLK #900002 Global Equity

144)    BGF ESG Multi-Asset Fund - Aggregate

145)    BGF Global Allocation Fund - Aggregate

146)    BGF Global Dynamic Equity Fund - Aggregate

147)    BGF US Growth Fund - Aggregate

148)    BGF US Small & MidCap Opportunities Fund - Aggregate

149)    BGF World Healthscience Fund - Aggregate

150)    BSF - BlackRock Global Long/Short Equity Fund - Aggregate

151)    BSF BlackRock Americas Diversified Equity Absolute Return Fund - Aggregate

152)    BSF BlackRock Systematic Global Equity Fund - Aggregate

153)    iShares North America Equity Index Fund (LU)

154)    iShares World Equity Index Fund (LU)

155)    Aquila Life Global 3000 Fundamental Weighted Index Fund

156)    Aquila Life Global Developed Fundamental Weighted Index Fund

157)    Aquila Life MSCI World Fund

158)    Aquila Life US Equity Index Fund

159)    Ascent Life Enhanced Global Equity

160)    Ascent Life Overseas Equity Fund

161)    Ascent Life US Equity Fund

162)    ACS US Equity Tracker Fund

163)    BlackRock Global Long / Short Equity Fund - Aggregate

164)    BlackRock US Opportunities Fund

165)       iShares North American Equity Index Fund (UK)

166)       iShares US Equity Index Fund (UK)

25.     Plaintiffs purchased Perrigo common stock during the Relevant Period, and most Plaintiffs held shares of Perrigo common stock as of November 13, 2015.

**B.     Defendants**

**1.     Perrigo**

26.     Defendant **Perrigo Company plc** is the world's largest manufacturer of over-the-counter ("OTC") healthcare products.  Perrigo is also a significant supplier of generic pharmaceuticals, infant nutrition products, branded pharmaceuticals in Europe (through its Omega acquisition), and animal health products.

27.     Defendant Perrigo is the successor to Perrigo Company ("Former Perrigo"), a Michigan corporation that began in 1887 as a seller of packaged goods and was based for most of its existence in Allegan, Michigan.  After Papa became CEO and Chairman of Perrigo's Board in October 2006, the Company transitioned from its prior iteration as a slow-growing manufacturer and distributor of healthcare products that focused on store brand versions of popular OTC products such as analgesics and cough syrup to a serial acquirer of healthcare companies.  Through those acquisitions, Former Perrigo both grew its core OTC business and expanded into markets like generic prescription drugs, infant nutrition, and animal healthcare.

28.     At all periods relevant to the allegations in this Complaint, Perrigo had significant operations in New Jersey, including a 14,000-square foot research and development facility in Piscataway Township.  Perrigo describes its Piscataway facility as a "strategic location in the hub of New Jersey's pharmaceutical industry" that "gives Perrigo a footprint in the northeast." The Company also operates a research and development facility in Parsippany, New Jersey.

Perrigo's common stock is dual-listed on the New York Stock Exchange ("NYSE") (symbol: PRGO) and Tel Aviv Stock Exchange ("TASE") (symbol: PRGO).

29.     Throughout most of the Relevant Period, Perrigo segmented its results into five major divisions:

- Branded Consumer Healthcare ("BCH" or "Omega Segment"): BCH contained the newly acquired Omega businesses, as well as a German supplement brand called Yokebe, purchased in 2015, and additional European OTC brands purchased from GlaxoSmithKline in 2015. As of June 27, 2015, the BCH unit marketed approximately 5,200 branded OTC products in Europe, focusing on natural health, vitamins, supplements, and minerals, cough and cold, allergy, skin care, weight management, pregnancy and fertility products, sleep aids, and anti-parasitic products such as lice treatments. During the six months ended December 31, 2015, the Omega Segment represented approximately 23% of consolidated net sales.

- Consumer Healthcare ("CHC"): Perrigo's CHC unit marketed primarily unbranded and store brand OTC analgesics, cough syrups, smoking cessation products, gastrointestinal remedies, supplements, and animal healthcare products. This segment also included nutritional products, such as infant formula, which had previously been reported separately, and its Israeli-based pharmaceutical and diagnostic business, which had previously been reported as "Other." According to Perrigo's SEC filings, the CHC division marketed over 4,900 products during the Relevant Period. During the six months ended December 31, 2015, the CHC segment represented approximately 50% of consolidated net sales.

- Generic Rx: Perrigo's Rx unit offered approximately 800 generic prescription drug products (including otherwise OTC drugs that are sold through the prescription channel to obtain reimbursement, which Perrigo calls ORx). The Rx unit focused on "extended topical" treatments, such as creams, ointments, gels, sprays, foams, powders, suppositories, and shampoos. During the six months ended December 31, 2015, the Rx segment represented approximately 20% of Perrigo's consolidated net sales.

- Specialty Sciences: Specialty Sciences consisted of the royalty stream Perrigo received from Biogen for Biogen's sales of Tysabri. Perrigo was entitled to a royalty rate of 18% of annual worldwide sales of Tysabri up to $2.0 billion, and 25% of sales above $2.0 billion. During the six months ended December 31, 2015, Specialty Sciences was reported to represent approximately 6% of Perrigo's consolidated net sales.

- Other:  This division includes Perrigo's Active Pharmaceutical Ingredient ("API") business, which manufactures active ingredients sold to other healthcare companies.  While Perrigo does not separately report a percentage of total sales figure for the "Other" segment, deducting the percentages represented by the remaining segments shows this segment contributed approximately 3% to the Company's net sales in the six months ended December 31, 2015.

30.    In 2013, Defendant Perrigo became the successor of Former Perrigo as the result of an "inversion" transaction with Elan, an Irish corporation, which closed on December 18, 2013.  That transaction resulted in the formation of a new Irish corporation, Perrigo Company plc, which was 71% owned by shareholders of Former Perrigo and 29% owned by shareholders of Elan.

31.    The inversion structure Perrigo utilized "refers to a legal maneuver in which a company declares that its U.S. operations are owned by its foreign subsidiary, not the other way around, and uses this role reversal to shift reported profits out of American jurisdiction to someplace with a lower tax rate."[6]  Through the inversion, Perrigo also acquired Elan's major asset, a financial interest in the royalty stream for Tysabri, a blockbuster treatment for multiple sclerosis manufactured and sold by Biogen Inc. (formerly known as Biogen Idec Corporation).  Perrigo began to report that royalty interest as a separate reporting unit known as "Specialty Sciences" in its periodic report.

32.    Although the inversion transaction made Perrigo an Irish corporation and provided a financial asset—the Tysabri royalty stream—Perrigo gained no meaningful operations.  Just like Former Perrigo, Defendant Perrigo had virtually no presence in continental

---

[6] Paul Krugman, *Corporate Artful Dodgers*, N.Y. TIMES (July 27, 2014), https://www.nytimes.com/2014/07/28/opinion/paul-krugman-tax-avoidance-du-jour-inversion.html.

Europe.  After the inversion transaction, Perrigo began to seek a European foothold, which it found in Omega, now included as one of Perrigo's five divisions.

33.     Perrigo attempted to expand into Europe in late 2014 by making its largest acquisition ever.  On November 6, 2014, Perrigo announced it would acquire Omega for €3.6 billion, or $4.5 billion.  The acquisition closed on March 30, 2015, just before the beginning of the Relevant Period.  Omega was one of the largest OTC healthcare companies in Europe and had a commercial presence in 35 countries.  Like Perrigo, Omega operated as a "roll-up," growing primarily through acquisition.  But unlike Perrigo, Omega focused on name-brand products rather than store-brand or unbranded products.

### 2.     Individual Defendants

34.     Defendant **Joseph C. Papa** served as Perrigo's President and CEO from October 2006 until April 25, 2016.  Papa also served as a director of Perrigo between November 2006 and April 2016.  Papa is currently President and CEO of Bausch Health Companies Inc. (f/k/a Valeant Pharmaceuticals International, Inc.) ("Valeant").

35.     Defendant **Judy L. Brown** served as Perrigo's CFO from July 2006 until her resignation on February 27, 2017.

36.     Defendants Papa and Brown are sometimes collectively referred to in this Complaint as the "Individual Defendants."

## IV.   DEFENDANTS REPEATEDLY THWARTED MYLANS'S ATTEMPTS TO ACQUIRE PERRIGO

37.     On April 8, 2015, Mylan made an unsolicited offer directly to Perrigo shareholders to acquire the Company for $205 per share in cash and stock, a premium of approximately 25% above the price that Perrigo shares had closed at the prior trading day, and substantially above any price at which Perrigo shares had traded for the Company's entire

history.  In the public offer letter addressed to Papa, Mylan's Chairman of the Board Robert

Coury stated:

> As you and I have discussed on a number of occasions over the past few years, a combination of Mylan and Perrigo offers clear and compelling strategic and financial benefits, has sound industrial logic, and would create a global leader with a unique and one-of-a-kind profile.  We have complementary operations across all of our businesses, both from a product and geographic perspective.  In an environment where scale and reach are becoming increasingly important, the combination of our companies would result in an unmatched global platform, substantial revenue and operating synergies, and enhanced long-term growth potential, all of which would serve to create significant value for the combined company's shareholders and other stakeholders.
>
> *        *        *
>
> [W]e propose to offer Perrigo shareholders $205 in a combination of cash and Mylan stock for each Perrigo share, which represents a greater than 25% premium to the Perrigo trading price as of the close of business on Friday, April 3, 2015, a greater than 29% premium to Perrigo's sixty-day average share price and a greater than 28% premium to Perrigo's ninety-day average share price.
>
> Our proposal provides a very significant cash payment to Perrigo shareholders.  In addition, even with conservative assumptions for what we believe to be significant and meaningful synergies coming from both companies, our proposal provides Perrigo shareholders with an even greater equity value in the combined company than they currently have in Perrigo today.[7]

38.     Because Perrigo is an Irish company, Mylan's April 8, 2015 proposal commenced

an offer period under the Irish Takeover Rules, which strictly governed both Mylan's bid and

Perrigo's defense against it.  In particular, to prohibit unsubstantiated claims to support or defeat

an offer, Irish Takeover Rules require the directors of the offeror and offeree, when making

public statements, to "accept responsibility for the information contained in the document or

---

[7] Form 425 filed by Mylan on April 8, 2015.

advertisement and [to state] that, to the best of their knowledge and belief (having taken all reasonable care to ensure that such is the case), the information contained in the document or advertisement is in accordance with the facts and, where appropriate, that it does not omit anything likely to affect the import of such information."  Irish Takeover Rule 19.2.

39.     Further, because financial projections by the offeror and offeree can unfairly influence takeovers, Irish Takeover Rules require that every profit forecast by an offeror or offeree "(including the assumptions upon which it is based) shall be compiled with scrupulous care, accuracy and objectivity by the directors of the offeror or (as the case may be) of the offeree."  Irish Takeover Rule 28.1.

40.     In response to the April 8, 2015 announcement, investors sent both stocks sharply higher.  Analysts were similarly positive.  Bank of America/Merrill Lynch stated, "From a business combination perspective, this makes sense to us as it brings together two companies with arguably best-in-class operations in the generic (MYL) and OTC (PRGO) spaces."  Barclays wrote: "We believe a combination between MYL and PRGO would offer a unique value proposition to their customers. . . ."  Deutsche Bank concluded "the combination of these companies makes a lot of strategic sense. . . . MYL represents a de-risking as PRGO would otherwise be in a multi-year globalization phase."  UBS predicted the combined stock would move higher over the next year.  Market observer Jim Cramer opined, "These two would be a match made in heaven."[8]

41.     On or about April 21, 2015, Defendants decided to reject Mylan's unsolicited bid and keep Perrigo an independent company, and gave a presentation to investors in which Defendants claimed Mylan's offer did not capture Perrigo's true value.

---

[8] *See* Summary of Analyst Opinions, Form 425 filed by Mylan on May 5, 2015, at slide 32.

42.     On April 24, 2015, Mylan made a legally binding commitment to tender for Perrigo shares at $60 cash plus 2.2 Mylan shares per Perrigo share tendered.  At Mylan's closing price that day of $76.06, the revised bid was worth over $227 per share.  Perrigo's board again rejected the offer and encouraged shareholders not to tender shares.

43.     On April 29, 2015, Mylan increased its bid again, this time to $75 cash plus 2.3 Mylan shares per Perrigo share tendered.  At Mylan's closing price of $74.50 on April 29, 2015, the revised bid was worth over $246 per share.  Again, Perrigo's board rejected the offer and encouraged shareholders not to tender shares.

44.     On September 14, 2015, Mylan commenced its formal tender offer to purchase Perrigo shares.  As Mylan had earlier promised, Perrigo shareholders would receive $75 in cash and 2.3 Mylan ordinary shares for each Perrigo ordinary share tendered.  The deadline to tender shares was November 13, 2015, and the offer required only 50% of shares to be tendered.  Mylan described its offer to Perrigo shareholders as deciding between one of two scenarios: either accept a "highly attractive offer" including $75 in cash and a total value substantially greater than Perrigo's market price, or, alternatively, receive no cash and risk a significant decline in the value of Perrigo's stock, while "weathering the delays and potential execution and integration risk inherent in Perrigo's standalone strategy."  On September 17, 2015, Defendants once again urged Perrigo investors not tender shares into the offering.

45.     Defendants' misstatements and omissions were successful in thwarting the Mylan Tender Offer: On November 13, 2015, Perrigo investors tendered less than the 50% threshold, ending Mylan's takeover bid.

46.     As detailed in ¶¶ 47-261 below, throughout the Relevant Period—and specifically in connection with the Mylan Tender Offer—Defendants made numerous false or misleading statements to Perrigo investors, in particular to dissuade them from accepting Mylan's offer.

V.     **DEFENDANTS DEFRAUDED INVESTORS REGARDING PERRIGO'S INTEGRATION OF OMEGA AND OMEGA'S FINANCIAL BENEFITS TO PERRIGO**

   A.     **Defendants Repeatedly Touted the Purportedly Successful Integration of Omega as Well as Omega's Impact on Perrigo's Financial Results and Prospects.**

47.     After the November 6, 2014 announcement that Perrigo would acquire Omega, Defendants falsely touted the synergies that the combined company would create and the purported seamless integration process.  During the November 6, 2014 Perrigo conference call announcing the acquisition, Papa stated "[o]ne of the real keys to this transaction is the immediate scale and broadened footprint this combination provides."  He assured investors "there is a competitive fit of Omega within Perrigo through the company's combined geographic diversity and scale."

48.     Also during that call, Defendants predicted wide-ranging synergies.  Papa represented: "There are opportunities to generate top line synergies by driving products from both companies through complementary US and European commercial channels.  Further, with the application of the supply chain excellence across Omega's footprint, we expect to drive additionally [sic] efficiency and operational synergies through the combined organization."

49.     Defendants continued to tout the Omega integration and Omega's purported impact on Perrigo's financial results and prospects in numerous representations to investors during the Relevant Period.

50.     During the January 12, 2015 JPMorgan Healthcare Conference, for example, Papa stated:

> *Obviously, we believe it's financially accretive, immediately accretive from day one, and also $1.7 billion in revenue that will add to the Perrigo portfolio of products opportunities.  And clearly we also think there are some cost synergies*.  One of the things that Perrigo does very well is manufacture—operational excellence in our facility, we make about 50 billion tablets every year, every second of every day, somewhere in the world 1,600 people [are] taking a Perrigo product.  When we take that efficiency and bring [it] into the Omega organization, where about 80% of their products are outsourced, where someone else is making it, we think that also will drive cost synergy for the Omega organization.

51.     Those statements were materially false or misleading when made because, as detailed in ¶¶ 103-111 below, (a) there were serious impediments to the Omega integration, including technological disparities, the decentralized structure of Omega, management resistance, and regulatory hurdles; (b) Omega was already underperforming; and (c) Omega was not "accretive" to Perrigo's claimed organic growth rate.

52.     On March 30, 2015, Perrigo filed with the SEC its fiscal Form 8-K related to the Omega acquisition.  Perrigo also issued a press release that quoted Papa as "expect[ing] the combined companies will create tremendous value for consumers and shareholders for years to come."  Perrigo further stated in the press release that it expected "the transaction to be *immediately accretive* and between $0.10 and $0.20 accretive to fiscal 2016 adjusted earnings per share," and that the Company would "achieve increasing revenue and supply chain synergies within Europe over time contributing greater than $125 million to gross profit in 2019."

53.     Those statements were materially false or misleading when made because, as detailed in ¶¶ 103-111 below, (a) there were serious impediments to the Omega integration, including technological disparities, the decentralized structure of Omega, management resistance and regulatory hurdles; (b) Omega was already underperforming; and (c) Omega was not "accretive" to Perrigo's claimed organic growth rate.

54.     On April 21, 2015, Perrigo issued a press release on Form 8-K titled *Perrigo's Board Unanimously Rejects Unsolicited Proposal from Mylan* ("April 21, 2015 Press Release"), which attached an investor presentation titled *Perrigo: Creating Superior Value for Shareholders* ("April 21, 2015 Presentation"), and held a conference call ("April 21, 2015 Call").  Also that day, Perrigo issued a press release on Form 8-K announcing its third quarter 2015 financial results ("April 21, 2015 Earnings Release").

55.     In the April 21, 2015 Press Release, Perrigo announced its Board had "unanimously rejected" Mylan's Offer, having concluded that the Offer "***substantially undervalues the Company and its future growth prospects*** and is not in the best interests of Perrigo's shareholders."

56.     According to Perrigo, the Board's determination was informed by certain "key factors," including that the Offer (i) "does not take into account the full benefits of the Omega Pharma acquisition, which closed on March 30, 2015, including additional value to be derived from synergies and increased global presence"; (ii) "would deny Perrigo shareholders the full benefits of Perrigo's durable competitive position and compelling growth strategy"; and (iii) "substantially undervalues Perrigo's differentiated global business, including the Company's leading market position in key franchises, global distribution platform, and proven expertise in product development and supply chain management."

57.     During the April 21, 2015 Call, Papa also focused on Omega, stating: "[W]e have just completed the Omega acquisition, which among other major benefits, provides a significantly enhanced international platform for additional growth.  Simply put, Omega allows us to pursue paths that were never available to us in the past."

58.     When pressed by analysts for more information concerning Omega—which Papa

had identified as a primary basis for rejecting any takeover attempt by Mylan—and the status of

Perrigo's integration efforts, Papa responded:

> Sure.  Well, I will start with Omega.  We're very pleased with our
> initial integration projects with Omega, so there is a lot of good
> activities happening with the integration team.  I'd say it's focused
> on both driving that topline numbers . . . but it's also focused on
> improving the cost of goods sold.  We've got a supply chain team
> already working with them to drive the bottom line results as well.
> As I talk about the growth of Omega from a historical point of
> view moving into the future, it has been accretive to our growth
> rate.  So we're excited about that.

59.     Later during that same call, Papa stated:

> At Omega, we feel very good about the opportunity with Omega
> and specifically what I would refer to and we've talked about in
> the past about revenue synergies.  We do believe that there are
> revenue synergies with the product portfolio that we have at
> Perrigo as we bring the 3,000 Perrigo products and help to bring
> them to Omega and look for ways that we could do line extensions
> of existing Omega brands.  ***That's something that we have teams
> underway already from an integration process. Those teams are
> very active in looking at which ones are the best ones to do, the
> earliest ones to do and move that forward***.  We do believe that
> that will allow us with the Omega portfolio to be in that 5% to 10%
> compound annual growth rate.  Obviously, the more success we
> have with Omega, the more it would help us to be at the higher end
> of that from the revenue synergies point of view.  Number two, on
> the Mylan proposal, candidly, I don't have more facts than are out
> in the marketplace relative to what is in the proposal.  There was
> no specifics in the proposal for Mylan relative to—they were at
> $205 per share but there was no specifics relative to cash versus
> stock percentages nor what their view was on synergies.  Mylan is
> a good company, Perrigo is a good company.  There are
> opportunities, but I don't want to make any specific comments
> about or speculate anything about the synergies that could be
> available between the two companies.

60.     In the April 21, 2015 Presentation, Defendants likewise assured investors that

Omega "is accretive to Perrigo's organize[d] growth profile, and creates additional value derived

from synergies and increased global scale."

61.     Papa further touted Perrigo's standalone growth prospects, highlighting the

Omega acquisition:

> Now, **with the successful completion of the Omega acquisition** on
> March 30, Perrigo is a top 5 global OTC company, **better
> positioned than ever to deliver on our leading market positions**,
> unrivaled global manufacturing and distribution capabilities,
> unparalleled customer relationships, and broad portfolio of
> products to continue to deliver superior value for shareholders.
> Our confidence in the future, as consumers around the world
> increasingly seek greater choice and value in their healthcare, is
> reflected in the guidance we are providing today.

62.     The statements in ¶¶ 54-61 were materially false or misleading when made

because, as detailed in ¶¶ 103-111 below, (a) Omega was not accretive to Perrigo's claimed

organic growth rate; (b) there were serious impediments to integration, including technological

disparities, the decentralized structure of Omega, management resistance, and regulatory hurdles;

and (c) Omega was already underperforming.

63.     On May 6, 2015, Papa attended and spoke on behalf of Perrigo at the Deutsche

Bank 40th Annual Health Care Conference, held in Boston, Massachusetts.  At the outset, Papa

addressed Mylan's most-recent offer, stating "[w]e believe we have a very strong standalone

business" and "we believe the offer from Mylan substantially undervalues the Perrigo Company,

and doesn't take into account really some of the important things that we've done with the

Omega business."

64.     When asked specifically what about Omega drove Defendants' financial

guidance, Papa responded:

> When we signed the deal on November 6 we were very excited
> about Omega.  But if anything, since that point as we closed the
> Omega on March 30, we've become even more excited.  The
> excitement comes from a number of things.  Number one, you take
> a company like Perrigo that was doing business in six countries.
> Now you open up, and you have 39 countries available.  You have

300 million more consumers that you have access to as a result of doing the Omega transaction.

That's a really exciting prospect for us as a Company. ***So we think there is tremendous revenue synergies for us as a business as we put these two businesses together.*** Part of that revenue synergy is very simply we take the Perrigo products that we have today. Some of them are already approved in Europe. We take those and we look at ways we can do line extensions of Perrigo products via the—take a Perrigo product, a product that's a nighttime pain product, match it up with the brand item that Omega has today, and you launch a nighttime pain product by Omega. Very simple, it takes advantage of the brand equity that's already in place for the Omega products. We think that's a great revenue synergy opportunity.

65.     Papa further represented:

[O]ne of the things Omega did really well was sales marketing. One of the things they, by their own admission, say they were not focused on was the supply chain and manufacturing. We think we can help them tremendously with that. We've already got over 20 projects, identified staff to lower the cost of goods of the Omega product. I remind you that 79% of what Omega sells today, they outsource. ***Some of those products we can bring into a Perrigo facility or an Omega facility with our expertise, and lower the cost of goods by 30-40%, which will absolutely add to the bottom line of Omega and Perrigo.***

66.     Following those representations, Papa concluded "[n]ow that I've got the Omega business, and we're in 39 countries, we think the bolt-on strategy for the future can be very, very profitable for Perrigo shareholders as we now have a commercial footprint in these countries that we didn't have before," and noted "we're very excited about that" and "think that brings a significant number of synergies."

67.     The statements in ¶¶ 63-66 were materially false or misleading when made because, as detailed in ¶¶ 103-111 below, (a) Omega was not accretive to Perrigo's claimed organic growth rate; (b) there were serious impediments to integration, including technological

-29-

disparities, the decentralized structure of Omega, management resistance, and regulatory hurdles; and (c) Omega was already underperforming.

68.     On May 12, 2015, Papa attended and spoke on behalf of Perrigo at the Bank of America Merrill Lynch Health Care Conference, held in Las Vegas, Nevada.  With respect to the lingering Mylan takeover attempt, Papa again focused investors on the value that Omega purportedly added to Perrigo:

> What we've said as a board is that we believe that offer substantially undervalues the Perrigo Company.  And specifically, we said relative to the—*we're just getting started with the Omega transaction, and as a result of that we think there is a lot more opportunity for us as a company*.  As we've gone from competing in approximately six countries now to about 39 countries we think there's a lot of opportunity for the Perrigo Company. . . . *So we do think that $202 or $187 number did significantly undervalue the Perrigo Company, especially given what we have now done with Omega.*

69.     Papa was then asked to identify the "most under-appreciated" aspect of the "Omega transaction."  He responded:

> Well, I will say for me personally even when we made the announcement on November 6, we thought there would be opportunity for synergy, but as now we've got more involved and closed the transaction on March 30.  So from November 6 to March 30 we've become smarter about what's in the Perrigo, I am sorry, within Omega and how the Perrigo products would fit within Omega, relative to taking the easy example.  Omega has got some great products for pain, but they don't have a night time pain that also has a product in it that allows you to sleep better at night.  It is the combination products that we have we think that would fit naturally into the Omega pipeline and launch new line extensions of the Omega pain products.  That [is] a great easy example.

70.     Papa was also asked, "When you said [the] Mylan offer severely undervalues and you offered new value, the $202 per share, is it the total deal value that is undervaluing or is it the cash-equity split that is the issue here?"  Papa responded, "It is the total that we believe to be

undervalue of the Perrigo Company, the $202 number that we think based on our track record and performance, we think our Company is worth more than that."

71.    The statements in ¶¶ 68-70 were materially false or misleading when made because, as detailed in ¶¶ 103-111 below, (a) there were serious impediments to integration, including technological disparities, the decentralized structure of Omega, management resistance, and regulatory hurdles; and (b) Omega was already underperforming.

72.    On June 2, 2015, Papa spoke on behalf of Perrigo at the Jefferies Global Healthcare Conference, held in New York City.  Once again, Papa represented that "Omega and Perrigo together are well-positioned" and characterized Omega as "immediately accretive":

> With Omega though, it was a perfect example of doing exactly what we did in the US, but now apply that to these 36 additional countries that I now have access to that I didn't before.  So I could not bolt on something in my German operations prior to Omega.  I didn't have German operations.  Now I do.  Now I can bolt things on to Germany.  I can bolt things on to Sweden.  That really is the logic of why we felt Omega was so strategically important to us, and it will allow us so many more opportunities to do these bolt-on transactions, which generally come with very good return characteristics, and why we think it's really important for the future success of the Perrigo Company.

73.    The statements in ¶ 72 were materially false and misleading when made because, as detailed in ¶¶ 103-111 below, (a) Omega was not accretive to Perrigo's claimed organic growth rate; (b) there were serious impediments to integration, including technological disparities, the decentralized structure of Omega, management resistance, and regulatory hurdles; and (c) Omega was already underperforming.

74.    On June 23, 2015, Brown spoke on behalf of Perrigo at the Oppenheimer Consumer Conference, held in Boston, Massachusetts.  During the conference, Brown was specifically asked to discuss the "Omega integration."  She stated:

> We closed the transaction on March 30, so we are about nine
> weeks in right now, and we are online—I should say in line with
> our going online integration process. ***Back office is working
> smoothly.*** We're bringing them onto all of our back-office
> systems, and importantly what was the underlying core of this deal
> was allowing Omega to remain independent in their sales and
> marketing process, not interfering with that, but providing them
> product to put into that pipeline.

75.     Later, Brown made additional representations concerning the Omega integration

efforts:

> We [Perrigo] have management teams who are in charge of Omega
> integration who are actively involved on a day-to-day basis in both
> running Omega and another team that is focused on helping them
> get those product launches, helping on the integration. That was
> underway. That was rolling down the tracks before the Mylan
> letter came out, and that continues, so it is not as if the entire
> management team suddenly stops doing everything they are doing
> and is focused exclusively on the offer.

76.     An analyst then specifically asked Brown: "[H]as Mylan impacted the integration

process for Omega in any way? Has there been any distraction?" In response, Brown stated:

"No. That team continues to do what their mission is and what they have been scheduled to do."

Brown added, "[T]hey [Omega] are more invigorated than ever by the combination of what we

can do together. So that team is doing their thing and I am off to Belgium next week. That was

process like normal."

77.     Brown also reaffirmed Perrigo's targeted annual growth rate of 5-10%,

specifically attributing the growth to what the Company would see "from the combined Perrigo

and Omega footprint."

78.     The statements in ¶¶ 74-77 were materially false or misleading when made

because, as detailed in ¶¶ 103-111 below, (a) Omega was not accretive to Perrigo's claimed

organic growth rate; (b) there were serious impediments to integration, including technological

disparities, the decentralized structure of Omega, management resistance, and regulatory hurdles; and (c) Omega was already underperforming.

79.     On August 5, 2015, Perrigo held its fourth quarter 2015 earnings call ("August 5, 2015 Earnings Call"), in which Papa and Brown participated.  During the call, Papa again directed investors to Perrigo's supposedly successful integration of Omega, stating "[e]ven with all the noise you've been following over the past few months [concerning Mylan's takeover bid] . . . [we] delivered on our Omega integration plan [and] achieved great operational efficiencies and productivity improvement . . . ."  Brown likewise represented, "We [Perrigo] continue to execute on the integration of Omega."

80.     The statements in ¶ 79 were materially false or misleading when made because, as detailed in ¶¶ 103-111 below, (a) there were serious impediments to integration, including technological disparities, the decentralized structure of Omega, management resistance, and regulatory hurdles; and (b) Omega was already underperforming.

81.     On August 6, 2015, Perrigo filed with the SEC a Form SC14D9, attaching a presentation titled *Creating Long-Term Value for Shareholders* ("August 6, 2015 Presentation"), which focused heavily on the purported value added by the Omega transaction and on Perrigo's rejection of Mylan's most-recent offer.  In the presentation, Defendants represented that (i) the Omega acquisition "[s]upports [Perrigo's] global strategy and positions Perrigo for continued European organic and inorganic growth"; (ii) with Omega, Perrigo obtained "a world-class management team and leading European distribution network spanning at least 35 countries"; and (iii) the "[c]ombined commercial infrastructure, supply chain capabilities and financial strength enables highly synergistic bolt-on transactions."

82.     Following their glowing review of Omega, Defendants addressed Mylan's most-recent offer, representing that it was "value destructive" and telling investors "the Board unanimously concluded that the offer substantially undervalues the Company and its future growth prospects and is not in the best interests of Perrigo's shareholders."

83.     The statements in ¶¶ 81-82 were materially false or misleading when made because, as detailed in ¶¶ 103-111 below, (a) Omega was not accretive to Perrigo's claimed organic growth rate; (b) Defendants there were serious impediments to integration, including technological disparities, the decentralized structure of Omega, management resistance, and regulatory hurdles; and (c) Omega was already underperforming.

84.     On August 13, 2015, Perrigo filed its Form 10-K for the period ending June 27, 2015 ("2015 Form 10-K"), which was signed by Papa and Brown.  With respect to Omega, Defendants again represented:

> Prior to its acquisition, Omega was one of the largest OTC companies in Europe.  The Omega acquisition expanded our OTC leadership position across Europe, accelerated our international expansion and geographic diversification through enhanced scale and a broadened footprint, and diversified our revenue and cash flow streams while strengthening our financial profile.

85.     The statements in ¶ 84 were materially false or misleading when made because, as detailed in ¶¶ 103-111 below, (a) Omega was not accretive to Perrigo's claimed organic growth rate; (b) there were serious impediments to integration, including technological disparities, the decentralized structure of Omega, management resistance, and regulatory hurdles; and (c) Omega was already underperforming.

86.     On September 17, 2015, Perrigo issued a press release on Form 8-K disclosing that the Company's Board recommended that Perrigo shareholders reject Mylan's Tender Offer, which included a presentation titled *Responding to Mylan's Inadequate Tender Offer: Perrigo's*

*Board Recommends That You Reject the Offer and __Do Not Tender__* ("September 17, 2015 Press Release").

87.     In the press release, Defendants represented that the Tender Offer "substantially undervalues the Company and does not adequately compensate shareholders for Perrigo's exceptional standalone growth prospects."  Papa specifically represented that the Tender Offer "undervalues our compelling prospects for continued growth and sustainable, longterm shareholder value" because, among other things:

> We continue to build upon our recently acquired pan-European branded consumer healthcare [BCH] platform . . . demonstrating our unique positioning to capitalize on the growing $30 billion European OTC market opportunity.

88.     The statements in ¶¶ 86-87 were materially false or misleading when made because, as detailed in ¶¶ 103-111 below, (a) Perrigo had not successfully integrated its largest acquisition, Omega; (b) Omega's senior executives had already warned Perrigo, Papa, and Brown of regulatory impediments to their assumption that synergies could easily be achieved by swapping Omega's suppliers that were located in its key markets with Perrigo's U.S.-based supply chain; and (c) Perrigo had not created value for shareholders by the Omega acquisition.

89.     On September 17, 2015, Perrigo filed with the SEC a letter on Form SC14D-9 from Papa concerning the Mylan Tender Offer.  Papa once more stated "Mylan's offer not only fails to reflect Perrigo's outstanding track record of value creation, it also undervalues our *compelling prospects for continued growth and sustainable, long-term shareholder value*," which includes "build[ing] upon our recently acquired pan-European [Omega] branded consumer healthcare platform."  The letter further stated that "[t]he directors of Perrigo," including Papa, "accept responsibility for the information contained in this announcement," and that "[t]o the best of the knowledge and belief of the directors (who have taken all reasonable care to ensure

-35-

such is the case), the information contained in this announcement is in accordance with the facts and does not omit anything likely to affect the import of such information."

90.     The statements in ¶ 89 were materially false or misleading when made because, as detailed in ¶¶ 103-111 below, (a) Perrigo's directors, including Papa, had not "taken all reasonable care" to ensure that the descriptions of Perrigo's record of integrating acquisitions and value creation was "in accordance with the facts and does not omit anything likely to affect the import of such information"; (b) Perrigo had not successfully integrated its largest acquisition, Omega; (c) Omega's senior executives had already warned Perrigo, Papa, and Brown of regulatory impediments to their assumption that synergies could easily be achieved by swapping Omega's suppliers that were located in its key markets with Perrigo's U.S.-based supply chain; and (d) Perrigo had not created value for shareholders by the Omega acquisition.

91.     Also on September 17, 2015, Papa spoke on behalf of Perrigo at the Morgan Stanley Healthcare Conference, held in New York City.  At the outset, Papa was asked how Perrigo was "driving the organization to execute" on its growth agenda.  In response, he identified Omega as a driving force in that growth:

> Our concept is we believe we have a base business that's going to be able to grow that 5% to 10% especially now that we've added the Omega business.  We just closed Omega on March 30.  So now we've got Omega, which allows us not [only] to compete in the six countries where we were before Omega.  But now we're up to 39 countries.  So a tremendous expansion of our geographic foot print, very important to us.

92.     With respect to Mylan's Tender Offer, which had been launched that same day, Papa concluded, "We always said that Perrigo is not against deals.  We're just against this deal, because it's a bad deal."

93.     The statements identified in ¶¶ 91-92 were materially false or misleading when made because, as detailed in ¶¶ 103-111 below, (a) Omega's senior executives had already

-36-

warned Perrigo, Papa, and Brown of regulatory impediments to their assumption that synergies could easily be achieved by swapping Omega's suppliers that were located in its key markets with Perrigo's U.S.-based supply chain; (b) there were serious, known impediments to the integration of Omega, including technological disparities, the decentralized structure of Omega, and management resistance; and (c) Omega was already underperforming.

94.     On October 22, 2015, Perrigo held its third quarter 2015 earnings call ("October 22, 2015 Earnings Call"), in which Papa participated.  In conjunction with the earnings call, Perrigo issued an investor presentation titled *Creating Value for Shareholders: Now and For the Long Term* ("October 22, 2015 Presentation").  With respect to Omega, Papa represented: "[W]e [Perrigo] built up the platform with the acquisition of Omega, which has enabled us to provide quality healthcare products to hundreds of millions more consumers globally.  We are continuing to build on this platform, realizing even greater benefits than we initially expected."

95.     Additionally, to justify its inflated profit forecasts for calendar years 2015 and 2016, Perrigo and its directors, including Papa, indicated they assumed (a) 2016 net sales for the BCH (Omega) segment would grow in the middle of the 5%-10% guidance they had previously published; and (b) the "***integration and realization of synergies in relation to the acquisition of, Omega Pharma*** . . . will proceed as planned and will not be subject to unforeseen material delays."  Perrigo and its directors, including Papa, further represented that those assumptions were "compiled with scrupulous care, accuracy and objectivity by the directors."

96.     The statements identified in ¶¶ 94-95 were materially false or misleading when made because, as detailed in ¶¶ 103-111 below, (a) Perrigo's directors, including Papa, had not compiled the assumptions regarding BCH net sales, integration of Omega, and realization of synergies with "scrupulous care, accuracy and objectivity"; (b) Omega's senior executives had

already warned Perrigo, Papa, and Brown of regulatory impediments to their assumption that synergies could easily be achieved by swapping Omega's suppliers that were located in its key markets with Perrigo's U.S.-based supply chain; (c) there were serious, known impediments to the integration of Omega, including technological disparities, the decentralized structure of Omega, and management resistance; (d) Omega was already underperforming; and (e) Omega management had actually modeled Omega's organic growth rate between 2013 and 2017 to be only 3.2% per year, not the 5%-10% range touted to investors.

97.     On November 2, 2015, Perrigo filed its Form 10-Q for the period ending September 26, 2015, which was signed by Papa and Brown.  Defendants again represented:

> Omega was a leading European OTC company, and is providing us several key benefits, including advancing our growth strategy outside the U.S. by providing access across a larger global platform with critical mass in key European countries, establishing commercial infrastructure in the high-barrier-to-entry European OTC marketplace, strengthening our product portfolio while enhancing scale and distribution, enhancing our financial profile, and expanding our international management capabilities.

98.     The statements in ¶ 97 were materially false or misleading when made because, as detailed in ¶¶ 103-111 below, (a) Perrigo had not successfully integrated its largest acquisition, Omega; (b) Omega's senior executives had already warned Perrigo, Papa, and Brown of regulatory impediments to their assumption that synergies could easily be achieved by swapping Omega's suppliers that were located in its key markets with Perrigo's U.S.-based supply chain; and (c) Perrigo had not created value for shareholders by the Omega acquisition.

99.     On January 5, 2016, Papa spoke on behalf of Perrigo at the Goldman Sachs Healthcare Conference, held in New York City.  During the conference, Jami Rubin, a Goldman Sachs analyst, asked Papa the following questions about Omega's integration and the revenue synergies Defendants had repeatedly touted throughout the Relevant Period:

> Let's talk about the integration of Omega.  That's, I think, pretty much behind you.  A big part of that Omega story was generating leverage—generating revenue synergies from Omega.  How are you levering—A, are you getting that revenue synergy?  How are you getting it?  And how are you leveraging Omega across Perrigo?

Papa, without correcting Rubin's statement that the Omega integration was "pretty much behind [Perrigo]," responded:

> [W]e felt there would be revenue synergies of $100 million-plus and cost-of-goods-sold synergies in the order of magnitude of the $25 million range.  We still feel very good about those—certainly on the cost-of-goods-sold synergies.  We clearly are seeing projects in place that are going to generate far superior to $25 million just by simply either bringing some of the products that were outsourcing inside and/or things that we are doing just to leverage the Perrigo supply chain to get better raw material costs.  So we feel very good about that.

100.    The statements in ¶ 99 were materially false or misleading when made because, as detailed in ¶¶ 103-111 below, (a) Perrigo had not successfully integrated its largest acquisition, Omega; (b) Omega's senior executives had already warned Perrigo, Papa, and Brown of regulatory impediments to their assumption that synergies could easily be achieved by swapping Omega's suppliers that were located in its key markets with Perrigo's U.S.-based supply chain; and (c) Perrigo had not created value for shareholders by the Omega acquisition.

101.    On January 11, 2016, Papa spoke on behalf of the Company at the JPMorgan Healthcare Conference, held in New York City.  During the conference, Papa made the following statements concerning Omega:

> Our branded consumer healthcare is a business that we acquired, the Omega Company.  We acquired Omega and closed the transaction on March 30 of 2015 and it's one of the things that we think is very important to our future.  ***First and foremost, it moved us from a company competing in approximately 6 countries to a Company now than being in 39 countries.  So dramatically expanded our geographic footprint, which we think is important for our future.  Number two: we are now top five over-the-***

*counter company in Europe. In fact, one of the fastest-growing over-the-counter companies in Europe. We also think it well positions us for additional M&A in the branded consumer healthcare space in Europe as there is additional opportunities to roll up additional consumer assets in the rest of Europe. So we are very excited about that. Within Omega, we compete in very large segments: cough, cold, allergy, analgesics, etc. And we try to find those where there's some unmet needs because of either formulation or something that we can do to make our product unique to the consumers.* We also have some niche products where we are number one in the category. Importantly, as we think about the future, with our branded consumer healthcare business, we think there is over $200 million of new product sales in our branded consumer healthcare business from 2016 to 2018.

102.    The statements in ¶ 101 were materially false or misleading when made because, as detailed in ¶¶ 103-111 below, (a) Perrigo had not successfully integrated its largest acquisition, Omega; (b) Omega's senior executives had already warned Perrigo, Papa, and Brown of regulatory impediments to their assumption that synergies could easily be achieved by swapping Omega's suppliers that were located in its key markets with Perrigo's U.S.-based supply chain; and (c) Perrigo had not created value for shareholders by the Omega acquisition.

**B.    Through Their Numerous Representations to Investors Concerning Omega, Defendants Concealed Serious and Far-Reaching Integration Problems, Which Defendants Knew About or Recklessly Disregarded.**

103.    Omega was far larger and more complex than any other company Perrigo had previously acquired. With annual revenues of approximately $1.6 billion, approximately 2,500 employees (including a sales force of 1,100 employees), a portfolio of several thousand branded products, decentralized management, and an array of IT systems, Omega posed a significant integration challenge.

104.    Defendants were aware of considerable integration and operating hurdles with Omega. Perrigo was exposed to those challenges during the extensive due diligence prior to the acquisition. As described in deal documents, Perrigo was provided a confidential package of

information regarding Omega businesses during the latter half of July 2014 and engaged with the assistance of its professional advisors between September 7, 2014 and November 4, 2014 in additional due diligence into Omega group companies and their "business, operations, assets, liabilities, legal, tax, commercial and accounting and financial condition."[9]  As part of that due diligence, Perrigo and its advisors were given access to a confidential "data room," participated in a presentation by Omega management on September 25, 2014, conducted meetings with management of Omega and Omega group companies, and were provided further information in the form of answers to written questions.[10]

105.    As a result of their due diligence, Defendants knew or were reckless in not knowing, for example, that Omega's sales figures were inflated, and Defendants took that into account in their projections about Omega's potential contribution to Perrigo's growth or revenue. According to former Perrigo employees cited as confidential witnesses in the Sculptor Master Fund Complaint (at ¶ 59), a large Belgian wholesale-distributor of pharmaceuticals would buy product from Omega at the end of the month, and at the end of each quarter, with agreements allowing for the return of the product to Omega without penalties.  Such distributions were accounted for in Omega's sales figures, even though they were actually consignment sales.  *Id.*

106.    Defendants nonetheless described the Omega acquisition as a key part of the 5%-10% organic growth they touted in opposing Mylan's Tender Offer.  As Defendants explained during the Relevant Period, their profit forecast assumed the Omega assets would deliver organic growth at the midpoint of that range, or 7.5%.[11]  Perrigo's growth assumption for Omega was more than double the 3.2% organic growth Omega's management had independently projected

---

[9] *See* Purchase Agreement, attached as Exhibit 10.1 to Form 8-K filed on November 12, 2014.
[10] *Id.*

[11] *See* Perrigo Form 8-K filed on October 22, 2015.

for 2013-2017 as part of its goodwill calculation.[12]  While Papa and Perrigo's other directors claimed they had prepared their own assumption for Omega's organic growth in compliance with the "scrupulous care, accuracy and objectivity" standard required under Irish Takeover Rules, they were, in fact, aware of extensive integration problems (among others) at Omega imperiling their aggressive guidance.

107.    The lack of synergies and underperformance of Omega from the outset of the acquisition are corroborated by information attributed to Christine Kincaid (now Ray) ("Kincaid"), Perrigo's Global Cyber Security Manager from June 2015 to December 2015, as well as other unnamed former Perrigo and Omega employees, in the Class Complaint and complaints in pending related individual actions.  *See, e.g.*, ACAC ¶¶ 57-62; Kuwait Compl. ¶¶ 49, 84, 86-94, 96-97, 102-08, 110, 181.  As stated in the Class Complaint:

- Kincaid served for a portion of her tenure as Perrigo's acting Chief Security Officer, reporting directly to Chief Information Officer ("CIO") Tom Farrington, who also served as Papa's direct appointee to oversee the Omega integration (ACAC ¶ 57);[13]

- Kincaid was responsible for IT integration projects in Europe (*id.*);

- Kincaid indicated IT integration between Perrigo and Omega had completely stalled by mid-2015, which caused Farrington to instruct her in July 2015 to reach out to her direct counterpart in Belgium—the Omega segment's head of IT—to find out why integration was not advancing (*id.*);

---

[12] *See* 2013 Omega Annual Report at 42.

[13] During a June 2, 2015 investor call, Papa stated: "[T]here was a specific person that I had designated in  my Company who heads up all my integrations.  And I said, Tom, you need to help us successfully integrate Omega.    That's your role.  Make sure it happens.  And that's your focus."

- Kincaid recounted that at Farrington's direction, as well as through her standard integration responsibilities, she had multiple conversations with Omega's head of IT integration, who detailed to Kincaid various issues that were causing "discord" between Omega's CEO and CFO, to whom the Omega head of IT reported directly, and the top executives of Perrigo, including Papa and Brown (*id.* ¶ 58).

108.    The Class Complaint further detailed that in addition to discussions with Omega's head of IT integration, Kincaid "personally experienced major integration impediments as well as cultural discord between Omega and Perrigo." *Id.* The Complaint alleges:

- Kincaid explained, for example, that European Union regulations would make it difficult to replace Omega's EU suppliers with Perrigo's U.S.-based supply chain." *Id.* ¶ 59. Further, as recounted in the Kuwait Complaint (at ¶ 110), that issue would require Perrigo to discount products to make them competitive in the EU.[14]

- As Kincaid indicated, during July and August of 2015, Omega's most-senior executives tried on multiple occasions to communicate that and other concerns to Papa and Brown but were frustrated by their refusal to engage in discussions about those issues (in part because Perrigo's senior executives appeared more focused on fighting the Mylan takeover)." ACAC ¶ 59; *see also* Kuwait Compl. ¶ 110.

---

[14] In particular, the home country of the Omega business segment making the purchase is the primary preferred source  of suppliers, other EU member states were the second, and non-member countries the third.   ACAC ¶ 59.  Accordingly, changing Omega's source of manufactured drugs from existing EU suppliers to Perrigo—which manufactured in the  U.S.—would change the terms of service for numerous existing and future Omega service contracts with its customers and may cause serious disruption to those customer relationships.   *Id.*

Further, the Kuwait Complaint alleges (at ¶¶ 95-97) Kincaid also explained that replacing Omega's EU suppliers with Perrigo's U.S.-based suppliers proved to be  problematic and cut into Perrigo's margins.

- Omega's head of IT told Kincaid that he was personally instructed by a senior Omega executive in mid-2015 to put integration on hold pending resolution of those problems. ACAC ¶ 59.[15]

- Kincaid further explained that Papa's understanding of the integration problems was reflected by his mid-2015 appointment of Mary Donovan, an Irish executive, as an additional representative to bridge communication gaps between Perrigo's U.S. operations and Omega.  ACAC ¶ 60.  Kincaid recounted that one of Donovan's first acts upon being appointed to the role was to pay a week-long visit to Allegan, Michigan to meet with the IT development teams, Perrigo's Chief Technology Officer (known at Perrigo as the VP of Global Infrastructure) Brian Marr, other project managers, and Kincaid to discuss the integration." *Id.*  Kincaid explained that during that visit, Donovan hosted meetings in which numerous integration issues, including breakdowns in communication, IT processes, and other problems, were acknowledged and discussed in detail.  *Id.*

109.    Additionally, the Kuwait Complaint alleges:

- Kincaid recounted that Omega personnel told Perrigo leadership "that full migration of Omega data from each country location could not be completed based on the incompatible operating systems and applicable EU regulations, but that Perrigo continued to ignore the negative impact of the issue."  *Id.* ¶ 102.

---

[15] Additionally, the Kuwait Complaint alleges (at ¶ 110) "[f]rustration boiled over to the point where some Omega salespeople stopped attending meetings with Perrigo's executive management," and "[Kincaid's] impression, based on the calls and meetings she attended, was that the frustration applied to sales challenges at all Omega locations."

- Kincaid "met, spoke on conference calls, or emailed with senior level personnel at both Perrigo and Omega at least monthly, and sometimes weekly, to discuss compliance and regulation problems related to migrating Omega's data from Germany to the U.S."  *Id.*

- Kincaid also stated the Omega integration team had weekly reporting responsibilities to CIO Farrington, and to that end, Paula Makowski, Farrington's Chief of Staff, would send a weekly email requesting a status report.  *Id.* ¶ 103.

- Kincaid "would respond to both Farrington and Makowski providing updates on her conversations with [Sven] Deneubourg [Corporate IT professional for Omega] and Donovan and the aforementioned integration calls and meetings."  *Id.*  Additionally, Kincaid often "would have no information to report because Deneubourg was out of the office from July 2015 through August 2015 (returning part-time in September 2015) with a broken leg, such that integration efforts 'came to a standstill.'"  *Id.* ¶ 103.  Kincaid further recounted that "local IT issues were taking precedence over the Omega/Perrigo integration."  *Id.* ¶ 104.[16]

- Kincaid explained that during meetings and calls during her tenure, Farrington confirmed that he had reported the Omega data migration issues to Papa and sought assistance from Papa and Perrigo's Board to remedy those issues.  *Id.* ¶ 105.  Kincaid recalled, for example, "that Farrington told Papa during the summer of 2015 that the migration had not occurred, that the project was stalled, and that Deneubourg was injured."  *Id.*  Additionally, "Farrington mentioned to [Kincaid] and other members of Perrigo's integration team during at least two or three meetings leading up to the August 2015 Perrigo Board meeting, that he spoke with Papa about dedicating funds to hire an assistant for Deneubourg."  *Id.*  Kincaid and the integration

---

[16] Indeed, according to the Kuwait Complaint, when asked if Deneubourg was "ridiculously understaffed,"  Kincaid responded, "yes."  *Id.* at 104.

team even put together a "CapEx forecast" and "Request for Hire," detailing the need for the hire as it pertained to the stalled integration project." *Id.* Perrigo's Board, led by Papa, "not only denied the request in August 2015, but again in October 2015, when it deferred consideration until January 2016." *Id.* ¶ 106. Further, Farrington told the integration team that he unsuccessfully attempted to make the case for the position several times with Papa during the August through November 2015 timeframe. *Id.*

- Kincaid also explained that several Omega senior members of sales leadership felt their concerns regarding the Omega data migration issues were being ignored during meetings with Perrigo executives, including Papa and Perrigo Board members. *Id.* ¶ 107.

- According to Kincaid, "during July and August 2015, Omega's senior-most executives made several attempts to report their concerns to Papa and Brown, both of whom refused to engage in additional discussions." *Id.* She recalled that Omega leadership felt that Perrigo, preoccupied with the Mylan takeover bid, disregarded or minimized the negative impact of the debilitating migration issues. *Id.* Deneubourg "specifically told [Kincaid] that [a senior Omega executive] had instructed him in mid-2015 to put integration to the side." *Id.*

- "Based on conversations that [Kincaid] had with Farrington and those that took place during integration meetings and conference calls, [Kincaid] understood that Brown met with Farrington at least weekly and was aware of the integration issues and failures." *Id.* ¶ 108. Kincaid further recalled that in August 2015, Donovan came to the U.S. and briefed everyone on the overall integration challenges with respect to Omega, including technology and security issues. *Id.*

110.   The Class Complaint and the Kuwait Complaint also include factual allegations based on accounts by other former Perrigo and Omega employees, which corroborate Kincaid's

account.  Those former employees also recounted multiple additional operational impediments that corroborate and expand on Kincaid's account, including allegations concerning (i) the poor organizational structure at Omega; (ii) IT integration problems, including difficulties integrating Omega's IT systems with Perrigo's; (iii) management resistance, including that Omega managers were not cooperating with Perrigo in the integration; (iv) Perrigo's diversion of resources and budget to fight the Mylan bid; and (v) underperformance in key Omega markets and unrealistic expectations relating to Omega.  *See* ACAC ¶ 62; Kuwait Compl. ¶¶ 84-118.

111.    Given the magnitude and duration of those material problems with Omega, Perrigo was far from being in position to benefit from the Omega acquisition.  Despite having knowledge of those problems, Defendants repeatedly touted to investors the purported success of the Company's integration of Omega, in addition to Omega's purported impact on Perrigo's financial results and prospects, as detailed in ¶¶ 50-102 above.

## VI.    DEFENDANTS DEFRAUDED INVESTORS REGARDING PERRIGO'S PARTICIPATION IN ANTICOMPETITIVE DRUG PRICING AND THE COMPANY'S EXPOSURE TO PRICING PRESSURES

112.    During the Relevant Period, Defendants repeatedly failed to disclose to investors that Perrigo was engaged in price collusion with its competitors with respect to numerous drugs, which allowed Perrigo to artificially inflate its financial results.

113.    At the same time, given the increased competition in the U.S. generic drug industry in which Perrigo operated and regulatory scrutiny in that industry, Defendants were asked on a regular basis how that competition and scrutiny were impacting Perrigo's generic drug pricing and pricing strategy.  Defendants falsely denied Perrigo was feeling the impact of any "pricing pressures" and in fact, with few exceptions, falsely claimed Perrigo was "insulated from" those pressures.

114.    Indeed, the pricing pressures Perrigo faced gave them a clear motive to collude

with other pharmaceutical companies to fix the prices of certain drugs.

A. **Defendants Made Numerous Statements to Investors Regarding the Pricing of Perrigo's Drugs and the Generic Pharmaceuticals Market.**

115. In myriad statements to investors during the Relevant Period, Defendants addressed drug pricing and the state of the generic pharmaceuticals market. During the April 21, 2015 Earnings Call, for example, Papa was asked whether pricing in the generic drug industry would impact Perrigo's business and growth prospects. Papa explained that Perrigo intended, as it always had in the past, to "keep pricing flat to up slightly" and that he was "very comfortable that, certainly in our current year in our calendar 2015, as we look to the future, we can keep pricing flat to up slightly," in spite of the pricing pressures in the industry.

116. Additionally, in the April 21, 2015 Presentation, Perrigo projected 8%-12% net sales growth for the Generic Rx division. The presentation slides explained that the "directors of Perrigo accept responsibility for the information contained in this presentation" and that "[t]o the best of the knowledge and belief of the directors of Perrigo (who have taken all reasonable care to ensure such is the case), the information contained in this presentation is in accordance with the facts and does not omit anything likely to affect the import of such information."

117. The statements in ¶¶ 115-116 were materially false or misleading when made because, as detailed in ¶¶ 172-189 below, pricing levels for Perrigo's U.S. generic drugs were unsustainable as a result of increased market competition, caused in large part by accelerated approvals of generic drug applications by the FDA and U.S. regulatory scrutiny into generic drug industry pricing. Additionally, as detailed in ¶¶ 144-171 below, Defendants' statements concealed that Perrigo was engaged in price collusion with its generic drug competitors as to numerous drugs, and misrepresented the competitive nature of the Company's participation in the generic drug markets. Specifically, Defendants concealed that (i) Perrigo and several of its

pharmaceutical industry peers colluded to fix generic drug prices, which constituted anticompetitive conduct; and (ii) Perrigo's pricing decisions and strategy accordingly were based on anticompetitive conduct.

118.   During the May 12, 2015 Bank of America Merrill Lynch conference, Papa assured investors once more that Perrigo intended to keep pricing "flat to up slightly":

> [O]bviously it's a competitive market out there.  There is always going to be—in a pricing world somebody is going to gain some share, somebody is going to lose some share.  I think as a general rule, what I've tried to do with pricing at Perrigo in the eight years, nine years, I've been a part of the company is to keep pricing flat to up slightly.  And if I do that, I believe that puts me in the best long-term position to deliver shareholder value for the Company.

119.   The statements in ¶ 118 were materially false or misleading when made because, as detailed in ¶¶ 172-189 below, pricing levels for Perrigo's U.S. generic drugs were unsustainable as a result of increased market competition, caused in large part by accelerated approvals of generic drug applications by the FDA and U.S. regulatory scrutiny into generic drug industry pricing.  Additionally, as detailed in ¶¶ 144-171 below, Defendants' statements concealed that Perrigo was engaged in price collusion with its generic drug competitors as to numerous drugs, and misrepresented the competitive nature of the Company's participation in the generic drug markets.  Specifically, Defendants concealed that (i) Perrigo and several of its pharmaceutical industry peers colluded to fix generic drug prices, which constituted anticompetitive conduct; and (ii) Perrigo's pricing decisions and strategy accordingly were based on anticompetitive conduct.

120.   During the June 2, 2015 Jefferies conference, Papa was asked to comment on Perrigo's pricing strategy, and again reaffirmed the viability of the Company's "flat to up slightly" strategy:

> That's what we do on our pricing for our business.  Across all the
> Perrigo segments, the consumer segment, the nutrition segment,
> the Rx segment and the API segment; we try to take a view on
> pricing across that total portfolio, with a goal of keeping our
> pricing flat to up slightly.  Now in any individual category, like
> Rx, there may be more upside.  But we're recognizing that there is
> going to be some products in Rx that I'm going to have to decrease
> for competitive reasons, as well as increase some.  So what we try
> to do is take a holistic view across the entire portfolio, and keep
> pricing flat to up slightly.  I will say, over the last several years to
> be fair, there's been more pricing upside in the Rx category than
> perhaps some of the other categories.  But we still take that kind of
> total portfolio view of keeping pricing flat to up slightly as a view.

121.    The statements in ¶ 120 were materially false or misleading when made because,
as detailed in ¶¶ 172-189 below, pricing levels for Perrigo's U.S. generic drugs were
unsustainable as a result of increased market competition, caused in large part by accelerated
approvals of generic drug applications by the FDA and U.S. regulatory scrutiny into generic drug
industry pricing.  Additionally, as detailed in ¶¶ 144-171 below, Perrigo was engaged in price
collusion with its generic drug competitors as to numerous drugs, and misrepresented the
competitive nature of the Company's participation in the generic drug markets.  Specifically,
Defendants concealed that (i) Perrigo and several of its pharmaceutical industry peers colluded to
fix generic drug prices, which constituted anticompetitive conduct; and (ii) Perrigo's pricing
decisions and strategy accordingly were based on anticompetitive conduct.

122.    During the August 5, 2015 Earnings Call, Papa was asked "where we are in this
price increase dynamic and how sustainable you feel like those increases are?"  Papa responded:
"On the generics and the pricing environment, our team has done a great job at looking at pricing
. . . . across the portfolio, we think there are still opportunities to do pricing."  Papa added, "[W]e
think we've got a strong Rx business.  And we look to still find some additional pricing
opportunities in the future."

123.    The statements in ¶ 122 were materially false or misleading when made because,

as detailed in ¶¶ 172-189 below, pricing levels for Perrigo's U.S. generic drugs were unsustainable as a result of increased market competition, caused in large part by accelerated approvals of generic drug applications by the FDA and U.S. regulatory scrutiny into generic drug industry pricing.  Additionally, as detailed in ¶¶ 144-171 below, Perrigo was engaged in price collusion with its generic drug competitors as to numerous drugs, and misrepresented the competitive nature of the Company's participation in the generic drug markets.  Specifically, Defendants concealed that (i) Perrigo and several of its pharmaceutical industry peers colluded to fix generic drug prices, which constituted anticompetitive conduct; and (ii) Perrigo's pricing decisions and strategy accordingly were based on anticompetitive conduct.

124.    On August 13, 2015, Perrigo filed the 2015 Form 10-K, which was signed by Papa and Brown.  Defendants stated the Generic Rx division "operate[d] in a highly competitive environment" and "face[d] vigorous competition from other pharmaceutical companies that may threaten the commercial acceptance and pricing of our products."

125.    The statements in ¶ 124 were materially false or misleading when made because, as detailed in ¶¶ 172-189 below, pricing levels for Perrigo's U.S. generic drugs were unsustainable as a result of increased market competition, caused in large part by accelerated approvals of generic drug applications by the FDA and U.S. regulatory scrutiny into generic drug industry pricing.  Additionally, as detailed in ¶¶ 144-171 below, Defendants' statements concealed that Perrigo was engaged in price collusion with its generic drug competitors as to numerous drugs, and misrepresented the competitive nature of the Company's participation in the generic drug markets.  Specifically, Defendants concealed that (i) Perrigo and several of its pharmaceutical industry peers colluded to fix generic drug prices, which constituted anticompetitive conduct; and (ii) Perrigo's pricing decisions and strategy accordingly were based

on anticompetitive conduct.

126.    During the October 22, 2015 Earnings Call, Papa also dismissed an analyst's observation that the "financial markets have become very concerned about the price inflation component of growth also on the generic and brand side going forward," stating:

> Our total strategy for pricing, as I have said I think on numerous calls, is to keep pricing flat to up slightly.  Which means that yes, some parts we may attempt to raise prices there, but in other products we're bringing the price down.  So think about us as keeping pricing flat to up slightly as really the way we're going to look at our total portfolio.

127.    During that same call, Brown stated "nearly all of [Perrigo's] revenues are *insulated from the current pricing drama* you see playing out in the pharmaceutical industry today."

128.    Also on October 22, 2015, Perrigo released inflated profit forecasts for calendar years 2015 and 2016.  The October 22, 2015 Presentation in which those profit forecasts were published stated: "The directors of Perrigo accept responsibility for the information contained in this presentation.  To the best of the knowledge and belief of the directors of Perrigo (who have taken all reasonable care to ensure such is the case), the information contained in this presentation is in accordance with the facts and does not omit anything likely to affect the import of such information."  Additionally, Perrigo indicated the guidance constituted "profit forecast[s]" under Rule 28.1 of the Irish Takeover Rules.  That statement was intended to, and did, assure investors that the Company had compiled the profit forecasts *and* "the assumptions upon which [they are] based" using "scrupulous care, accuracy and objectivity by the directors," as Irish Takeover Rule 28.1 requires.  Perrigo's profit forecasts guided investors to expect adjusted diluted earnings per share (EPS) of $7.65-$7.85 in calendar year 2015, and $9.30-$9.83 in calendar year 2016.  In a letter attempting to justify this inflated model, Perrigo indicated it

assumed that 2016 net sales for the Generic Rx segment would grow organically in the middle of the 8%-12% guidance the Company had previously published, and that the "competitive environment" would not change.

129.    The statements in ¶¶ 126-128 were materially false or misleading when made because, as detailed in ¶¶ 172-189 below, pricing levels for Perrigo's U.S. generic drugs were unsustainable as a result of increased market competition, caused in large part by accelerated approvals of generic drug applications by the FDA and U.S. regulatory scrutiny into generic drug industry pricing.  Additionally, as detailed in ¶¶ 144-171 below, Defendants' statements concealed that Perrigo was engaged in price collusion with its generic drug competitors as to numerous drugs, and misrepresented the competitive nature of the Company's participation in the generic drug markets.  Specifically, Defendants concealed that (i) Perrigo and several of its pharmaceutical industry peers colluded to fix generic drug prices, which constituted anticompetitive conduct; and (ii) Perrigo's pricing decisions and strategy accordingly were based on anticompetitive conduct.

130.    During the January 5, 2016 Goldman Sachs Healthcare Conference, Papa stated:

> Number one, our goal—I've been at Perrigo nine years.  My goal in pricing has been the same for the nine years: try to keep my pricing flat to up slightly.  Now, to be clear, what that means is that I'm taking some products up, and some products can be competition and I'm taking them down.  On balance, what I've tried to—what I strive very hard to achieve is what I would call pricing flat to up slightly.
>
> Now, within a category like let's use the generic Rx products, there may be more volatility up or down in products.  Certainly there's more than generics than there is in my consumer business.  My consumer business has very minimal volatility.  So that's what I've strived to accomplish.
>
> Is there a place now as we sit here today that there's going to be less pricing?  ***I think the answer really is—I'm a believer in economic theory.  It all comes down to supply and demand.***  In

other words, if there are five players, 10 players supplying drug, I can pretty much tell you what the price points are going to be. It's going to be your cost of goods plus 10%. It's going to find its way down to that level.

In a case where there's only two or three players, it's—you are going to make better margins. And that's why we have purposely tried not to be in the commodity generics but to stay in the extended topicals.

Do I think the point of your question is [sic] there going to be more price competition in even things like dermatology? Yes, I do because there are some people coming in.

131.     The statements in ¶ 130 were materially false or misleading when made because, as detailed in ¶¶ 172-189 below, pricing levels for Perrigo's U.S. generic drugs were unsustainable as a result of increased market competition, caused in large part by accelerated approvals of generic drug applications by the FDA and U.S. regulatory scrutiny into generic drug industry pricing. Additionally, as detailed in ¶¶ 144-171 below, Perrigo was engaged in price collusion with its generic drug competitors as to numerous drugs, and misrepresented the competitive nature of the Company's participation in the generic drug markets. Specifically, Defendants concealed that (i) Perrigo and several of its pharmaceutical industry peers colluded to fix generic drug prices, which constituted anticompetitive conduct; and (ii) Perrigo's pricing decisions and strategy accordingly were based on anticompetitive conduct.

132.     On February 18, 2016, Perrigo announced fourth quarter calendar year results and held a conference call in which Papa and Brown made the following statements:

**Brown:** Were you to go through and accumulate the comments we made each quarter throughout calendar 2015 on new products in Rx, new product contributed approximately $121 million over the course of those four quarters. ***And pricing wise, we did see some pressure, give or take, in the total portfolio over the course of the year, approximately 1%***.

**Papa:** And the latter part of your question, it really talks about the pricing dynamics and what we're thinking about and looking at for

-54-

the future.  And I'd say the following.  Are there some incremental product competition that we're going to face?  The answer is yes.

However, what we've tried to do at the Perrigo Group is not just stay focused only on dermatology.  As you know, we've moved into what I would refer to as extended topicals.  So those are things beyond just certainly dermatology, but respiratory, nasal, ophthalmic.

And with those product categories—for example, at the end of the year, we'll launch our ProAir product in terms of a meter-dosed inhaler for respiratory—those are the things that are giving us great strength in our Rx category.  ***And as we believe, that will give us a very high gross margin and operating margin, certainly as we think about the 2016 and beyond.***  So, we like what we see in terms of our ability to launch these new products and what they mean for gross margins and operating margins.

133.   The statements in ¶ 132 were materially false or misleading when made because, as detailed in ¶¶ 172-189 below, pricing levels for Perrigo's U.S. generic drugs were unsustainable as a result of increased market competition, caused in large part by accelerated approvals of generic drug applications by the FDA and U.S. regulatory scrutiny into generic drug industry pricing.  Additionally, as detailed in ¶¶ 144-171 below, Perrigo was engaged in price collusion with its generic drug competitors as to numerous drugs, and misrepresented the competitive nature of the Company's participation in the generic drug markets.  Specifically, Defendants concealed that (i) Perrigo and several of its pharmaceutical industry peers colluded to fix generic drug prices, which constituted anticompetitive conduct; and (ii) Perrigo's pricing decisions and strategy accordingly were based on anticompetitive conduct.

134.   Following its decision to change its fiscal year end from the end of June to the end of December, on February 25, 2016 Perrigo filed a report on Form 10-KT for the fiscal six month stub period ending December 31, 2015 ("2015 Form 10-KT"), which was signed by Papa and Brown.  Defendants represented that, as a manufacturer of  generic versions of brand-name drugs, Perrigo "operate[d] in a highly competitive environment" and "face[d] vigorous

competition from other pharmaceutical companies that may threaten the commercial acceptance and pricing of our products" and further stated "[t]he market for Rx products is subject to intense competition from other generic drug manufacturers."  Additionally, Perrigo listed Actavis (a/k/a Allergan), Glenmark, Mylan, Sandoz, and Taro as among its "generic drug manufacturer competitors."

135.   The statements in ¶ 134 were materially false or misleading when made because, as detailed in ¶¶ 172-189 below, pricing levels for Perrigo's U.S. generic drugs were unsustainable as a result of increased market competition, caused in large part by accelerated approvals of generic drug applications by the FDA and U.S. regulatory scrutiny into generic drug industry pricing.  Additionally, as detailed in ¶¶ 144-171 below, Perrigo was engaged in price collusion with its generic drug competitors as to numerous drugs, and misrepresented the competitive nature of the Company's participation in the generic drug markets.  Specifically, Defendants concealed that (i) Perrigo and several of its pharmaceutical industry peers colluded to fix generic drug prices, which constituted anticompetitive conduct; and (ii) Perrigo's pricing decisions and strategy accordingly were based on anticompetitive conduct.

136.   Even when ultimately forced to acknowledge the impact of pricing pressures on Perrigo's business performance and financial results, Defendants continued to conceal from investors the Company's price-fixing schemes.  On May 12, 2016, for example, Perrigo announced first quarter 2016 results and held a conference call ("May 12, 2016 Call"), in which Brown stated:

> During the quarter, we experienced 24 competitive launches against our portfolio, producing sharp price erosion in a number of topical products we sell.  These factors, combined with continued pricing pressure due to the consolidation of the large buying cooperative groups, and the absence of significant new products in

-56-

the quarter, further impacted our ability to execute on our planned pricing strategies.

Despite all of this, however, the team was able to maintain its extended topicals leadership position in the quarter.  These pricing pressures impacted both the adjusted gross and operating margins, accounting for the decline you see here year-over-year.

137.    The statements in ¶ 136 were materially false or misleading because, as detailed in ¶¶ 144-171 below, Defendants failed to disclose that Perrigo and several of its pharmaceutical industry peers engaged in anti-competitive conduct by colluding to fix generic drug prices.

138.    On May 16, 2016, Perrigo issued a press release announcing first quarter 2016 results, in which it represented that "the Rx segment delivered strong margins in an increasingly challenging pricing and competitive environment," and that "[f]irst quarter adjusted operating income of $117 million decreased by 3% compared to the prior year, primarily driven by industry pricing and competitive pressures."

139.    The statements in ¶ 138 were materially false or misleading when made because, as detailed in ¶¶ 172-189 below, pricing levels for Perrigo's U.S. generic drugs were unsustainable as a result of increased market competition, caused in large part by accelerated approvals of generic drug applications by the FDA and U.S. regulatory scrutiny into generic drug industry pricing.  Additionally, as detailed in ¶¶ 144-171 below, Perrigo was engaged in price collusion with its generic drug competitors as to numerous drugs, and misrepresented the competitive nature of the Company's participation in the generic drug markets.  Specifically, Defendants concealed that (i) Perrigo and several of its pharmaceutical industry peers colluded to fix generic drug prices, which constituted anticompetitive conduct; and (ii) Perrigo's pricing decisions and strategy accordingly were based on anticompetitive conduct.

140.    Also on May 16, 2016, Perrigo filed a Form 10-Q for the first quarter of 2016, which was signed by Brown (Papa had left Perrigo in April 2016).  The Form 10-Q stated the

Company had experienced "a recent reduction in pricing expectations in our U.S. businesses from historical patterns, in particular in our Rx segment due to industry and competitive pressures in the sector," which it attributed in part to "competition in specific product categories."  Perrigo's Forms 10-Q for the second and third quarters of 2016 (dated August 10, 2016 and November 10, 2016, respectively), which were also signed by Brown, contained substantially similar statements.

141.    The statements in ¶ 140 were materially false or misleading when made because, as detailed in ¶¶ 172-189 below, pricing levels for Perrigo's U.S. generic drugs were unsustainable as a result of increased market competition, caused in large part by accelerated approvals of generic drug applications by the FDA and U.S. regulatory scrutiny into generic drug industry pricing.  Additionally, as detailed in ¶¶ 144-171 below, Perrigo was engaged in price collusion with its generic drug competitors as to numerous drugs, and misrepresented the competitive nature of the Company's participation in the generic drug markets.  Specifically, Defendants concealed that (i) Perrigo and several of its pharmaceutical industry peers colluded to fix generic drug prices, which constituted anticompetitive conduct; and (ii) Perrigo's pricing decisions and strategy accordingly were based on anticompetitive conduct.

142.    On May 24, 2016, Brown participated in the UBS Global Healthcare Conference, during which she stated:

> So, now, if you're trying to say, of that basket, how much is pressure versus specific pricing initiatives, in some cases, one could say that they're intrinsically linked.  What do I mean?  We saw a dynamic in Q1 of products being launched against us when we didn't have our product launches right at that time.  **So, we saw some competitive pressure.**  We'll have our products launching later in the year, but we got the pressure at this point and weren't ready with our own launches at that moment.

Now, you start to say: Okay.  **Now, we're seeing a different pricing dynamic for the remainder of the year.**  We have some price increases slated over the rest of the calendar year.

How do we feel?  Are those really going to happen?  Are we going to have some pressure on being able to execute against that tactical plan in our price increases?  Will there be challenges?  So, is that **directly pricing pressure from the consortia**, or is it really a situation of indirect?  And is it our own reticence perhaps to be able to execute on those specific actions?

So, they're linked.  So, you think, of the changing guidance, more than half is Rx.  And of those changes, **it's linked to the environment**.  It's linked to how well we'll be able to execute on those remaining plans because of the environment, as well as some things, the dynamic that happened in Q1 that flows through, obviously, for the rest of the year.

143.   The statements in ¶ 142 were materially false or misleading when made because, as detailed in ¶¶ 172-189 below, pricing levels for Perrigo's U.S. generic drugs were unsustainable as a result of increased market competition, caused in large part by accelerated approvals of generic drug applications by the FDA and U.S. regulatory scrutiny into generic drug industry pricing.  Additionally, as detailed in ¶¶ 144-171 below, Perrigo was engaged in price collusion with its generic drug competitors as to numerous drugs, and misrepresented the competitive nature of the Company's participation in the generic drug markets.  Specifically, Defendants concealed that (i) Perrigo and several of its pharmaceutical industry peers colluded to fix generic drug prices, which constituted anticompetitive conduct; and (ii) Perrigo's pricing decisions and strategy accordingly were based on anticompetitive conduct.

> **B.    Defendants Concealed from Investors that Perrigo Was Colluding with Other Pharmaceutical Companies to Artificially Inflate the Price of Numerous Drugs.**

144.   In stark contrast to their representations to investors identified in ¶¶ 115-143 above, Defendants concealed that Perrigo was participating in anticompetitive price-fixing schemes to artificially inflate the price of numerous drugs.

145.     While Perrigo was principally known as a manufacturer of store-brand OTC products, the operating segment with the greatest impact on earnings was not its consumer healthcare (CHC) division, but Generic Rx.  For the six quarters preceding the Relevant Period, the Generic Rx division contributed more to Perrigo's adjusted net operating earnings than any other segment:

| Quarter ending: | 12/28/2013 | 3/29/2014 | 6/28/2014 | 9/27/2014 | 12/27/2014 | 3/28/2015 |
|---|---|---|---|---|---|---|
| Generic Rx adjusted net operating income | **$123.1m** | **$100.3m** | **$122.3m** | **$81.1m** | **$127.7m** | **$120m** |
| Rank among Perrigo operating divisions | **1st** | **1st** | **1st** | **1st** | **1st** | **1st** |

(Source: Perrigo press releases dated 2/6/14, 5/7/14, 8/14/14, 11/6/14, 2/5/15, 4/21/15 (reporting operating income by division, Form 10-K filed May 22, 2017 (restating operating income to exclude Tysabri royalty stream))

146.     Perrigo's ability to maintain its profit margin in the Generic Rx business accordingly was of paramount importance to investors.  Perrigo claimed to enjoy these margins because the topical generic sector in which it focused was difficult for competitors to enter.  For example, at the J.P. Morgan Healthcare Conference on January 13, 2014, Papa told analysts:

> Our Rx segment, generic Rx segment, has been a real star for us. This segment has really been a focus on going after products that are generic equivalent products, but importantly staying away from just simple oral tablets and going after what we call extended topicals.  And by extended topicals, they fall under the category of dermatology, absorbed topically through the skin, absorbed topically through the lungs; nasal products absorbed topically through the nasal mucosa; ophthalmic and optic are the areas that we predominantly focus on.  And the reason why that's important is that it's much harder to bring these products to the market to be clear, but once you get them to the marketplace they're much harder for other competitors to come into the space.

In other words, as Papa explained, Perrigo had "unique positioning" because its Generic Rx business was focused on products where it could be "one of two or three players entering a market rather than one of 20 players."

147.    Generic drugs enter the market after a patent monopoly has expired.  Because they must be demonstrably equivalent in therapeutic effect to the branded drug, they are differentiated only by price.  In functioning markets, generic drugs provide substantial price breaks for consumers as increased competition drives prices toward the marginal cost of production.  Reviewing a study of data prior to the collusive activities alleged in this Complaint, the FDA concluded "[g]eneric competition is associated with lower drug prices."[17]  Specifically, the FDA determined prices should decline substantially where at least two generic manufacturers have entered the market:



Source:  FDA analysis of retail sales data from IMS Health, IMS National Sales Perspective (TM), 1999-2004, extracted February 2005

A Federal Trade Commission study similarly found that in a "mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug prices."[18]

---

[17] *See* U.S. Food & Drug Admin., *Generic Competition and Drug Prices* (last updated May 13, 2015),  https://medicalproductsandtobacco/cder/ucm129385.htm.

[18] *See* Fed. Trade Comm'n, *Pay-for-Delay: How Drug Company Pay-Offs Cost Consumers Billions* (Jan. 2010),  https://www.ftc.gov/sites/default/files/documents/reports/ pay- delay-how-drug-company-pay-offs-cost-consumers-billions-federal-trade-commission-staff-study/100112payfordelayrpt.pdf.

148.    But, as relevant here, generic drugs have been the subject of numerous recent antitrust investigations.  State and federal regulators have been investigating over 300 generic drugs and at least 16 companies since at least 2006.  State AGs have referred to a scheme to fix prices and allocate a "fair share" in markets for generic pharmaceuticals to ensure profitability and undermine competition as "the largest cartel case in the history of the United States."[19]

149.    Indeed, the existence of collusion in the generic pharmaceutical industry is now well established, with former presidents and CEOs of major drug companies having pleaded guilty to federal criminal charges of anticompetitive collusion relating to multiple generic drugs.[20]

150.    The unlawful and collusive conduct sweeps far broader than the guilty pleas, which merely define the minimum parameters of the generic drug price-fixing conspiracy.  A widespread conspiracy is detailed in the consolidated amended complaint in a civil enforcement action brought by the AGs of 45 states.[21]  That complaint reveals substantial evidence of a broader, overarching conspiracy to cartelize the entire generic drug market.  The state AGs allege there was a longstanding agreement or understanding in the generic drug industry that each competitor was entitled to a certain percentage of the market for each generic drug it manufactured.  And the relevant drugs in the AGs' action overlap with drugs at issue in this case, including desonide and econazole.

---

[19] July 11, 2018 Hrg. Tr. at 36:1-4; 48:10-16, *In re Generic Pharm. Pricing Antitrust Litig.*, MDL 2724 (E.D. Pa.).

[20] *See, e.g.*, DOJ Press Release, *Former Top Generic Pharmaceutical Executives Charged with Price-Fixing, Bid-Rigging  and Consumer Allocation Conspiracies: First Charges Brought By Antitrust Division Involving Generic Drugs* (Dec.  14, 2016), https://www.justice.gov/opa/pr/former-top-generic-pharmaceutical-executives-charged-price-fixing-bid-rigging-and-customer.

[21] *See* State Att'ys Gen. Consol. Am. Compl., Case No. 17-cv-3768 (E.D. Pa.), Dkt. 3.

151.    Perrigo was a part of that market.  In the six quarters preceding the Relevant Period, Perrigo's Generic Rx unit relied on anticompetitive markets to generate its "star" performance.  In contrast to the price declines that are typically associated with maturing generic markets, Perrigo relied on collusion with other manufacturers of generic drugs, or in some cases took advantage of pre-existing price-fixing conspiracies, to engage in unprecedented price hikes that could never be accomplished in a competitive market.  According to a *Wall Street Journal* analysis of generic drug price fixing, ***eight of the nine best-selling Perrigo generic drugs analyzed had price boosts of up to 531% since September 2013***:



See J. Rockoff and M. Rapoport, *Valeant's New CEO Brings Familiar Prescription*, WALL ST. J. (July 5, 2016), https://www.wsj.com/articles/valeants-new-ceo-brings-familiar-prescription-1467745749.  Experts from SSR Health LLC cited by the *Journal* concluded: "Generic drug prices rose significantly in 2013 and 2014 . . . and Perrigo upped the list prices of its generics

more than many rivals.  The list prices of Perrigo's drugs rose 52% over the past four years, compared with an average 18% across manufacturers."  *Id*.  A Perrigo spokeswoman quoted in the *Journal* article conceded "we take our competitors' pricing into account" when raising prices for Perrigo generics.  *Id*.

152.    Because generic drugs by different manufacturers were therapeutically equivalent and interchangeable by pharmacists, there would be strong incentive for the manufacturers of those generic drugs to try to gain market share by lowering price in a normal, unaffected market. Further, each of the drugs listed in ¶ 151 had a highly concentrated market structure susceptible to collusion, inelastic demand because most of the price increases fell to third-party payors, and high barriers to entry due to the requirement that new competitors first obtain an abbreviated new drug approval ("ANDA") from the FDA.  Additionally, third-party data services such as Symphony Health Services, IMS, and First Data Bank provided weekly pricing updates, transmitting prices among market participants.  Finally, there were no non-collusive factors that could explain the rapid and coordinated price increases initiated by Perrigo and its so-called "competitors."

### 1.    Desonide

153.    Perrigo's pricing of desonide cream shows clear signs of collusion with Taro and other generic manufacturers.  Desonide is a mild topical corticosteroid that has been used to treat a variety of skin conditions since the 1970s and has been available in generic form for decades. For years, competition among generic manufacturers kept prices stable, at relatively low levels. Before the Relevant Period, Perrigo and Taro dominated the market for the most prevalent form of generic desonide, external cream.

154.    In February and April 2013, representatives of Perrigo and Taro met at the annual meetings of the Generic Pharmaceutical Association from February 20 to 22, 2013, in Orlando,

Florida; the National Association of Chain Drug Stores from April 20 to 23, 2013, in Palm

Beach, Florida; and the June 4-5, 2013 Generic Pharmaceutical Association CMC workshop in

Maryland.  Promptly after those trade meetings, between April and June 2013, Perrigo and Taro

both abruptly raised desonide prices by approximately 600%.  Perrigo and Taro continued to

maintain that high fixed price, and other manufacturers that began to sell generic desonide did so

at the prices fixed by Perrigo and Taro.

155.    During the Relevant Period, an article in *eDermatology News* noted there was no

rational basis for generic desonide price hikes:

> [R]ecently I've become aware of a new wrinkle that complicates
> daily practice life for both doctors and patients in a significant
> way.  I can't make any sense of it.
>
> I mean the high price of desonide.
>
> When I was [a] student many years ago, my teachers told me that I
> should prescribe generic drugs whenever possible.  This would
> help hold down medical costs.  It was the right thing to do.
>
> *            *            *
>
> But lately I've been getting complaints from patients about the
> high cost of desonide.  My first reaction to these was, "How on
> earth is that possible?"
>
> *            *            *
>
> I asked my secretary to call the pharmacy to get a price for other
> generic steroid creams.  Triamcinolone would cost $14.70.
>
> Alclometasone would cost $35.20.
>
> And desonide—generic desonide—would cost $111.70.  For a 15-
> g tube.  $111.70 for 15 g of a generic cream that's been on the
> market forever!  Does that make any sense?

Alan Rockoff, M.D., "The high price of desonide," *eDermatology News* (Feb. 3, 2015),

http://www.mdedge.com/edermatologynews/article/96892/high-price-desonide.

156.     Perrigo generated millions of dollars in collusive revenues through supracompetitive pricing of desonide cream.  Indeed, as alleged in the Class Complaint (at ¶ 76), lead plaintiff's expert determined Perrigo derived $98.3 million in collusive revenues across its formulations of generic desonide for 2014, $49.7 million for 2015, and $22.6 million for 2016.

157.     Additionally, Sandoz recently entered into a deferred prosecution agreement with the DOJ, pursuant to which Sandoz admitted to anticompetitive conduct with respect to desonide.  Among other things, Sandoz attested that "[f]rom in or about July 2013 and continuing until in or about December 2015, Sandoz conspired to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and/or stabilize, maintain, and fix prices of, certain generic drugs, including desonide, ointment, with Company B, a generic drug company with its principal place of business in Michigan."  Deferred Prosecution Agreement, *United States v. Sandoz Inc.*, No. 2:20-cr-00111-RBS (E.D. Pa. filed Mar. 2, 2020), at 19.  Upon information  and belief, "Company B" in the Sandoz deferred prosecution agreement refers to Perrigo.

### 2.     Econazole

158.     Similarly, anticompetitive pricing can be seen in generic econazole, a prescription cream marketed since 1982 and available in generic form since 2002, which is used to treat skin infections such as athlete's foot, jock itch, and ringworm.  As with desonide, Perrigo dominated the generic econazole market in the years preceding the Relevant Period.  And as with desonide, Perrigo and other manufacturers made unprecedented, coordinated price hikes in generic econazole cream prices just after attending industry meetings, in this case the February 19-21, 2014 Generic Pharmaceutical Association annual meeting in Orlando, Florida and the June 3-4, 2014 Generic Pharmaceutical Association CMC workshop meeting in Maryland.

159.     Perrigo generated millions of dollars in collusive revenues through supracompetitive pricing of econazole cream.  As alleged in the Class Complaint (at ¶ 80), lead plaintiff's expert determined Perrigo reaped $72.5 million in collusive revenue from generic econazole cream in 2014, $125.2 million in 2015, and $53.6 million in 2016.

### 3.     Permethrin

160.     Collusion is also evident in the 300%+ contemporaneous price hikes that Perrigo and other generic manufacturers set for permethrin cream, a prescription treatment for lice and scabies that is on the World Health Organization's List of Essential Medicines.  Permethrin has been available in branded form since 1986 and in generic form since 1998.  Perrigo, which has sold permethrin since 2003, dominates the market, selling far more than its peers Actavis Pharma and Renaissance Acquisition Holdings (now a division of Mylan).

161.     Although economic theory and the actual experience documented by the FDA in competitive generic drug markets indicate prices should drop when additional competitors enter the market, Perrigo successfully increased prices for permethrin as competitors entered the market.

162.     Perrigo generated millions of dollars in collusive revenues through supracompetitive pricing of permethrin external cream.  As alleged in the Class Complaint (at ¶ 84), lead plaintiff's expert determined Perrigo received collusive revenues for permethrin cream totaling $79.1 million in 2014, $60.4 million in 2015, and $73.8 million in 2016.

### 4.     Tretinoin

163.     While Perrigo may not have been responsible for initiating collusion in generic tretinoin, a topical treatment for acne more commonly known as Retin-A, it nonetheless enjoyed inflated returns because of price fixing in that market.  Perrigo acquired a portfolio of tretinoin products from Matawan Pharmaceuticals, a division of Rouses Point Pharmaceuticals

("Rouses"), in December 2015.  Perrigo had previously served as the authorized generic

distributor of these products from 2005 to 2013, so it was familiar with what pricing in that

market should have been under normal competitive circumstances.  At all relevant times, the

portfolio of products distributed by Perrigo, briefly sold by Rouses itself and then reacquired by

Perrigo, dominated the market for generic tretinoin.

164.     Lockstep price increases were implemented while the tretinoin portfolio was

controlled by Rouses, which were maintained after Perrigo's December 2015 purchase.

165.     Perrigo generated millions of dollars in collusive revenues through

supracompetitive pricing of tretinoin external cream.  As alleged in the Class Complaint (at

¶ 86), lead plaintiff's expert determined Perrigo's results were inflated by $84.1 million in

collusive revenue from generic tretinoin revenues in 2016.

### 5.     Clobetasol

166.     Clobetasol is a potent corticosteroid used to treat eczema, dermatitis, and

psoriasis, among other skin conditions.  Many formulations of clobetasol, another important

Perrigo generic drug, also showed signs of collusion.  For example, for generic clobetasol gel,

Perrigo was the dominant producer throughout the Relevant Period in a market with only four

substantial participants.  For the gel formulation of clobetasol, the other three substantial

producers engaged in coordinated, collusive price hikes in 2014, simultaneously inflating prices

by several hundred percent.

167.     In January 2016, Perrigo joined the existing price-fixing conspiracy and raised its

own prices five-fold so that they were approximately identical to all other competitors.  Because

all other market participants had agreed to maintain the same anticompetitive prices, and because

demand for clobetasol gel was inelastic, Perrigo's price inflation led to a huge spike in monthly

sales.

168.     Perrigo generated millions of dollars in collusive revenues through supracompetitive pricing of clobetasol gel.  As alleged in the Class Complaint (at ¶ 88), lead plaintiff's expert determined Perrigo's collusive revenues across various formulations of Clobetasol were $28.0 million in 2014, $21.1 million in 2015, and $43.0 million in 2016.

### 6.     Halobetasol propionate

169.     Another key topical generic drug, halobetasol propionate, shows similar evidence of collusion.  Halobetasol propionate is a corticosteroid used on the skin to reduce swelling, redness, and itching due to certain dermatological conditions.  It has been available in generic form since 1990.  Perrigo dominated the market for generic halobetasol propionate ointment, along with another manufacturer, G&W Labs.

170.     Perrigo and G&W Labs kept their prices highly correlated between 2012 and 2016, including a massive lockstep hike in 2013 just after the annual meeting for the Generic Pharmaceutical Association.  The coordinated price hikes in halobetasol propionate ointment were very profitable for both Perrigo and G&W Labs.  Monthly sales revenue from the drug more than doubled for both Perrigo and G&W Labs immediately following the lockstep 2013 price hike.

171.     Perrigo generated millions of dollars in collusive revenues through supracompetitive pricing of halobetasol propionate ointment.  As alleged in the Class Complaint (at ¶ 91), lead plaintiff's expert determined the collusive revenues from halobetasol propionate were $17.7 million in 2014, $15.4 million in 2015, and $14.4 million in 2016.

### C.     Defendants Also Concealed from Investors that Perrigo Was Not Insulated from Pricing Pressures Due to Competition in the Generic Pharmaceutical Industry.

172.     While Perrigo's newly-formed BCH segment housed the Company's consumer-facing business (including Omega), Perrigo's Rx segment was primarily focused on the sale of

generic and specialty pharmaceutical prescription products in the U.S.  During the Relevant

Period, Defendants represented that the prices for Perrigo's prescription drugs in the U.S.,

including generics, were sustainable.  In fact, as detailed above, Defendants told investors the

Company intended to keep pricing in its Rx segment "flat to up slightly," while Brown assured

the market that Perrigo's revenues were "insulated from the current pricing drama" in the

market.  In contrast to those representations, Defendants knew or recklessly disregarded that the

pricing levels for Perrigo's generic drug products were unsustainable.

**1.      The FDA's accelerated approvals for new generic drugs reached record levels in 2015.**

173.      Since the implementation of the Drug Price Competition and Patent Term

Restoration Act (known as the "Hatch-Waxman Act") in 1984, generic drugs have resulted in

billions of dollars in annual savings for consumers and the overall healthcare system.  The

Hatch-Waxman Act was enacted to simplify the regulatory hurdles for bringing generic drugs to

market and eliminated the prior requirement that generic drug companies file costly New Drug

Applications ("NDA") to obtain FDA approval.  The Act was designed to get less expensive

generic drugs into the hands of consumers expeditiously.  Under the revised process, generic

drug companies can instead file an Abbreviated New Drug Application ("ANDA").  A generic

drug company that submits an ANDA generally is not required to include clinical trial data to

establish the safety and efficacy of the drug.  Instead, the company can "piggyback" on the safety

and efficacy data supplied by the original NDA holder for a given drug.

174.      Generic drugs must meet certain bioequivalence and pharmaceutical equivalence

standards set by the FDA to ensure the generic drug is essentially an exact substitute for the

given brand name drug.  To receive FDA approval through an ANDA, a generic drug must

contain the same active ingredient, in the same dosage form and in the same strength, to be

-70-

bioequivalent to the reference listed drug (i.e., the original brand name version approved by the

FDA through an NDA). The FDA uses a review process to ensure that brand name and generic

drugs that are rated "therapeutically equivalent" have the same clinical effect and safety profile.

The FDA assigns generics that are deemed to be therapeutically equivalent to their brand name

counterparts an "AB" rating. Drugs that are bioequivalent, but that do not share the same dosage

form, are not AB-rated.

175.    The Hatch-Waxman Act also provides a 180-day exclusivity period for the first

generic drug company that files an ANDA and simultaneously challenges the validity of the

patent for a brand-name drug. This exclusivity period, which allows the generic drug company

to market its generic version free from competition, is intended to spur generic drug companies

to provide alternatives to brand-name drugs. When generic drugs enter the market, they are

often priced well below the brand-name drugs and quickly take a large market share from the

brand-name drug company. The first generic drug will generally be priced 15% to 20% below

the brand-name drug. Once the exclusivity period ends and more generic versions enter the

market, the price of the generic drugs continues to fall and the generics' combined share of the

market for that drug, relative to the brand-name equivalent, continues to grow. The price of the

generic versions of a given drug can fall to as little as 10% to 20% of the original price for the

brand-name drug. Eventually, the price of the generic drugs reaches an equilibrium price point,

at or close to the manufacturers' marginal production costs, resulting in significant savings for

consumers, insurers, and employers.

176.    For all of these reasons, the overall cost of prescription drugs for the public is

reduced by faster generic drug approval times. Generally speaking, the average time between

generic drug application submission and approval ranges from six months to several years,

depending on the complexity of the drug production and the completeness of the application.

177.    Given the influx of market participants as the generics market expanded, the FDA was left with a substantial backlog of ANDAs, which it largely attributed to a lack of resources. Spurred on by the severe scrutiny placed on the FDA's approval process during the early years of the AIDS epidemic in the late 1980s and early 1990s, Congress in 1992 enacted the Prescription Drug User Fee Act ("PDUFA"), which provided the FDA with a supplemental revenue source to fund the approval process, namely, fees paid by the drug companies seeking approval of the drugs. PDUFA was passed to shorten the length of time from a manufacturer's submission of a new drug application to the FDA's decision to approve or deny the application.

178.    After undergoing various authorizations and reauthorizations since its inception, PDUFA was once more reauthorized in July 2012, at a time when the FDA was saddled with nearly 3,000 backlogged ANDAs and 2,000 prior approval supplements ("PASs").[22]  Around that same time, Congress passed the Generic Drug User Fee Act of 2012 ("GDUFA"), which authorized additional funds for the FDA's review of generic drug applications, among other things.

179.    With the additional funds provided by GDUFA came an FDA commitment to reach a variety of goals, including accelerating the review process and eliminating the mounting backlog of ANDAs. The backlog had led to unprecedented generic price inflation between 2013 and late 2014, the result of highly concentrated markets in which a handful of competitors could hike prices. One such commitment the FDA took was to review and act on 90% of all backlogged ANDAs, PASs, and amendments by the end of fiscal year 2017.

---

[22] A PAS is a filing with the FDA to gain approval of a major change that has a substantial potential to have an adverse effect on the identity, strength, quality, purity, or potency of a drug product, as these factors may relate to the safety or effectiveness of the drug product.

180.    By early 2015, ANDAs were still subject to significant backlogs, limiting price competition for generics.  In a keynote address at the Generic Pharmaceutical Association (GPhA) annual meeting in early 2015, the Director of the FDA's Office of Generic Drugs, Kathleen Uhl, M.D., pledged accelerated action.  The FDA delivered on Director Uhl's promise, hiring nearly 1,200 new employees in 2015, more than the preceding two years combined.  The number of full approvals and tentative approvals of generic drugs accordingly began to reach record heights in or around April 2015, at the start of the Relevant Period.

181.    Additionally, as shown below, between April 2015 and December 2015, the FDA approved the ANDAs for at least nine drugs that compete directly with drugs sold by Perrigo according to the FDA's Orange Book:

| PROPRIETARY NAME | APPLICANT HOLDER | APPROVAL DATE |
|---|---|---|
| 1% CLINDAMYCIN PHOSPHATE TOPICAL SOLUTION | VINTAGE  PHARMACEUTICALS | 5/29/2015 |
| 0.25%  DESOXIMETASONE TOPICAL CREAM | AKORN INC | 6/12/2015 |
| 0.01% FLUOCINOLONE ACETONIDE TOPICAL OIL | AKORN INC | 6/25/2015 |
| 0.25% DESOXIMETASONE TOPICAL CREAM | ACTAVIS MID ATLANTIC LLC | 9/4/2015 |
| 400MG IBUPROFEN TABLET | GRANULES INDIA LTD | 9/15/2015 |
| 600MG IBUPROFEN TABLET | GRANULES INDIA LTD | 9/15/2015 |
| 800MG IBUPROFEN TABLET | GRANULES INDIA LTD | 9/15/2015 |
| 20MG FAMOTIDINE TABLET | AUROBINDO  PHARMA  LTD | 12/22/2015 |
| 40MG FAMOTIDINE TABLET | AUROBINDO  PHARMA  LTD | 12/22/2015 |

182.    On November 9, 2015, *InsiderHealthPolicy* reported, in an article titled *FDA, Pressed to Clear Generic Drug Backlog, Says It Is Ahead of Schedule*, that the FDA had taken action on 82% of the backlog "as a rising chorus of voices, including Democratic presidential candidate Hillary Clinton, press the agency to clear the backlog to help counter rising pharmaceutical prices."

183.    In all, in 2015 more than 700 generic drugs were approved or tentatively approved

by the FDA, the highest figure in the FDA's history.

> **2.** **Defendants knew or recklessly disregarded that the pricing levels for Perrigo's U.S. generic drugs were unsustainable.**

184.     In light of the well-known and undeniable impact that increased competition and generic drug approvals have on market pricing for such drugs, as well as the historic number of ANDA approvals by the FDA beginning in April 2015, Perrigo knew or recklessly disregarded that the elevated pricing levels for its generic drugs were unsustainable as the rate of new approvals accelerated and continued unabated throughout 2015 and into 2016.  Indeed, Perrigo had entire divisions tasked with monitoring its rivals' development of competing generic drugs and the regulatory status of such potential competitor drugs.  The market, on the other hand, was in the dark, as Defendants falsely represented that Perrigo was immune to such pricing pressures.

185.     *First*, Defendants were aware that increased competition in the industry was pushing, and would continue to push, generic drug pricing down.  As discussed above, beginning in April 2015 the FDA began to clear its substantial backlog of ANDAs and approve new generic drugs at record levels, including nine drugs approved between May and December 2015 that competed directly with Perrigo's products.  The accelerated rate of ANDA approvals persisted throughout 2015 and into the first quarter of 2016.

186.     Internally, Defendants knew that Perrigo was not immune to those pricing pressures, as CEO John Hendrickson admitted following Papa's abrupt departure from the Company, and that competition was the cause of such pressures.  According to former employees cited in the Kuwait Complaint, Perrigo, like other drug companies, kept track of what competing drug companies were doing in the new product development area.  More specifically, as detailed in the Kuwait Complaint (at ¶¶ 135-37):

- Senior Vice President of Generic RX John Wesolowski had a running list that

included not only Perrigo products coming to market, but also identified the companies in competition with Perrigo to be first to market in the ANDA process.  A former employee explained Wesolowski would give him the list identifying which competing companies were applying for ANDA approval of competing products so that the former employee would know which companies Perrigo had to beat in the ANDA process.

- Wesolowski had management oversight of the entire generic side of Perrigo's business and reported directly to Doug Boothe, who ran the Rx segment, and who in turn reported to Papa.

- According to the same former employee, Wesolowski's group also knew which products other drug companies were bringing to market to compete with existing Perrigo products.  The former employee heard individuals in Wesolowski's group discuss keeping track of such information.  The former employee explained that Wesolowski's group needed that information so it could plan sales and pricing.

- Another former employee, who served as a Senior Business Analyst during the Relevant Period, learned through conversations with Tom Wight, a Business Process Architect for Rx and OTC at Perrigo, that increased competition in the generic market was creating pricing pressure in the Rx segment in 2015.  The former employee, who worked on the same floor as Wight, explained that Business Process Architects are essentially business relationship managers who work with business line leaders to develop sales strategy.

- The former employee recalled being told by Wight that, whereas prior to the increased competition in the marketplace, sales were almost automatic for the business segment, during the Relevant Period the sales team encountered a market where buyers were looking elsewhere.

187.     *Second*, Defendants were aware that the generics market was under pricing pressure following the commencement of industry-wide investigations of suspicious price hikes by Congress, the DOJ, and several state AGs beginning in late 2014.  Those investigations have begun to reveal a reportedly broad, well-coordinated, and long-running series of schemes to fix prices for a number of generic drugs.

188.     On March 3, 2017, in an article titled *Perrigo Joins Firms With Generic Drugs Under U.S. Glare*, Bloomberg reported that Perrigo was one of the companies under scrutiny at the DOJ.  It was also disclosed that the DOJ sought a stay of discovery in civil antitrust suits brought against Perrigo and its competitors in connection with three drugs—desonide, clobetasol, and fluocinonide—to avoid compromising the government's investigation.  Then, on May 2, 2017, Perrigo confirmed that the DOJ had executed search warrants at the Company's corporate offices in connection with its investigation into price collusion in the generic drug industry.  As reported by Bloomberg, analysts from RBC Capital Markets stated the raid of Perrigo "is going to bring the DOJ generic pricing risk back into focus."[23]

189.     Given the intense scrutiny of price inflation across the generic drug industry, coupled with the FDA's well-known and identifiable efforts to accelerate the approval of new generics to bring down that inflation, Defendants knew or recklessly disregarded that the then-current pricing levels for Perrigo's Rx products were unsustainable.

**VII.    DEFENDANTS ISSUED FALSE OR MISLEADING FINANCIAL GUIDANCE**

190.     Faced with Mylan's hostile takeover attempt, Defendants issued financial guidance that lacked a reasonable basis and cloaked Perrigo's true financial condition and prospects, as Defendants' guidance did not take into account the true value of the Omega

---

[23] Drew Armstrong and Caroline Chen, "Perrigo Offices Searched by U.S. Agents in Drug Price Probe," Bloomberg, May 2, 2017.

acquisition and Perrigo's problems with the Omega integration (set forth in ¶¶ 103-111 above), as well as Perrigo's involvement in price-fixing with respect to numerous generic drugs and the Company's true exposure to pricing pressures in the generic drug industry (set forth in ¶¶ 144-189 above).  Defendants' financial guidance was also misleading because, at the time it was issued, Defendants did not disclose specific, material information that, had it been disclosed, would have reasonably called into doubt Perrigo's financial guidance.  Having elected to issue financial guidance, Defendants violated their duties to (i) disclose that specific information so as to render Perrigo's financial guidance not misleading; and (ii) update Perrigo's financial guidance when Defendants became aware of that information.

191.    On August 5, 2015, Perrigo filed a Form 8-K announcing its second quarter results ("August 5, 2015 Earnings Release"), which was signed by Brown.  In the release, Defendants reaffirmed Perrigo's adjusted earnings guidance for 2015, representing to investors that "[t]he Company continues to expect calendar year 2015 adjusted earnings per diluted share of $7.50 to $8.00."

192.    Those statements were materially false or misleading when made for the reasons set forth in ¶ 190 above.

193.    On October 22, 2015, Perrigo issued a press release on Form 8-K announcing its third quarter 2015 financial results, which was signed by Brown ("October 22, 2015 Press Release").  Perrigo narrowed its guidance for 2015 adjusted earnings to a range between $7.65 and $7.85 per diluted share, and also announced 2016 adjusted earnings guidance of $9.30 per diluted share (or $9.45 per diluted share inclusive of a planned share repurchase plan).  Among other things, Papa reiterated that the Company's "durable business model and ***future growth prospects are self-evident*** as we continue to deliver value for our shareholders."  Those

representations were repeated in substantial form in the Company's October 22, 2015 Presentation.

194.    Those statements were materially false or misleading when made for the reasons set forth in ¶ 190 above.

195.    On January 11, 2016, Perrigo issued a press release on Form 8-K announcing its updated 2016 full-year adjusted earnings guidance.  Specifically, the Company increased its 2016 adjusted earnings guidance from $9.45 per diluted share to a range of $9.50 to $10.10 per diluted share, an increase of 24% to 29% over the 2015 adjusted earnings per diluted share guidance range of $7.65 to $7.85.

196.    Those statements were materially false or misleading when made for the reasons set forth in ¶ 190 above.

## VIII.   DEFENDANTS DEFRAUDED INVESTORS REGARDING PERRIGO'S ORGANIC GROWTH

### A.    Defendants Made Numerous Representations to Investors Regarding Perrigo's Organic Growth.

197.    Throughout the Relevant Period, Defendants touted Perrigo's purported organic growth.  For example, in the April 21, 2015 Press Release issued to persuade Perrigo investors to reject Mylan's $205 per share cash and stock acquisition offer, Perrigo stated:

> Following a thorough review, advised by its financial and legal advisors, the Board unanimously concluded that the Proposal substantially undervalues the Company and its future growth prospects and is not in the best interests of Perrigo's shareholders.

Key factors informing the Board's determination include:

> The Proposal substantially undervalues Perrigo's differentiated global business, including the Company's leading market position in key franchises, global distribution platform, and proven expertise in product development and supply chain management;

**The Proposal would deny Perrigo shareholders the full benefits of Perrigo's durable competitive position and compelling growth strategy, which is reflected in the Company's three-year organic net sales compound annual growth rate (CAGR) goal for calendar 2014 to 2017 of 5-10%;**

\*      \*      \*

Joseph C. Papa, Chairman, President and CEO, said, "***The Board believes the Proposal substantially undervalues Perrigo and its growth prospects and that continued execution by the management team against our global growth strategy will deliver superior shareholder value.  Perrigo has a long history of driving above market shareholder value through consistent growth with a focus on profitability and operational excellence, which is reflected in our organic net sales CAGR goal of 5-10% for the next three years. . . . We will continue to capitalize on our durable competitive position by expanding our international platform organically*** and through future synergistic deals.  These actions will advance our leadership in the global OTC marketplace."

198.    The statements in ¶ 197 were materially false or misleading when made because, as detailed in ¶¶ 103-111 and ¶¶ 144-189 above as well as ¶¶ 226-229 below, (a) Perrigo's organic growth was not "consistent"; (b) over the six quarters preceding the Relevant Period, Perrigo's actual average organic growth was far below 5%-10%; (c) Omega management modeled Omega's long-term organic growth to be substantially below the 5%-10% range referenced in the press release; (d) the growth that Perrigo did achieve was derived to a material extent from unlawful, collusive pricing that inflated revenues in Perrigo's Generic Rx division; (e) Perrigo relied on the unsustainable and undisclosed sales practices the Company internally referred to as "optimizing" to achieve the growth it touted and projected; (f) the Company had failed to integrate Omega operationally, which compromised the organic growth figures Defendants touted to investors; and (g) certain of Perrigo's key synergy assumptions for the Omega acquisition were unproven and unlikely to materialize, which negated the cost savings and growth projections Defendants were touting to investors.

199.    Additionally, in the April 21, 2015 Presentation, in a slide titled "Proven

Financial Track Record," Defendants claimed that Perrigo had a "proven history of meeting our

goals," identifying organic net sales growth of 7% between 2011 and 2014, and had "the ability

to keep delivering" growth in the 5%-10% range.  For its Generic Rx division, Perrigo enhanced

its hype even further, telling investors to expect growth in the 8%-12% range.  In the oral part of

the presentation, Papa claimed to "see additional upside for Perrigo on the horizon over and

above" the organic growth goal.

200.    Perrigo called its growth strategy "base plus plus plus," which it depicted visually

with a pyramid:



201.    The base was the existing businesses with their inflated 5%-10% growth

projections.  Layered on top of that was the industry trend of switching from prescription to

OTC, which theoretically helped the core CHC business but had failed to deliver much upside

for several quarters.  At the very top of the "base plus plus plus" pyramid, above mergers and

acquisitions, was the projection of "Tysabri upside" from possible new indications in stroke and

secondary progressive multiple sclerosis.

202.    Perrigo further stated in the April 21, 2015 Presentation:  "The directors of

Perrigo accept responsibility for the information contained in this presentation.  To the best of

the knowledge and belief of the directors of Perrigo (who have taken all reasonable care to

ensure such is the case), the information contained in this presentation is in accordance with the

facts and does not omit anything likely to affect the import of such information."  During the

presentation, Perrigo and Papa (on behalf of all of Perrigo's directors) stated:

> Simply put, the Board believes that continued execution by the
> management team against our existing global growth strategy will
> deliver superior shareholder value.  ***Perrigo has a long history of
> driving shareholder value through consistent, above-market
> growth and we are exceptionally well positioned to continue to
> deliver superior growth and shareholder value as we build our
> strong independent future.***
>
> *             *             *
>
> We're just back from the board meeting in Ireland and I'm thrilled
> to talk to you about our future growth prospects which gives me
> great confidence that our strong durable base will enable us to
> achieve our goal to grow our net sales by 5% to 10% into the
> future.  We continue to grow at this rate on a significantly bigger
> base, but there is a significant potential upside not included in the
> CAGR goal.  To reiterate this, our growth goal is purely organic.
> We have historically delivered a balanced mix of organic and
> inorganic growth, which we expect to continue into the future.  We
> also see substantial upside for Perrigo on the horizon over and
> above this three-year goal.
>
> *             *             *
>
> It's a very exciting chapter in the Perrigo growth story.  We've
> built a tremendous platform for growth and value creation and our
> pipeline is stronger than ever.  Plus, we are positioned to benefit
> from clear demographic trends and the movement of products from
> Rx to OTC.  Plus, we have just completed the Omega acquisition,
> which, among other major benefits, provides a significantly
> ***enhanced international platform for additional growth***.

203.    The statements in ¶¶ 199-202 were materially false or misleading when made

because, as detailed in ¶¶ 103-111 and ¶¶ 144-189 above as well as ¶¶ 226-229 below,

(a) Perrigo was not "exceptionally well positioned to continue to deliver superior growth"; (b) Perrigo did not have a "strong durable base" capable of delivering 5%-10% "purely organic" growth; (c) the Omega acquisition did not "significantly enhance[]" Perrigo's claimed organic growth rates; (d) Perrigo's growth prospects and competitive position were not accurately described and Perrigo's directors, including Papa, had not "taken all reasonable care" to ensure their characterizations of Perrigo's growth and competitive position were "in accordance with the facts and does not omit anything likely to affect the import of such information"; (e) Omega management modeled Omega's long-term organic growth to be substantially below the 5%-10% range referenced in the press release; (f) the growth that Perrigo was able to achieve was derived to a material extent from unlawful, collusive pricing that inflated revenues in Perrigo's Generic Rx division; (g) Perrigo relied on the unsustainable and undisclosed sales practices Perrigo internally referred to as "optimizing" to achieve the growth it touted and projected; (h) the Company had failed to integrate Omega operationally, which compromised the organic growth figures Defendants touted to investors; (i) certain of Perrigo's key synergy assumptions for the Omega acquisition were unproven and unlikely to materialize, which negated the cost savings and growth projections Defendants were touting to investors; and (j) Omega management modeled Omega's long-term organic growth to be substantially below the 5%-10% range referenced in the presentation.

204.    During the same presentation, Perrigo and Brown utilized slides claiming (in relevant part) to establish Perrigo's "Proven Financial Track Record," a "proven history of meeting our goals," and "the ability to keep delivering":



... and the ability to keep delivering

205.    Brown, on behalf of Perrigo and Perrigo's directors (including Papa), stated:

> ***The durability of our diverse product portfolio is clearly evident,
> as our consolidated result is solidly in the range.  We have met
> our consolidated organic-only goals in the past and fully intend
> to do so in the future.***  Looking forward, our goal is to once again
> deliver an organic net sales CAGR for the next three years in the
> 5% to 10% range while off a significantly larger base.

206.    The statements in ¶¶ 204-205 were materially false or misleading when made

because, as detailed in ¶¶ 103-111 and ¶¶ 144-189 above as well as ¶¶ 226-229 below, (a)

Perrigo did not have the "ability to keep delivering" organic net sales growth of 5%-10%, and

had not had that ability for several quarters; (b) the information presented in those slides and

Brown's discussion of growth was not "in accordance with the facts" as the Perrigo directors

(including Papa) had promised, and the presentation omitted material facts "likely to affect the

import of the information presented"; (c) over the six quarters preceding the Relevant Period,

Perrigo's actual average organic growth was far below 5%-10%, not "solidly in the range."

207.     On May 6, 2015, Papa represented during the Deutsche Bank Health Care Conference:

> We believe we have a business that will grow 5% to 10%, organically.  So, we believe we can grow revenue 5% to 10% organically in our base business.
>
> \*        \*        \*
>
> But the final point, I guess, I want to make is that, in the meantime, the Perrigo Company is number one, going to continue to execute on our base business.  We think we can execute as we said with the 5% to 10% compound annual growth rate over the three years organically.
>
> \*        \*        \*
>
> What we've always said is, what's most important for us is to continue to execute on our business, show that 5% to 10% compound annual growth rate.
>
> Historically, what we've been able to do is actually we've done right in the middle of that.  We've done about 8% compound annual growth rate organically.  And then we supplemented that with another approximately 7% to 8% of inorganic opportunity. Those were the things we're going to continue to do.  And that's why I think the board is very comfortable in stating that we felt the Mylan offer substantially undervalues the company.

208.     The statements in ¶ 207 were materially false or misleading when made because, as detailed in ¶¶ 103-111 and ¶¶ 144-189 above as well as ¶¶ 226-229 below, (a) over the six quarters preceding the Relevant Period, Perrigo's actual average organic growth was far below 5%-10%; and (b) Perrigo was *failing* to achieve organic growth goals and employing unsustainable sales practices to maintain the illusion of organic growth, and therefore "continu[ing] to execute" at the current rate would necessarily mean missing the growth targets touted to investors as a reason to reject Mylan's lucrative takeover offer.

209.     On May 12, 2015, Papa stated during the Bank of America Merrill Lynch Health Care Conference:

> I think the biggest challenge we have right now is that we just
> don't see the [Mylan] offer that's on the table as being equivalent
> to what we think the value of the Perrigo Company is.  So we think
> it substantially undervalues the Company.  Given that, what's
> incumbent upon on me and the Board of the Company and the
> executive committee is make sure we continue to focus on driving
> the business, making sure that we continue to deliver on the 5% to
> 10% compound annual growth rate, continue to deliver on really
> the bottom line.

210.    The statements in ¶ 209 were materially false or misleading when made because, as detailed in ¶¶ 226-229 below, (a) Perrigo was not then "deliver[ing] on the 5% to 10% compound [organic] annual growth rate," and therefore could not "continue to deliver" that rate; and (b) over the six quarters preceding the Relevant Period, Perrigo's actual average organic growth was far below 5% to 10%.

211.    On June 2, 2015, Papa stated during the Jefferies Global Health Care Conference: "[H]istorically, Perrigo has grown by about 5% to 10% annually.  Specifically, it has grown about 8% organically.  And we've grown about 8% inorganically on an annual basis."

212.    The statements in ¶ 211 were materially false or misleading when made because, as detailed in ¶¶ 226-229 below, Perrigo's actual average organic growth during the six quarters preceding the Relevant Period was far below 5% to 10%.

213.    In the August 5, 2015 Earnings Release, Perrigo stated: "The directors of Perrigo accept responsibility for the information contained in this announcement.  To the best of the knowledge and belief of the directors of Perrigo (who have taken all reasonable care to ensure such is the case), the information contained in this announcement is in accordance with the facts and does not omit anything likely to affect the import of such information."  The press release also quoted Papa as stating "[o]ur durable business model and future growth prospects are self-evident as we continue to progress on our stand-alone strategy."

214.    The statements in ¶ 213 were materially false or misleading when made because, as detailed in ¶¶ 103-111 and ¶¶ 144-189 above as well as ¶¶ 226-229 below, (a) Perrigo's purportedly "self-evident" future growth was based upon fanciful assumptions and greatly exaggerated; (b) Perrigo's growth prospects and competitive position were not accurately described and Perrigo's directors, including Papa, had not "taken all reasonable care" to ensure that their characterizations of Perrigo's growth and competitive position were "in accordance with the facts and does not omit anything likely to affect the import of such information," and as a result, Perrigo's press release **_did_** omit material facts; (c) the statements omitted that over the six quarters preceding the Relevant Period, Perrigo's actual average organic growth was far below 5%-10%; (d) the growth Perrigo did achieve was derived to a material extent from unlawful, collusive pricing that inflated revenues in Perrigo's Generic Rx division; (e) Perrigo relied on the unsustainable and undisclosed sales practices the Company internally referred to as "optimizing" to achieve the growth it touted and projected; (f) the statements omitted that the Company had failed to integrate Omega operationally, a failure that would compromise the organic growth figures Defendants touted to investors; and (g) certain of Perrigo's key synergy assumptions for the Omega acquisition were unproven and unlikely to materialize, which would negate the cost savings and growth projections Defendants were touting to investors.

215.    In the August 6, 2015 Presentation, Defendants claimed they had a "[c]lear strategy for delivering 5%-10% organic growth" as well as "[m]ultiple avenues for additional upside."  The presentation also stated: "The directors of Perrigo accept responsibility for the information contained in this presentation.  To the best of the knowledge and belief of the directors of Perrigo (who have taken all reasonable care to ensure such is the case), the

information contained in this presentation is in accordance with the facts and does not omit anything likely to affect the import of such information."

216.   The statements in ¶ 215 were materially false or misleading when made because, as detailed in ¶¶ 103-111 and ¶¶ 144-189 above as well as ¶¶ 226-229 below, (a) Perrigo did not have a clear strategy for delivering 5%-10% organic growth; (b) Perrigo's growth prospects and competitive position were not accurately described and Perrigo's directors, including Papa, had not "taken all reasonable care" to ensure their characterizations of Perrigo's growth and competitive position were "in accordance with the facts and does not omit anything likely to affect the import of such information"; (c) Perrigo's actual organic growth rate during the most recent eight quarters averaged well below the referenced 5%-10% range; and (d) organic growth was threatened by known impediments to the Omega integration, by dependence on unsustainable sales practices, and by the increasing difficulty in replicating supracompetitive price hikes in the Generic Rx division.

217.   In the September 17, 2015 Letter, Perrigo and Papa stated:

> After consideration of Mylan's offer, our Board of Directors unanimously concluded that the offer substantially undervalues the strength of Perrigo's business, operations, and future growth opportunities. ***We are confident in our 5-10% three-year organic revenue CAGR goal, as executed historically, and we expect to meet our financial targets in the years to come, creating value for you well in excess of Mylan's offer, and with less risk.***

The filing further represented Perrigo's reason for rejecting Mylan's above-market offer:

> ***Perrigo has demonstrated a reliable ability to grow organically.*** Perrigo has grown organic net sales at a 6% CAGR since fiscal 2008, and the Perrigo Board expects that by continuing its leading market position, Perrigo's durable global base business will continue this trend and realize an organic net sales CAGR goal of 5-10% over the next three years.

218.    The statements in ¶ 217 were materially false or misleading when made because, as detailed in ¶¶ 103-111 and ¶¶ 144-189 above as well as ¶¶ 226-229 below, (a) the rejection of Mylan's offer urged by Defendants increased, not reduced, risk, as it encouraged investors to squander an offer at a significant premium to Perrigo market price at the time; (b) Perrigo's growth prospects and competitive position were not accurately described and Perrigo's directors, including Papa, had not "taken all reasonable care" to ensure that their characterizations of Perrigo's growth and competitive position were "in accordance with the facts and does not omit anything likely to affect the import of such information"; (c) Perrigo's actual organic growth rate during the most recent eight quarters averaged well below the referenced 5%-10% range; and (d) organic growth was threatened by known impediments to the Omega integration, dependence on unsustainable sales practices, and the increasing difficulty in replicating supracompetitive price hikes in the Generic Rx division.

219.    Also on September 17, 2015, Papa stated during the Morgan Stanley Global Healthcare Conference:

> *We try to focus on quality, affordable healthcare.  And for us that's been a big driver of our average growth rate of somewhere around 5% to 10% organic.*
>
> *                    *          *          *
>
> *Our goal is to continue to drive organically 5% to 10% growth rate.*  On top of that, we'll look to do additional M&A to get another 5% to 10%.  So that the revenue side will grow, and that, let's call it 10% plus, and then grow the bottom line even faster. That's how we structure the business and that's why we think we've got a great opportunity for the future.

220.    The statements in ¶ 219 were materially false or misleading when made because, as detailed in ¶¶ 144-189 above and ¶¶ 226-229 below, (a) Perrigo's actual organic growth rate during the most recent eight quarters averaged well below the referenced 5%-10% range; and (b)

that organic growth was threatened by known impediments to the Omega integration, dependence on unsustainable sales practices, and the increasing difficulty in replicating supracompetitive price hikes in the Generic Rx division.

221.    In the October 22, 2015 Presentation, Defendants projecting that Perrigo would earn $7.65-$7.85 for calendar year 2015, and that in 2016 it would "Accelerat[e] Shareholder Value" and "Amplify[] Perrigo's Earnings Power," delivering a baseline earnings per share of $9.30, increasing to $9.83 after including the effects of a planned share repurchase and "optimization actions."  To reach those lofty goals, Perrigo issued "CY2016 Revenue Guidance" incorporating organic growth assumptions of 5%-10% overall, 5%-10% in branded healthcare (former Omega), and 8%-12% in Generic Rx.

222.    Perrigo and the Perrigo directors (including Papa) further stated:  "The directors of Perrigo accept responsibility for the information contained in this presentation.  To the best of the knowledge and belief of the directors of Perrigo (who have taken all reasonable care to ensure such is the case), the information contained in this presentation is in accordance with the facts and does not omit anything likely to affect the import of such information."  Additionally, Perrigo and its directors (including Papa) indicated that the guidance for calendar years 2015 and 2016 constituted "profit forecasts" under Rule 28.1 of the Irish Takeover Rules.  That statement was intended to, and did, assure investors that the Company had compiled the profit forecasts and "the assumptions upon which [they are] based" using "scrupulous care, accuracy and objectivity by the directors," as the Irish Takeover Rules required.

223.    In a separate letter to investors that day, Perrigo and its directors (including Papa) identified the assumptions they employed to calculate the 2015 and 2016 profit forecasts, including the following factors "**outside the influence or control of the Perrigo directors**":

- There will be no changes in general trading conditions, economic conditions, competitive environment or levels of demand, in the countries in which Perrigo operates or trades which would materially affect Perrigo's business.

*     *     *

- There will be no material adverse events that affect Perrigo's key products, including, competition from new generic variants, product recalls, product liability claims or discovery of previously unknown side effects.

224. The letter also identified the following factors "**within the Directors' Influence and Control**":

- Fourth quarter 2015 net sales for the CHC, BCH, Rx and Specialty Sciences segments are assumed to grow in line with the growth rates achieved 2015 year- to-date.

- The 2016 net sales for CHC, BCH and Rx segments are forecasted to grow organically in the middle of the three year compounded annual growth rate ranges published and disclosed to investors in the October 22, 2015 earnings release  presentation.  The ranges published and disclosed in April  2015 forecasted compounded annual growth of 5% - 10% for the CHC and BCH segments and 8% - 12% for the Rx segment.

- ***The integration and realization of synergies in relation to the acquisition of Omega Pharma, certain branded consumer healthcare products from GSK, and Yokebe will proceed as planned and will not be subject to unforeseen material delays.***

- The forecast only includes those acquisitions closed or announced on or prior to October 22, 2015 and does not include any additional acquisitions, dispositions, partnerships, in-license transactions, or any changes to Perrigo's existing capital structure or business model after October 22, 2015.

- Adjusted operating margin is forecasted to remain consistent in 2016 when compared to 2015 and average ~28% of net sales.

- Interest rates underlying Perrigo's variable rate debt
  instruments will not vary significantly from the spot rates
  in effect as of October 22, 2015.

- The announced restructuring activities will proceed as
  planned and will not be subject to unforeseen material
  delays.

- The adjusted effective tax rate for the year ended December
  31, 2016 is estimated at 14%-15% assuming a jurisdictional
  mix of incomes in line with the Company's current
  operations and the implementation of the actions
  announced on October 22, 2015.

- Other than the Share Buyback Program, there will be no
  material share repurchases, or issuances, in determining
  weighted average number of diluted shares.

225.    The statements in ¶¶ 221-224 were materially false or misleading when made

because, as detailed in ¶¶ 103-111 and ¶¶ 144-189 above as well as ¶¶ 226-229 and ¶¶ 239-261

below, (a) Perrigo's growth prospects and competitive position were not accurately described

and Perrigo's directors, including Papa, had not "taken all reasonable care" to ensure their

characterizations of Perrigo's growth and competitive position were "in accordance with the

facts and does not omit anything likely to affect the import of such information"; (b) Perrigo's

profit forecasts for calendar years 2015 and 2016 were not prepared with "scrupulous care,

accuracy and objectivity"; (c) the assumptions underpinning Perrigo's profit forecasts for

calendar years 2015 and 2016 were not prepared with "scrupulous care, accuracy and

objectivity," especially the assumptions regarding 2016 organic net sales growth and an

unchanged "competitive environment," the assumption that unsustainable sales practices would

continue unabated, and the assumption that the Omega integration and synergies "will proceed as

planned"; (d) Perrigo's actual organic growth rate during most recent eight quarters was well

below 7.5%—the organic growth rate the directors assumed for 2016; (e) Perrigo's actual

organic growth rate during the most recent eight quarters averaged substantially below the range

of 5%-10% issued as guidance for 2016; (f) Perrigo's "competitive environment" was already changing, as the anticompetitive pricing activities used to boost its overall income and the results of its Generic Rx division were already coming under scrutiny; and (g) the profit forecasts for both periods failed to properly account for the deterioration in the fair value of Perrigo's largest financial asset, the Tysabri royalty stream, or the effect of fair value mark-to-market charges on Perrigo's earnings.

**B.  Through Their Numerous Misrepresentations Regarding Organic Growth, Defendants Concealed the Truth Regarding Perrigo's Financial Situation and Prospects.**

226.  Throughout Papa's reign as CEO, the Company touted its ability to grow organically, as well as through acquisition.  For example, in early 2014 Papa explained that organic growth had accounted for half (8%) of Perrigo's 15% to 16% revenue growth over the past four years, and that the Company targeted organic revenue growth of 5% to 10% during any rolling three-year period.[24]  By blending older, high-growth periods with newer, low-growth periods, Perrigo was able to create the deceptive impression of organic growth levels it had not consistently achieved for many quarters.

227.  The Class Complaint alleges (at ¶ 64), based on the analysis of lead plaintiff's forensic accounting expert, that Perrigo's actual organic growth rates during the six quarters preceding the Relevant Period *averaged just over 1% and were even negative for two quarters*:

| Quarter ending | 12/28/2013 | 3/29/2014 | 6/28/2014 | 9/27/2014 | 12/27/2014 | 3/29/2015 |
|---|---|---|---|---|---|---|
| Actual organic growth rate | 6.5% | **1.7%** | 6.7% | **-9.0%** | **-0.1%** | **0.9%** |

The Class Complaint further explains (*id.*):

---

[24] *See* Dominic Coyle, *Takeover of Elan the perfect fit in Perrigo's prescription for growth*, IRISH TIMES (Feb. 7, 2014), https://irishtimes.com/business/health-pharma/takeover-of-elan-the-perfect-fit-in-perrigo-s-prescription-for-growth-1.1682196.

1)      To determine these rates for each quarter, lead plaintiff's forensic accounting expert first calculated Perrigo's net sales without the Tysabri royalty stream, which the Company has admitted cannot be included in net sales under GAAP.

2)      To obtain organic revenues, sales attributable to acquisitions that were made during the preceding year were deducted.[25]

3)      Lead plaintiff's expert deducted organic revenues from revenues reported in the prior year quarter to determine organic revenue growth and expressed that as a percentage (rounded to the nearest tenth).

228.    Perrigo's opaque financial reporting obscured the deterioration in organic growth and prevented investors from making those calculations on their own.  The Company did not disclose organic growth in most periodic reports, and throughout the Relevant Period it misreported net sales in violation of GAAP by including royalty income.  Further, Perrigo did not consistently break out the impacts of recent acquisitions and repeatedly changed the way it presented financial statements.

229.    While promoting Perrigo's organic growth claims to investors, Defendants knew organic growth was eroding.  For the six quarters reported before the Relevant Period, Perrigo had averaged only a little over 1% organic growth, a slowdown it did not report to investors.  In the second calendar year quarter of 2015, organic growth turned negative, for both the quarter

---

[25] The Class Complaint further specifies (at ¶ 64 n.10):  "Specifically, for the quarter ending December 13, 2013, sales attributable to recent acquisitions Velcera ($5.2 million) and Rosemont and Fera ($26.3 million) were excluded to calculate organic revenue.  For the quarter ending March 29, 2014, sales attributable to Velcera and Aspen ($6.1 million) and Fera ($8.9 million) were excluded to calculate organic revenue.  For the quarter ending June 28, 2014, sales attributable to Aspen ($6 million) and Fera ($20 million) were excluded to calculate organic revenue.  For the quarter ending September 27, 2014, sales attributable to Aspen ($6 million) and methazolomide ($3.8 million) were excluded to calculate organic revenue.  For the quarter ended December 27, 2014, sales attributable to Aspen ($6 million, estimated based on prior quarter), methazolomide ($3.8 million, estimated based on prior quarter), and Lumara ($5.07 million, estimated based on subsequent quarter disclosure adjusted for time of purchase) were excluded to calculate organic revenue."

and the trailing twelve months.[26]  Nonetheless, to encourage investors to ignore that deterioration, Defendants made the false or misleading representations to investors detailed in ¶¶ 197-225 above.

## IX.   DEFENDANTS DEFEAUDED INVESTORS REGARDING THE VALUE OF PERRIGO'S LARGESST ASSET, THE TYSABRI ROYALTY STREAM

### A.   Defendants Repeatedly Touted the Tysabri Royalty Stream as an Important Component of Perrigo's Financial Strength and Prospects.

230.   Following Perrigo's acquisition of Elan, the Company improperly accounted for the Tysabri royalty stream that it had acquired in the transaction.  The improper accounting treatment artificially inflated the Company's revenues and hid billions of dollars of deterioration in the value of the Tysabri royalty stream.  Defendants concealed that improper accounting when making statements regarding Tysabri to investors.

231.   On April 29, 2015, Perrigo filed its third quarter 2015 Form 10-Q, which was signed by Papa and Brown.  Defendants claimed in the Form 10-Q that Perrigo's financial statements were "prepared in accordance with U.S. generally accepted accounting principles ('GAAP')."  Defendants further stated the Tysabri royalty stream was an "intangible asset," and "[t]he asset's value is $5.8 billion, which is being amortized over a useful life of 20 years."

232.   The statements in ¶ 231 were materially false or misleading when made because, as detailed in ¶¶ 239-261 below, (a) the asset's value was not $5.8 billion; (b) the financial results reported were not accurate and violated GAAP by improperly accounting for the Tysabri royalty stream as an intangible asset instead of as a financial asset, failing to disclose the fair

---

[26] The Class Complaint alleges (i) lead plaintiff's expert determined that Perrigo's organic growth for the quarter ended June 27, 2015, was *negative* 1.7%, when adjusted to exclude inorganic revenue from the recent acquisitions of Omega ($401.2 million), Gelcaps ($1.3 million, estimated), and Lumara ($5.43 million, estimated); and (ii) the average organic growth over the four quarters ending June 27, 2015 was approximately *-2.5%*.

market value of the royalty stream and record mark-to-market changes in that fair market value, and accounting for the payment as revenue; and (c) by failing to properly account for the Tysabri royalty stream, Defendants made it impossible for investors to understand that the royalty stream was deteriorating in value, as became apparent in February 2017 when Perrigo was only able to sell the asset for $2.2 billion (or up to $2.85 billion if certain milestones were met).

233.    On August 13, 2015, Perrigo filed the 2015 Form 10-K, which was signed by Papa and Brown.  Like the April 29, 2015 Form 10-Q, the 2015 Form 10-K referenced GAAP compliance but did not disclose the fair value of the Tysabri royalty stream at the end of the fiscal year; instead, it likewise stated the asset had "a value of $5.8 billion and a useful life of 20 years."

234.    Those statements were materially false or misleading when made because, as detailed in ¶¶ 239-261 below, (a) as Perrigo conceded in its restatement, the asset's value was not $5.8 billion, but rather was no more than $5.42 billion by June 27, 2015; (b) the financial results reported were not accurate and violated GAAP by improperly accounting for the Tysabri royalty stream as an intangible asset instead of as a financial asset, failing to disclose the fair market value of the royalty stream, and failing to record mark-to-market changes in that fair market value; and (c) by failing to properly account for the Tysabri royalty stream, Defendants made it impossible for investors to understand that the royalty stream was deteriorating in value, as became apparent in February 2017 when Perrigo was only able to sell the asset for $2.2 billion (or up to $2.85 billion if certain milestones were met).

235.    On October 22, 2015, Perrigo and its directors, including Papa, issued a press release announcing earnings for the third calendar quarter of 2015.  The press release stated: "The directors of Perrigo accept responsibility for the information contained in this

announcement.  To the best of the knowledge and belief of the directors of Perrigo (who have taken all reasonable care to ensure such is the case), the information contained in this announcement is in accordance with the facts and does not omit anything likely to affect the import of such information."

236.    Those statements were materially false or misleading when made because, as detailed in ¶¶ 239-261 below, (a) the financial results reported were not accurate and violated GAAP by improperly accounting for the Tysabri royalty stream as an intangible asset instead of as a financial asset, failing to disclose the fair market value of the royalty stream, and failing to record mark-to-market changes in that fair market value; (b) by failing to properly account for the Tysabri royalty stream, Defendants made it impossible for investors to understand that the royalty stream was deteriorating in value, as became apparent in February 2017 when Perrigo was only able to sell the asset for $2.2 billion (or up to $2.85 billion if certain milestones were met); and (c) Perrigo's directors, including Papa, had not "taken all reasonable care" to ensure that the description of the Tysabri royalty stream was "in accordance with the facts and does not omit anything likely to affect the import of such information."

237.    On November 2, 2015, Perrigo filed its Form 10-Q for the quarter ending September 26, 2015, which was signed by Papa and Brown.  Defendants represented in the Form 10-Q that Perrigo's financial statements were "prepared in accordance with U.S. generally accepted accounting principles ('GAAP')."  Defendants did not disclose the fair market value of the Tysabri royalty stream or update prior statements claiming the asset's value was $5.8 billion.

238.    Those statements were materially false or misleading when made because, as detailed in ¶¶ 239-261 below, (a) the financial results reported were not accurate and violated GAAP by improperly accounting for the Tysabri royalty stream as an intangible asset instead of

as a financial asset, failing to disclose the fair market value of the royalty stream, and failing to record mark-to-market changes in that fair market value; and (b) by failing to properly account for the Tysabri royalty stream, Defendants made it impossible for investors to understand that the royalty stream was deteriorating in value, as became apparent in February 2017 when Perrigo was only able to sell the asset for $2.2 billion (or up to $2.85 billion if certain milestones were met).

**B.     The Value of the Tysabri Royalty Stream Was Far Less Than What Defendants Represented to Investors.**

239.   Throughout the Relevant Period, the royalty stream for Tysabri was Perrigo's largest financial asset and played an important role in the "base plus plus plus" growth strategy Defendants claimed as a basis to reject Mylan's takeover offer.  High margin revenues from existing indications were an important part of the base for which Perrigo predicted 5% to 10% organic growth, and the potential for additional revenues from new treatment indications in stroke and secondary progressive multiple sclerosis was so significant that it formed its own "plus" layer, which Defendants visually depicted at the top of their revenue pyramid.

**1.     Applicable GAAP Requirements**

240.   GAAP include those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.  SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) provides that financial statements filed with the SEC that are not presented in accordance with GAAP will be presumed to be misleading, despite footnotes or other disclosures.  The Financial Accounting Standards Board ("FASB"), the entity that holds the authority to promulgate GAAP, has codified GAAP into a numbered scheme called the Accounting Standards Codification ("ASC"), which has been adopted as the framework for financial reporting for all public filers.  Additionally, the FASB

has issued guidance in the form of FASB Concept Statements ("FASCON"s), which set the objectives, qualitative characteristics, and other concepts used in the development of GAAP, and which reflect the underlying basis and framework for the promulgation of accounting standards.

241.    Financial statements (including footnote disclosures), like those filed on Forms 10-Q and 10-K with the SEC, are a central feature of financial reporting.  One of the fundamental objectives of financial reporting is to provide accurate and reliable information concerning an entity's financial performance during the period being presented.  FASCON No. 8, *Conceptual Framework for Financial Reporting* ("FASCON 8")—which, as its title provides, represents, along with other FASCONs, the framework for financial accounting—states "[t]he objective of general purpose financial reporting is to provide financial information about the reporting entity that is useful to existing and potential investors, lenders, and other creditors in making decisions about providing resources to the entity."  FASCON 8, ¶ OB2.

242.    This framework also states that "[d]ecisions by existing and potential investors about buying, selling, or holding equity and debt instruments depend on the returns that they expect from an investment in those instruments," and that "[i]nvestors', lenders', and other creditors' expectations about returns depend on their assessment of the amount, timing, and uncertainty of (the prospects for) future net cash inflows to the entity."  FASCON 8, ¶ OB3.

243.    FASCON 8 also states that, to assess an entity's prospects for future net cash inflows, "existing and potential investors, lenders, and other creditors need information about the resources of the entity, [and] claims against the entity."  FASCON 8, ¶ OB4.  It also states investors and other creditors are interested to know and understand, among other things, "how efficiently and effectively the entity's management and governing board have discharged their responsibilities to use the entity's resources."  *Id.*

244.     Because investors, lenders, and other creditors rely on financial statements for much of the financial information they need to make rational decisions regarding the entity, they are considered the primary users to whom general purpose financial reports are directed. FASCON 8, ¶ OB5.

245.     A primary quality that renders financial information useful to investors, creditors, and other users in their decisionmaking is *faithful representation*.  For an entity to faithfully represent what it purports to represent, including its financial position and the results of its operations for selected periods of time, information must be complete, neutral, and free from error.  FASCON 8, ¶ QC12.  To be complete, the financial information must include all information necessary for a user to understand the phenomenon being depicted, including all necessary descriptions and explanations.  FASCON 8, ¶ QC13.  To be neutral, the financial information must be without bias in the selection or presentation of such information.  FASCON 8, ¶ QC14.  The standard describes a neutral depiction of financial information in more detail:

> A neutral depiction is not slanted, weighted, emphasized, deemphasized, or otherwise manipulated to increase the probability that financial information will be received favorably or unfavorably by users.  Neutral information does not mean information with no purpose or no influence on behavior.  On the contrary, relevant financial information is, by definition, capable of making a difference in users' decisions.

*Id.*

246.     Significantly, for financial assets like the Tysabri royalty stream, GAAP requires that the assets be measured at their fair value at the end of each reporting period subsequent to their initial measurement.  *See* ASC 815-10-35-1.

### 2. Defendants' accounting for the Tysabri royalty stream admittedly violated GAAP.

247. Throughout the Relevant Period, Perrigo falsely stated the value of the Tysabri royalty stream was $5.8 billion.  That was not the fair market value of the royalty stream, and Defendants evaded reporting current fair market values by violating GAAP.  While Perrigo unquestionably was required to account for the royalty stream as a "financial asset," marking the fair value to market at least each quarter, the Company instead treated it as if it were an "intangible asset."

248. As a result of Defendants' accounting maneuver, investors were prevented from learning that the royalty stream had lost billions of dollars of value.

249. The Company now concedes that its accounting for the Tysabri royalty stream violated GAAP.  It admitted in May 2017:

> After an extensive evaluation of the facts and circumstances and the judgments required to determine the appropriate classification, it was determined that under existing U.S. GAAP the contingent payments from Elan's May 2013 sale of Tysabri® to Biogen (the "Tysabri® royalty stream") ***should have been recorded as a financial asset, rather than an intangible asset, on the date of our acquisition of Elan***.
>
> Our Tysabri® royalty stream is now accounted for in our consolidated financial statements for 2016 and prior restated periods as a financial asset using the fair value option. We made the election to account for the Tysabri financial asset using the fair value option as we believe this method is most appropriate for an asset that does not have a par value, a stated interest stream, or a termination date.  Accounting for the Tysabri® royalty stream as a financial asset required us to adjust our financial statements for the Restated Periods to (1) remove the Tysabri® royalty stream from net sales in our Consolidated Statements of Operations, (2) remove the amortization expense (reflected in cost of goods sold) associated with recording the Tysabri® royalty stream as an intangible asset, and (3) include the quarterly changes in fair value of the Tysabri® royalty stream as a component of other non-operating income/expense.  The cash payments we received from the royalty stream are included in our Consolidated Statements of

> Cash Flows for the Restated Periods and reflect the cash received
> from the Tysabri® royalty stream as cash from investing activities,
> rather than as cash from operating activities.

*Id.*

250.    Defendants knew all along that the Tysabri royalty stream was a financial asset.

Perrigo never operated any business involving Tysabri and, in a May 2016 conference call with

investors, then-CEO John Hendrickson called the royalty stream a "financial asset."  There

accordingly was no basis for Perrigo to evade the accounting required by ASC 815-10- 35-1.

251.    Perrigo's restatement constitutes an admission that its Relevant Period financial

statements were materially false when made.  GAAP defines a "restatement" as:

> The process of revising previously issued financial statements to
> reflect the correction of . . . [a]n error in recognition, measurement,
> presentation, or disclosure in financial statements resulting from
> mathematical mistakes, mistakes in the application of generally
> accepted accounting principles (GAAP), or oversight or misuse of
> facts that existed at the time the financial statements were
> prepared.

ASC 250-10-20; *see also* ASC 250-10-45-17 (instructing that a mere "change in accounting

estimate shall not be accounted for by restating or retrospectively adjusting amounts reported in

financial statements of prior periods").

252.    Perrigo's restatement was one of the largest restatements of any public company

since 2001.  As accounting consultancy Audit Analytics noted:

> Back in March, we predicted that Perrigo would likely restate its
> historical financial statements. What we could not predict is that 85
> days after the late filing, Perrigo would join the restatements club
> with a staggering $1 Billion restatement of net income.
>
> Since 2001, there have only been 19 restatements that exceeded the
> $1 Billion threshold.[27]

---

[27] *Perrigo Restates to Correct More than $1 Billion in Errors*, AUDIT ANALYSIS (June 1, 2017),
http://www.auditanalytics.com/blog/perrigo-restates-to-correct-more-than-1-billion-in-errors/.

### 3.    Defendants used GAAP violations to hide billions of dollars of deterioration in the Tysabri royalty stream's fair value.

253.    Perrigo's GAAP violations were used to create the impression that the valuation of the Tysabri royalty stream remained intact, even as its actual value plummeted due to known adverse clinical and competitive developments.

254.    In June 2015, the phase II trial for Tysabri as a treatment for stroke failed to meet its primary endpoint.  That indication was one of the two potential new indications that Perrigo and Papa touted as "Tysabri upside" and placed at the very top of their "base plus plus plus" pyramid slide presented to investors.  Instead of recording the diminution in fair value associated with that adverse development, Perrigo violated GAAP and told investors the Tysabri royalty stream had the same value as before: $5.8 billion.

255.    The "Tysabri upside" thesis fell apart in October 2015 when the phase III trial for the other proposed new indication, secondary progressive multiple sclerosis, also failed.

256.    Tysabri's core indication for primary multiple sclerosis also came under attack in October 2015, when Phase III trial results for ocrelizumab, a competing drug, were so positive that experts called it a "game changer."[28]  In February 2016, the FDA designated ocrelizumab a "breakthrough therapy."[29]

257.    Defendants nonetheless continued to insist the Tysabri asset was not impaired.  Perrigo's February 22, 2016 Form 10-KT, signed by Papa and Brown, again referenced a $5.8 billion valuation for the Tysabri royalty stream.  Even worse, the Form 10-KT stated that despite

---

[28] *See Phase III studies show Roche's ocrelizumab reduces relapse rate, delays disability progression in MS patients*, NEWS MEDICAL (Oct. 12, 2015), http://www.news-medical.net/news/20151012/Phase-III-studies-show-Roches-ocrelizumab-reduces-relapse-rate-delays-disability-progression-in-MS-patients.aspx.

[29] *See* Roche Press Release issued on February 17, 2016, https://www.roche.com/investors/updates/inv-update-2016-02-17.htm.

those negative developments, the royalty stream's "fair value exceeded its carrying value." That was false. As Perrigo now concedes, its internal calculations show that the fair value of the Tysabri royalty stream dropped from $5.42 billion in June 2015 to only $5.02 billion on April 2, 2016. By the end of 2016, the fair value was *only $2.35 billion—less than half of the figure referenced in the February 22, 2016 Form 10-KT*.

258.    Defendants' GAAP violations and false valuation assertions prevented investors from understanding the deterioration in Perrigo's largest financial asset. Investors did not learn the extent of those losses until the Tysabri royalty stream was sold on February 27, 2017 for only $2.2 billion (plus contingent payments that could total up to $650 million).

259.    On May 22, 2017, Perrigo filed its delinquent Form 10-K for calendar year 2016 and restated the financial statements previously filed on Form 10-Q for each of the first three quarters of 2016. Perrigo's delinquent 2016 Form 10-K conceded extensive material weaknesses in its financial reporting. With respect to the Tysabri royalty stream, the Company admitted:

> [M]anagement determined that its control over the review of the application of the accounting guidance in ASC 805 Business Combinations did not operate effectively in the appropriate identification of the assets acquired and liabilities assumed in connection with the Elan acquisition in December 2013. All originally filed financial statements presented up to the filing of this 2016 Form 10-K included the disclosure of the Elan acquisition with the Tysabri® royalty stream presented as an intangible asset. In addition, due to the fact that the asset was historically classified as an intangible asset, we did not design or implement controls around the fair value accounting for the Tysabri® royalty stream as a financial asset, so these controls were not in place at any quarter end subsequent to the acquisition, including the date of the annual assessment of internal control. Accordingly, management concluded that these control deficiencies represent material weaknesses.

260.    The delinquent 2016 Form 10-K and restated financial statements revealed that billions of dollars in Tysabri deterioration had been hidden from investors during the Relevant

Period.  As reflected in the below chart: (a) Perrigo's delinquent 2016 Form 10-K conceded that, in management's assessment, the fair value of the Tysabri royalty stream as of June 27, 2015 was no more than $5.42 billion, and as of December 31, 2015 was no more than $5.31 billion; (b) Perrigo's restated Form 10-Q for the first quarter of 2016 conceded that, in management's assessment, the fair value of the Tysabri royalty stream as of April 2, 2016 was no more than $5.02 billion; (c) Perrigo's restated Form 10-Q for the second quarter of 2016 conceded that, in management's assessment, the fair value of the Tysabri royalty stream as of July 2, 2016 was no more than $4.02 billion; (d) Perrigo's restated Form 10-Q for the third quarter of 2016 conceded that, in management's assessment, the fair value of the Tysabri royalty stream as of July 2, 2016 was no more than $3.55 billion; and (e) Perrigo's delinquent 2016 Form 10-K conceded that, in management's assessment, the fair value of the Tysabri royalty stream as of December 31, 2016 was no more than $2.35 billion.

| Measurement date | Last reported value for Tysabri royalty stream | Actual fair value according to Perrigo | Decline hidden from investors by false accounting |
|---|---|---|---|
| 6/27/2015 | $5.8 billion | $5.42 billion | $380 million |
| 12/31/2016 | $5.8 billion | $5.31 billion | $490 million |
| 4/2/2016 | $5.8 billion | $5.02 billion | $780 million |
| 7/2/2016 | $5.8 billion | $4.02 billion | $1.78 billion |
| 10/1/2016 | $5.8 billion | $3.55 billion | $2.25 billion |
| 12/31/2016 | $5.8 billion | $2.35 billion | $3.45 billion |

(Sources: Form 10-Q filed April 29, 2015; Form 10-Q filed August 29, 2015; Form 10-KT filed February 22, 2016; Forms 10-K and 10-Q/A filed on May 22, 2017)

261.    In light of the foregoing facts, Defendants' representations during the Relevant Period regarding their accounting for, and the value of, the Tysabri royalty stream were materially false or misleading when made.

## X.  THE PREVIOUSLY CONCEALED FACTS WERE ULTIMATELY REVEALED TO THE MARKET

262.    On February 18, 2016, after months of hyping its strong financial condition and

prospects, Perrigo stunned investors by reporting fourth calendar quarter 2015 revenue, margins,

earnings and cash flow that were all below what Defendants had led investors to expect.  The

Company also revised its 2016 earnings guidance downward from the guidance it had issued and

reiterated (with adjustments for recent acquisitions) just weeks earlier during the Mylan offer.

Additionally, the Company revealed previously undisclosed problems regarding Omega.  In

contrast to earlier claims that Perrigo's team had already delivered on the Omega integration,

Perrigo conceded it needed to restructure parts of the BCH unit containing Omega assets.  The

Company further admitted it needed to record an impairment charge of $185 million because the

carrying value of certain Omega assets exceeded their fair value.

263.    Analysts uniformly reacted harshly to the news, with reports by Deutsche Bank,

Jefferies, J.P. Morgan, Leerink, Morgan Stanley, and UBS all describing the results as a

"disappointment" or "disappointing."

264.    As a result of those disclosures, the price of Perrigo shares fell $14.77 from the

close on February 17, 2016, or over 10%, to close at $130.40 per share on February 18, 2016.

265.    On April 22, 2016, just after Papa collected millions of dollars in cash and equity

bonuses for fending off the Mylan bid, Reuters and other news services reported that he would

be leaving Perrigo to become the new CEO of Valeant.  According to Reuters, Valeant was

negotiating a contract with Papa and planned to announce his appointment as soon as the

following week.

266.    UBS's analyst report addressed the bombshell news by stating simply: "We are

surprised. We didn't see this coming."  The news particularly surprised the market given that

Papa had spent the better part of the prior year assuring investors of his long-term vision and strategy for the Company.  For example, Jefferies noted in its analyst report that, after investors had "heeded [Papa's] advice and voted against the [Mylan] tender" offer, "the mere thought that [Papa would] consider a new role could lead one to conclude that [Perrigo] is far from being 'fixed'" and "could imply more . . . [disappointing performance] to come."  By the end of the day, the price of Perrigo shares had fallen $7.33, or 5.7%, from $128.68 per share at the close on April 21, 2016, to $121.35 per share.

267.    Though Perrigo had initially issued a press release stating only that it would not comment on "speculation or market rumor," before the market opened on April 25, 2016—the next business day—Perrigo confirmed Papa's resignation.  The Company also significantly lowered its earnings guidance for 2016 and announced weak preliminary first-quarter 2016 results.  Specifically, Perrigo announced first-quarter 2016 earnings per share guidance of $1.71 to $1.77, compared with the $1.89 per share investors had been led to expect.  The Company also again significantly lowered its 2016 earnings guidance, from the already reduced $9.50 to $9.80 per share announced in February down to only $8.20 to $8.60 per share, a decline of nearly 14%.

268.    In sharp contrast to Defendants' prior representations about the strength of Perrigo's competitive position and the success of the Omega acquisition, Perrigo attributed its poor financial results to increased competitive pressures in its prescription drug segment and weaker-than-expected performance within Omega.  Even more surprisingly, Perrigo warned that investors should expect that weak performance to continue for at least the next three quarters.  Perrigo also revealed that Omega impairment charges might grow even larger than the $185 million charge it had announced two months earlier.

269.     Market commentators and analysts immediately noted those revelations contradicted Defendants' aggressive promotion of Perrigo's growth and prospects during the Mylan bid.  For example, "Mad Money" host Jim Cramer stated:  "Papa had come on 'Mad Money' and talked about how the Mylan bid dramatically undervalued Perrigo. . . . ***That was clearly untrue.***"  Cramer also noted his concern over Papa's decision to depart "under what is probably a terrible moment for Perrigo."

270.     Likewise, Wells Fargo downgraded Perrigo stock, noting "Perrigo management set unrealistic and aspirational earnings guidance in its effort to defend against Mylan's hostile bid."  A Barclays report stated that the news prompted "[n]o shortage of frustration . . . especially since the reset of expectations comes ~6 months after management convinced shareholders to rebuff [Mylan's] tender offer," and that "the circumstances around Papa's departure, so soon after fending off [Mylan] . . . left many investors concerned that [Perrigo] could be in worse shape than we supposed."

271.     As a result of those disclosures, Perrigo shares plummeted 18% that day, dropping by $21.95 per share from the prior day's close and erasing $3.1 billion in market value following unusually high trading volume of over 30 million shares.

272.     On May 12, 2016, Perrigo reported a disappointing first quarter 2016 loss of $0.93 per share (which the Company later revised to a loss of $2.34 per share).  The Company largely attributed that loss to an additional $467 million impairment charge relating to the Omega acquisition, bringing Omega impairment charges to more than $650 million, only months after touting the success of the Omega acquisition to stave off Mylan's Tender Offer.

273.     During a conference call with investors later that day, Perrigo's newly appointed CEO John Hendrickson stated the Company's "recent track record of performance against our

own expectations is unacceptable," and also said he would "try to be as transparent as possible" and target "realistic" forecasts that the Company could meet.

274.    The market took those statements as an admission that the Company and its former CEO, Papa, had misled investors with unrealistic and unattainable financial goals to defeat Mylan's takeover bid during the prior year.  For example, in its analyst report addressing these disclosures, Jefferies wrote it was "looking forward to [Hendrickson's] 'realistic' and 'transparent' approach to running the business since now more than ever the co needs to meet expectations & *reestablish credibility*."  Likewise, an analyst report by Barclays described the developments as Perrigo's new leadership team "'rethink[ing]' everything which is leading to more achievable targets."

275.    As a result of the disclosures on May 12, 2016, Perrigo shares fell an additional $3.71 per share, or 4%, from $92.75 at the close on May 11, 2016 to $89.04 at the close on May 12, 2016.

276.    On August 10, 2016, Perrigo announced that it was yet again revising its guidance in part because of lower performance expectations related to the Omega acquisition as it continued to implement "transformational organizational changes and improvements in products and process in this business."  The news led the market to question how Perrigo could have so drastically and continually misstated the benefits and integration of the Omega acquisition.  For example, an RBC Capital Markets analyst report said Perrigo's guidance was only "now reasonable," while a UBS analyst report stated it was "surprised that management did not plan for [Omega acquisition issues] in the last guidance change."

277.    Perrigo's August 10, 2016 earnings press release acknowledged that part of the shortfall was due to the beginning of the return of competitive pricing to the Generic Rx division,

the natural result of increased scrutiny making collusive price hikes more difficult to implement: "To be clear, our financial results were below our expectations primarily due to competition and price erosion in the Rx business."  Perrigo also stated: "Competition and price erosion impacted both reported gross margin and adjusted gross margin[.]"  On a conference call with analysts and investors that same day, Brown also attributed the shortfall partially to "price erosion" in the generics segment.

278.    As a result of the August 10, 2016 disclosures, Perrigo shares fell nearly another 10%, from $95.09 at the close on August 9, 2016 to $86.00 at the close on August 10, 2016, following unusually high trading volume of over 13.7 million shares.  Shares dropped another 2.37% to close at $81.95 on December 8, 2016, after Perrigo announced it had to entirely restructure the BCH (Omega) unit.

279.    On September 12, 2016, activist investor Starboard Value sent a letter to Hendrickson and the Board, criticizing the false promises that were made to thwart the Mylan bid:

> In April 2015, Mylan N.V. ("Mylan") made an unsolicited proposal to acquire Perrigo for cash and stock worth approximately $205 per share, more than a 25% premium at that time.  Even at current market prices for Mylan shares, this combination would have resulted in a current value of approximately $167 per share, or 88% more than the current Perrigo stock price of approximately $89.  Management and the Board went to great lengths to oppose this proposed combination, spending more than $100 million in advisor fees relating to its defense, and promising shareholders that their standalone strategy would produce more value than the transaction given the robustness of Perrigo's future prospects.  ***In order to convince Perrigo shareholders to reject Mylan's offer, management and the Board made aggressive promises of drastic improvements in both financial and stock price performance.***[30]

---

[30] Starboard letter dated September 12, 2016, http://www.starboardvalue.com/wp-2016.

The Starboard letter also called out "multiple overly optimistic presentations by Perrigo management illustrating the potential future value of Perrigo shares," and noted that "since that time, results have gone decidedly in the wrong direction, and management's promises have been woefully unfulfilled."[31]

280.    On November 3, 2016, Bloomberg announced that U.S. prosecutors planned to file charges in a generic drug price-fixing probe by the end of the year.  The article did not name Perrigo specifically as a company being investigated, but it was clear U.S. prosecutors viewed the collusive activities as pervasive and affecting the entire generic drug industry.  The article pointed out that the investigation was viewed similarly to the DOJ's long-running probe into auto-parts cartels, where charges were eventually brought against 46 companies and 65 individuals.

281.    News of the sweeping antitrust investigation into generic drug manufacturers caused the price of Perrigo shares to close down nearly 3.6%, from a close on November 2, 2016 of $82.91 per share to a close on November 3, 2016 of $79.95 per share.

282.    On December 8, 2016, Perrigo announced it was restructuring it BCH (Omega) segment.  According to the announcement, Perrigo's BCH business in Belgium needed to be restructured "to improve the financial profile and enhance focus of the business on branded consumer OTC products."  The media and analysts immediately understood that the announcement was simply Perrigo further admitting that its Omega acquisition was underperforming, even as it had touted the segment while encouraging investors to turn down the Mylan Tender Offer.  A December 8, 2016 *FiercePharma* article stated: "Perrigo's Omega Pharma has underperformed since the Dublin drugmaker picked it up for $4.5 billion last March.

---

[31] *Id.*

Now, under activist pressure, the company is doing something about it."  As part of the

"restructuring," Perrigo intended to cut jobs, and the "announcement marked the beginning of a

consultation period required by Belgian law when job cuts are imminent."  On the same day,

Bloomberg also reported the news, noting other generic drug companies had also recently

announced restructuring and job cuts.

283.   Perrigo's December 8, 2016 announcement caused its stock price to drop another

2.37%, from a December 7, 2016 close of $83.94 per share to a December 8, 2016 close of

$81.95 per share.

284.   On February 27, 2017, Perrigo announced it had agreed to sell the Tysabri asset

touted to investors at the beginning of the Relevant Period as having a "value of $5.8 billion,"

and which Defendants had never indicated was impaired, *for only $2.2 billion cash* (plus

potential future payments of up to $650 million).  Perrigo also announced that, for the first time,

the fair value of the royalty stream did not equal its carrying cost and it was therefore recording

an impairment charge associated with the asset.  Perrigo further stated it was examining

"historical revenue recognition practices" associated with the royalty stream and other potential

accounting irregularities and, as a result, could not timely file its periodic reports with the SEC.

Finally, Perrigo announced Brown was leaving the Company.

285.   As a result of those disclosures, Perrigo shares closed down nearly 12%, or $9.91,

from $84.68 at the close on February 27, 2017 to $74.77 on February 28, 2017, on unusually

high trading volume of over 14 million shares.  A Morgan Stanley analyst report described the

developments as a "Painful re-set."  Likewise, an RBC Capital Markets analyst report described

the disclosures as "worse than we anticipated" and was concerned by the "unexpected CFO

departure."

286. On March 3, 2017, Bloomberg reported that Perrigo's name had been raised by antitrust regulators at the DOJ.[32]  On that news, Perrigo shares dropped 3.71% to close at $72.76, from $75.56 at the close of the prior day.

287. After the close of the market on May 2, 2017, Perrigo revealed that its offices had been raided as part of an ongoing investigation by the DOJ into price-fixing in the pharmaceutical industry.  As a Wells Fargo analyst report noted, Perrigo had not "included a disclosure in its prior SEC filings related to an investigation."  The raid was a far more severe measure than taken against most other generic drug manufacturers, which merely received subpoenas.  As a result, on May 3, 2017—the last day of the Relevant Period—Perrigo shares closed down over 5%, or $3.88 per share, from $76.23 at the close on May 2, 2017 to $72.35 on May 3, 2017.

288. As one *Seeking Alpha* contributor recognized in an article published shortly after the raid:

> Perrigo (NASDAQ:PRGO) stock has been bit by a U.S Justice Department investigation into price fixing and anti-competitive practices in the generics market.  This controversy culminated in a federal raid on Perrigo's offices.
>
> \*       \*       \*
>
> Perrigo's 'roll up' business model is showing signs of stress.
>
> \*       \*       \*
>
> Perrigo's stock should be avoided, and the company looks like it is going down the same path Valeant went down this time last year.  The Federal raid on Perrigo's offices suggests that the company's

---

[32] *See Perrigo Joins Firms With Generic Drugs Under U.S. Glare*, BLOOMBERG (Mar. 3, 2017), https://www.bloomberg.com/news/articles/2017- 03-03/perrigo-joins-list-of-firms-with-generic-drugs-under-u-s-glare.

pricing power in the U.S market may come under threat, and its
roll-up business model may be depending on pricing power.[33]

289.    In all, Perrigo's stock declined more than 62% from the start of the Relevant

Period as the truth that had been concealed by Defendants' false or misleading statements came

to light.

290.    On June 5, 2017, Perrigo issued a press release announcing the forthcoming

retirement of John Hendrickson—who had succeeded Papa as CEO of Perrigo—making

Hendrickson the second top executive to leave the Company that year (after Brown).

## XI.    ADDITIONAL ALLEGATIONS OF SCIENTER

291.    Numerous additional facts demonstrate Defendants acted intentionally or, at

minimum, were reckless, in making the material misstatements and omissions detailed in this

Complaint.

292.    Defendants were active and culpable participants in the fraud, as evidenced by

their knowing or reckless issuance of, or ultimate authority over, Perrigo's and the Individual

Defendants' materially false or misleading statements and omissions.  The Individual Defendants

acted with scienter in that they knew or recklessly disregarded that the public statements set forth

above were materially false or misleading when made, and knowingly or recklessly participated

or acquiesced in the issuance or dissemination of those statements as primary violators of the

federal securities laws.  In addition to the specific facts alleged in ¶¶ 37-290 above, Defendants'

scienter is further evidenced by the following facts:

293.    *First*, Perrigo's sale of OTC products through Omega—which, as the Company

represented, provided it access to over 30 additional countries following the acquisition—was

---

[33] Biotechnocrat, *Will Perrigo Collapse?*, SEEKING ALPHA (May 5, 2017),
https://seekingalpha.com/article/4069635-will-perrigo-collapse.

the Company's core international operation through the BCH segment during the Relevant Period. Omega comprised almost the entirety of the BCH segment, and OTC sales through Omega's network accounted for nearly all of Perrigo's revenues and operations within BCH during the Relevant Period. Further, throughout the Relevant Period Defendants repeatedly identified Omega as the primary driver of Perrigo's growth prospects and standalone value.

294. Papa and Brown each had a substantial role in overseeing the Omega integration. For example, Papa told investors on June 2, 2015: "I had to integrate the Omega organization." Brown assured investors on June 23, 2015 that Mylan's takeover bid had not "distract[ed]" the integration process for Omega and stated that "the [integration] team continues to do what their mission is and what they had been scheduled to do" and that she was "off to Belgium" to meet with that team.

295. Further, Papa and Brown each had access to detailed information concerning Omega, including the numerous material issues that plagued Perrigo's efforts to integrate Omega. That information was transmitted and learned through regular meetings and other communications. As detailed above, CIO Tom Farrington was fully aware of the crippling issues with the Omega integration project, holding weekly or bi-weekly meetings with senior members of Perrigo's IT leadership team, mandating weekly reporting from the integration teams, and convening regular conference calls with senior-level personnel at both Perrigo and Omega to discuss compliance and regulatory issues relating to data integration.

296. In addition to the information Papa and Brown received from Farrington on a regular basis, during July and August 2015 Omega's senior-most executives made repeated efforts to report integration issues and pricing concerns to Papa and Brown, who at least recklessly disregarded those adverse reports.

297.    At a minimum, Papa and Brown were reckless in falsely touting Perrigo's growth prospects and issuing unrealistic guidance based on Omega without having full transparency into Omega's financial data.

298.    *Second*, Perrigo's production of generic drugs through the Company's Rx segment was also a core operation of the Company during the Relevant Period.  In fiscal year 2015, Rx contributed 22% to Perrigo's consolidated net sales.  Analysts covering Perrigo during the Relevant Period identified "intensifying competition and lower pricing" as among the chief risks to Perrigo achieving the analysts' stated price and earnings targets and as the basis for downgrades to Perrigo's common stock ratings.  For example, on April 26, 2016, Standard & Poor's Ratings Services lowered all of its ratings of Perrigo, explaining that the downgrade reflected its expectation for, among other things, "weakness in Perrigo's high-margin generic pharmaceutical business, largely resulting from intensifying competition and lower pricing," suggesting that the market considered Perrigo's "high-margin generic pharmaceutical business" to be a primary determinant of the Company's bottom line.

299.    As CEO and CFO, Papa and Brown knew pricing pressures in the generic drug industry were impacting (or were reasonably likely to impact in the near future) Perrigo's Rx segment.  Both Papa and Brown claimed to have personal knowledge of Perrigo's pricing strategy in the Rx segment and the Company's ability to withstand pricing pressures in the generic drug industry.  Further, Papa and Brown had access to information concerning, among other things, the increased competition in the U.S. generic drug market and the FDA's ramped-up approval of generic drug applications.  Indeed, Papa and Brown knew the immense regulatory scrutiny was aimed at driving down the price of generic drugs, which had reached unsustainable levels.  Throughout the Relevant Period, Perrigo maintained a comprehensive list of competitor

companies that had filed ANDAs with the FDA for products that would, if approved, compete with Perrigo's products.  Perrigo was also keenly focused on and monitored the FDA approval process, and thus was aware of when and how drugs would hit the market.  Papa and Brown therefore had access to information concerning applications in the FDA pipeline for generic drugs that would, once approved, rival Perrigo's stable of generics.  At a minimum, Papa and Brown were reckless in falsely stating the Company was "insulated from" negative pricing pressures and was keeping pricing "flat to up slightly" despite those pressures.

300.   *Third*, Perrigo's price collusion with its generic drug rivals exhibited all the hallmarks of fraudulent intent, including:

a.   There were no material increases in demand or production costs or reported supply shortages for Perrigo's generic drugs that would justify or otherwise explain the dramatic and concerted price increases for those drugs and Perrigo's competitors' generic drugs. The more compelling explanation for those price increases is price collusion between Perrigo and its competitors, as evidenced by (i) the sudden and astronomical nature of the increases; (ii) the fact that the increases occurred in concert with Perrigo's competitors; and (iii) the fact that the increases typically occurred shortly after the industry conferences or events attended by Perrigo representatives.  The price increases operated, moreover, as a "one-way ratchet": the drug prices never decreased following the initial price increases to their pre-increase equilibrium price points, as would be expected if the sudden price increases reflected temporary supply shortages, cost increases, or other benign market explanations.

b.   Price increases of the magnitude alleged in this Complaint would have been contrary to Perrigo's economic interest absent an agreement to fix prices.  Without the certainty that all of the co-conspirators would raise and maintain the prices for their generic

drugs, each co-conspirator risked getting undercut by the others, leading to a loss of market share and revenue.  That risk was alleviated by the co-conspirators' agreement to raise and maintain their prices.

    c. Perrigo and the Individual Defendants had a demonstrable motive to fix prices with Perrigo's competitors, which derives from the nature of the U.S. generic drug market itself.  As discussed above, because federal law requires each generic pharmaceutical to be readily substitutable for another generic of the same brand-name drug, competition will cause prices to fall until they near generic drugmakers' marginal production costs.  That is confirmed by the price movements alleged in this Complaint, which show that prior to the price collusion among Perrigo and the co-conspirators, the prices of desonide, clobetasol, econazole, permethrin, tretinoin, and halobetasol propionate had stabilized.  That stabilization of prices in turn caused Perrigo's profits to level off, thus giving Perrigo and its co-conspirators a common motive to conspire to raise prices.

    d. Perrigo and its representatives had substantial opportunities at industry conferences and events to collude on prices.  Given the frequency and regularity of those conferences, there is a strong inference that the various participants in the alleged price-fixing schemes were well-acquainted with each other, bolstering the likelihood that those participants entrusted each other to engage in, and jointly conceal, the illicit price-fixing.

    e. The historic rise in generic drug prices before and during the Relevant Period was well publicized.  Those price increases led Congress to commence an industry-wide investigation beginning in 2014.  That congressional investigation, the subsequent DOJ subpoenas to Perrigo's co-conspirators (including Allergan, Mylan and Taro), and the widespread publicity surrounding the price hikes that spawned those investigations gave rise to a

duty to investigate the existence of price collusion and a duty to monitor changes in Perrigo's generic drug pricing. These duties to investigate and monitor fell upon the Individual Defendants as Perrigo's senior-most executives who were responsible for signing and attesting to the accuracy of the Company's filings with the SEC and addressing market analysts and the investing public during earnings calls. At a minimum, Defendants' false or misleading statements were recklessly made, in dereliction of their duty to investigate perceived anticompetitive behavior and their duty to monitor changes in the pricing of the Company's core products.

f.      The Individual Defendants, who were the Company's senior-most executives, were aware of the historically large price increases and the reasons for them. The Individual Defendants had access to information concerning those price increases. At a minimum, they were reckless in falsely telling investors that the market for Perrigo's generic drugs was truly competitive, without confirming the absence of price collusion.

301.    The fact that the DOJ raided Perrigo's offices in connection with its generic pharmaceutical price-fixing investigation and intervened in three civil antitrust actions against Perrigo after subpoenaing and receiving documents from other generic drug manufacturers strongly suggests that federal prosecutors have determined there is evidence of a criminal conspiracy to fix prices in an anticompetitive manner.

302.    *Fourth*, the Individual Defendants had a palpable motive to engage in the fraudulent conduct alleged in this Complaint, namely, to fend off Mylan's Tender Offer and, by extension, to preserve their lucrative jobs at Perrigo. As reported by Bloomberg in a March 7, 2016 article titled *Perrigo Paid Executives Bonuses for Fending Off Mylan Offers*, following Perrigo's disclosures in a March 4, 2016 preliminary proxy statement, Papa received additional

restricted stock in December 2015 worth $1.5 million at the time and a $500,000 cash bonus. The one-time $2 million payment was made to Papa for his "key contributions related to Mylan's hostile takeover attempt" between April and November 2015, when Perrigo shareholders rejected the Tender Offer. Brown likewise received stock awards valued at $375,000 and a cash bonus for an equal amount.

303. *Fifth*, public statements made by the Individual Defendants during the Relevant Period strongly suggest that each had detailed knowledge of or access to the material facts misstated or concealed by Defendants. The vast majority of Defendants' misrepresentations explicitly or implicitly pertain to the value (or purported lack of value) of Mylan's Tender Offer, Omega's performance and prospects, Perrigo's generic drug pricing, Perrigo's financial guidance, Perrigo's purported organic growth, and the value of the Tysabri royalty stream; and each of the Individual Defendants made statements and fielded questions regarding those subjects during, *inter alia*, earnings calls and investor conferences. In that regard, the Individual Defendants controlled the contents of their statements on behalf of the Company.

304. *Sixth*, Defendants' intent to issue false or misleading financial guidance is evidenced by, among other things, senior management's knowledge of or disregard for the pricing challenges Perrigo faced in the EU market, as detailed above.

305. *Seventh*, as Perrigo's CEO and CFO, Papa and Brown were each provided with, or had access to, copies of the SEC filings alleged in this Complaint to be false or misleading— before or shortly after their issuance—and had the ability and opportunity to prevent their issuance or cause them to be corrected. As CEO and CFO, both Papa and Brown signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") and Exchange Act Rule 13a-14(a) in connection with Perrigo's Forms 10-Q and 10-K filed with the SEC during the Relevant

Period.  They accordingly certified that "the information contained in th[e] [SEC filings] fairly

presents, in all material respects, the financial condition and results of operations of Perrigo,"

and that the Company's SEC filings did "not contain any untrue statement of a material fact or

omit to state a material fact necessary to make the statements made . . . not misleading."  Papa

and Brown accordingly each had a duty to monitor any conduct or information that threatened to

undermine the veracity of those filings, including all material facts concerning the Omega

acquisition and the integration of Omega into Perrigo's business, as well as information

concerning the Company's product pricing, the Company's organic growth, and the value of the

Tysabri royalty stream.  As Perrigo's CEO and CFO, Papa's and Brown's knowledge or

recklessness is imputed to the Company.

306.    *Eighth*, the terminations and resignations of high-ranking executives, including

both of the Individual Defendants, during or shortly after the revelation of the fraud are further

indicia of scienter.

307.    Throughout the Relevant Period, Papa promised an earnings and growth surge for

Perrigo that never materialized.  Once it was revealed that his last major acquisition, Omega, was

in fact detrimental to Perrigo's bottom line, he abruptly and unexpectedly resigned.  As noted

above, "Mad Money" host Jim Cramer, who described certain of Papa's statements during the

Relevant Period as "clearly untrue," likewise questioned Papa's "rapid[]" departure, stating he

thought the business was in "more of decline than we realized" when Perrigo "turned down a

$200 bid from Mylan" under Papa.

308.    Further, immediately upon assuming the position of CEO after Papa's resignation,

Hendrickson also fired Marc Coucke, Omega's business head.  And in July 2016, only three

months after Papa's resignation, Douglas Boothe, the head of Perrigo's Rx segment—which,

contrary to Defendants' representations, was harmed by pricing pressures—abruptly left the Company, even though Hendrickson had characterized Boothe during the May 12, 2015 Earnings Call as "the right person to guide the business in this market [i.e., the generic drug market]" amid those belatedly admitted pressures. Within a year's time, Brown likewise left the Company.

309.     *Ninth*, the sheer size of the impairments taken by Perrigo in connection with or related to Omega strongly indicates Defendants' scienter. In total, Defendants' misrepresentations concerning Omega led to total impairments charge of approximately ***$2.3 billion*** in 2016, or about 50% of the approximately $4.5 billion purchase price for Omega. That includes a $1.67 billion impairment recorded in third quarter of 2016, plus the $652 million in impairments announced on February 18 and May 12, 2016.

310.     The facts collectively demonstrate Defendants knowingly or recklessly concealed from investors key information regarding Perrigo, which caused investors—including Plaintiffs—significant damages.

## XII.   PLAINTIFFS ARE ENTITLED TO A PRESUMPTION OF RELIANCE

311.     Plaintiffs are entitled to a presumption that they relied on Defendants' false or misleading statements during the Relevant Period, as established by the fraud-on-the-market doctrine, because, among other things:

a.     Defendants made public misstatements or failed to disclose material facts during the Relevant Period;

b.     The misstatements and omissions were material;

c.     Perrigo's securities traded in efficient markets;

d.     The misstatements and omissions would induce a reasonable investor to misjudge the value of the Company's securities; and

        e.      Plaintiffs purchased Perrigo securities between the time Defendants misstated or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misstated or omitted facts.

312.    At all relevant times, the market for Perrigo's securities was efficient for the following reasons, among others:

        a.      Perrigo's common stock met the requirements for listing, was liquid, and was listed and actively traded on the NYSE and TASE, highly efficient and automated markets;

        b.      As a regulated issuer, Perrigo filed periodic reports with the SEC and the NYSE;

        c.      Perrigo regularly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

        d.      Perrigo was covered by multiple analysts during the Relevant Period.

313.    As a result of the foregoing, the market for Perrigo's securities promptly digested current information regarding Perrigo from all publicly available sources and reflected such information in the price of Perrigo securities.  Under these circumstances, a presumption of reliance applies.

314.    If the Court ultimately determines the claims asserted in this Complaint are primarily predicated on omissions of material fact for which there was a duty to disclose,

Plaintiffs also are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).[34]

## XIII.  CLAIMS FOR RELIEF

<u>COUNT I</u>

<u>FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT
AND SEC RULE 10b-5
(AGAINST ALL DEFENDANTS)</u>

315.    As detailed in ¶¶ 1-314 above, which Plaintiffs incorporate here by reference, during the Relevant Period Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Relevant Period, did (i) deceive the investing public, including Plaintiffs; and (ii) cause Plaintiffs to purchase Perrigo common stock at artificially inflated prices.

316.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort

---

[34] The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint.  Those statements were not "forward-looking statements," nor were they identified as "forward-looking statements" when made.  Nor was it stated with respect to any of the statements forming the basis of this Complaint that actual results "could differ materially from those projected."  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent the statutory safe harbor does apply to any forward-looking statements pleaded in this Complaint, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew the particular forward-looking statement was false, or the forward-looking statement was authorized or approved by an executive officer of Perrigo who knew those statements were false when made.

to maintain artificially high market prices for Perrigo common stock in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

317.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

318.    During the Relevant Period, Defendants made the false or misleading statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misstatements and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

319.    Defendants had actual knowledge of the misstatements and omissions of material fact set forth in this Complaint, or recklessly disregarded the true facts that were available to them.  Defendants engaged in that misconduct to conceal Perrigo's true condition from the investing public and to support the artificially inflated prices of the Company's stock.

320.    Plaintiffs have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Perrigo common stock.  Plaintiffs would not have purchased the Company's stock at the prices they paid, or at all, had they been aware that the market price for Perrigo common stock had been artificially inflated by Defendants' fraudulent course of conduct.

321.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of the Company's stock during the Relevant Period.

## COUNT II

### FOR VIOLATIONS OF SECTION 14(e) OF THE EXCHANGE ACT
### (AGAINST ALL DEFENDANTS)

322.    Section 14(e) provides: "It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer."

323.    As detailed in ¶¶ 1-314 above, which Plaintiffs incorporate here by reference, Defendants' conduct violated their respective obligations under Section 14(e) because Defendants made the materially false or misleading statements set forth above in connection with Mylan's Tender Offer.

324.    Those misstatements and omissions were material, in that a reasonable investor would have deemed the facts important in determining whether to purchase and tender its shares of Perrigo stock in connection with the Tender Offer.

325.    Defendants intentionally or recklessly engaged in acts, practices, and a course of conduct that was fraudulent, deceptive, or manipulative when issuing their false or misleading statements in violation of Section 14(e) of the Exchange Act.  During the Relevant Period, and while in possession of material adverse, nonpublic information, Defendants used the means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of the national securities exchanges to make the materially false or misleading statements alleged in this Complaint to (i) knowingly or recklessly deceive Perrigo shareholders with respect to Perrigo's operations, business, performance, and prospects; (ii) cause the market price of Perrigo stock to trade above its true value; and (iii) induce a majority of Perrigo shareholders to reject Mylan's

Tender Offer, thereby interfering with Plaintiffs' opportunity, and depriving them of the opportunity, to receive the combination of cash and Mylan stock offered by Mylan through the Tender Offer in exchange for the shares Plaintiffs held as of November 13, 2015, the deadline provided for by the Tender Offer.

326.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their holdings of Perrigo stock as of the expiration of Mylan's Tender Offer on November 13, 2015, because the Tender Offer, which was in large part defeated as the result of Defendants' material misstatements and omissions, would have provided Plaintiffs with substantially more value than holding their Perrigo common stock.

327.     As a direct and proximate result of Defendants' violations of Section 14(e) of the Exchange Act, Plaintiffs were prevented from fairly assessing Mylan's offer, and were deprived of the opportunity to exchange their Perrigo shares for superior compensation in cash and stock. As a result, Plaintiffs incurred significant damages.

## COUNT III

### FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT (AGAINST DEFENDANTS PAPA AND BROWN)

328.     As detailed in ¶¶ 1-314 above, which Plaintiffs incorporate here by reference, from the beginning of the Relevant Period until he departed Perrigo in April 2016, Defendant Papa was the Company's CEO and Chairman of the Board, and was directly involved in the day-to- day management of the Company, including its communications to investors.  As a result, he had the power and ability to control the actions of Perrigo, and acted as a controlling person of Perrigo within the meaning of Section 20(a) of the Exchange Act for all statements and omissions of Perrigo until his resignation, and is liable for Perrigo's violations of the Exchange Act during that time.

329.     As detailed in ¶¶ 1-314 above, which Plaintiffs incorporate here by reference, Defendant Brown was the CFO of Perrigo until she departed the Company in or around April 2017, and signed periodic filings on behalf of Perrigo and certified those filings pursuant to SOX.  As a result, Brown exercised control over Perrigo's selection of accounting treatment, the recording of its financial statements, and its decisions to comply or not comply with GAAP.  By reason of such conduct, Brown was a control person of Perrigo within the meaning of Section 20(a) of the Exchange Act for all statements and omissions of Perrigo, and is liable for Perrigo's violations of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.     Awarding compensatory damages in favor of Plaintiffs against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

B.     Awarding Plaintiffs reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

C.     Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:  April 21, 2020

**ROBINSON MILLER LLC**

By: /s Justin T. Quinn

Justin T. Quinn
110 Edison Place, Suite 302
Newark, NJ 07102
Telephone:  (973) 690-5400
Facsimile: (973) 466-2760
jquinn@rwmlegal.com


**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
Steven E. Fineman
(*pro hac vice* application forthcoming)
Michael J. Miarmi
(*pro hac vice* application forthcoming)
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone:  (212) 355-9500
Facsimile: (212) 355-9592
sfineman@lchb.com
mmiarmi@lchb.com

Richard M. Heimann
(*pro hac vice* application forthcoming)
Sharon M. Lee
(*pro hac vice* application forthcoming)
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone:  (415) 956-1000
Facsimile: (415) 956-1008
rheimann@lchb.com
slee@lchb.com

*Attorneys for Plaintiffs*